```
 1              IN THE UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF TENNESSEE

 3                      AT CHATTANOOGA

 4   ----------------------------------------------------------

 5   UNITED STATES OF AMERICA,        :

 6      Plaintiff,                    :

 7   -vs-                             :    CASE # 1:15-MJ-83

 8   ROBERT DOGGART,                  :

 9      Defendant.                    :

10   ---------------------------------------------------------

11           BE IT REMEMBERED, that the above-styled cause

12   came on for hearing on April 20th, 2015 before the

13   Honorable Susan Lee, Magistrate of said court, where the

14   following evidence was heard, to wit:

15   ---------------------------------------------------------

16

17            E X C E R P T   T E S T I M O N Y

18                      JAMES SMITH

19

20   ---------------------------------------------------------

21

22

23              KRISTY L. RISNER, LCR
                918 AUTUMN WAY LANE
                SIGNAL MOUNTAIN, TENNESSEE 37377
24                (423) 886-2585
                elitereporter@bellsouth.net

25
```

APPEARANCES OF COUNSEL:


            PERRY H. PIPER, ESQUIRE
            U.S. ATTORNEY'S OFFICE
            1110 MARKET STREET, SUITE 515
            CHATTANOOGA, TENNESSEE  37402
            (423)  752-5140

            Appearing for the Plaintiff



            BRYAN HOSS, ESQUIRE
            DAVIS & HOSS
            850 FORT WOOD STREET
            CHATTANOOGA, TENNESSEE  37403
            (423) 825-9747

            Appearing for the Defendant

---------------------------------------------------------

# E X A M I N A T I O N

                                          Page #

Direct Examination by Mr. Piper ------------  3
Cross Examination by Hoss ------------------ 46
Redirect Examination by Piper ------------- 75

# E X H I B I T S

                                 Page #

Exhibit One -------------------------------  6
   (Facebook information returned with
    search warrant)

**JAMES SMITH,**

called as a witness, being first duly sworn, was examined and testified as follows:

**DIRECT EXAMINATION**

BY MR. PIPER:

Q.      Tell us your name, please, sir.

A.      James Smith.

Q.      And will you spell your name for us, please?

A.      J-A-M-E-S  S-M-I-T-H.

Q.      And how are you employed?

A.      I'm employed with the Federal Bureau of Investigation.

Q.      And how long have you been with the FBI, Agent Smith?

A.      Since 2011.

Q.      All right.  Is that your first job in law enforcement?

A.      Yes, it is.

Q.      All right.  Are you one of the case agents on Mr. Doggart's case?

A.      Yes.

Q.      And the affidavit in support of the arrest warrant, was that your affidavit?  Did you sign that?

A.      Yes.

Q.      All right.  And as far as you know, is

1　everything in the affidavit true and correct?

2　　A.　　　Yes.

3　　Q.　　　We've got two different avenues I'd like to

4　discuss with you, Agent Smith; the solicitation to burn

5　the mosque and the interstate communication of threats.

6　Are you familiar with those two charges?

7　　A.　　　Yes, I am.

8　　Q.　　　And I've got right here what I've marked as

9　Government's Exhibit One, which I've given a copy to Mr.

10　Hoss, Your Honor.  Would you --

11　　　　　　THE COURT:  You can use the equipment.

12　　　　　　MR. PIPER:  Thank you.  Thank you, Your

13　Honor.  I was just going to ask Agent Smith to identify

14　it, Judge.

15　　　　　　THE COURT:  That's all right.  I'll be able

16　to see it when you use the equipment.

17　　　　　　MR. PIPER:  Okay.  Fantastic.

18　BY MR. PIPER:

19　　Q.　　　Do you recognize this document, these

20　documents?

21　　A.　　　Yes, I do.

22　　Q.　　　And what is this?

23　　A.　　　This is the Facebook information that was

24　returned from a search warrant.

25　　Q.　　　Okay.  And whose account was it?

1    A.        This was the account for Robert Doggart.

2    Q.        Okay.  And we notice some yellow highlights

3 in there.  Where do those yellow highlights come from?

4    A.        The yellow highlights were communications

5 between Robert Doggart and Chris Powell.

6    Q.        Okay.  Well, did -- I'm sorry.  Did the FBI

7 put the yellow highlights in there?  Do you want me to

8 hand you a copy of it?  Do you have a copy?

9    A.        I do not have a copy of that.

10   Q.        Did you not bring a copy with you?

11             THE COURT:  Why don't you represent -- for

12 the record, Mr. Piper, I doubt there's going to be a big

13 controversy about who highlighted it.

14             MR. PIPER:  Thank you.  I'm sorry, Judge.

15             THE WITNESS:  May I hand this up to him?

16             THE COURT:  Yes.

17             THE WITNESS:  Thank you.

18 BY MR. PIPER:

19   Q.        All right.

20             THE COURT:  And what you've handed to him is

21 what?

22             MR. PIPER:  That's the same as -- that's a

23 copy of Government's Exhibit One, Your Honor.

24             THE COURT:  All right.  Is there any

25 objection to admitting Exhibit One?

1          MR. HOSS:  No, Your Honor.

2          THE COURT:  All right.  It will be admitted

3    without objection.

4          MR. PIPER:  Okay.

5          (Whereupon, said document was received and

6          marked as Exhibit Number One.)

7    BY MR. PIPER:

8     Q.       And there's some yellow highlights in here.

9    There's a lot of -- would it be fair to say there's a lot

10   of conversation in this search warrant return of

11   Mr. Doggart's Facebook page?

12    A.       Yes.

13    Q.       And the yellow highlights were put in by

14   somebody with the FBI.  Is that correct?

15    A.       Yes.

16    Q.       Okay.  And this is a conversation with a

17   fellow named Chris Powell, is that correct; this first

18   one is?

19    A.       Yes, it is.

20    Q.       All right.  Let me see, here.  Here we go.

21   And Mr. Powell is actually located where?

22    A.       Mr. Powell is located in Moss, Tennessee.

23    Q.       Okay.  Just outside of Carthage.  Is that

24   correct?

25    A.       I know it's northeast of Nashville,

1    Tennessee.

2        Q.        All right.  And Mr. Powell and the defendant

3    are having this conversation.  Is that right?

4        A.        Correct.

5        Q.        And the defendant says -- up here, if you'll

6    look at the top one that's highlighted, can you tell who

7    this is from and who is the recipient of it?

8        A.        Yes.  This messaging is authored by Robert

9    Doggart and the recipient is Chris Powell.

10       Q.        Okay.  And again, Powell is in Tennessee, so

11   this is not an interstate communication of threat.  Is

12   that correct?

13       A.        Correct.  Correct.  The two individuals are

14   both in Tennessee.

15       Q.        All right.  But he -- they just talked about

16   an insurrection here.  Is that right?

17       A.        Right.

18       Q.        Mr. Powell says what down here?  Do you see

19   this right here?

20       A.        Yeah.  That's where Mr. Powell just says he's

21   going to do what needs to be done and --

22       Q.        Okay.  And then later Mr. Doggart says what?

23       A.        The next statement there is just you're

24   committing to placing yourself in harm's way without

25   condition, questioning to Chris Powell.  And then he says

1    if that is so, then we are now three.

2       Q.      Okay.  And there's another conversation here

3    between Powell and Mr. Doggart.  Is that right?

4       A.      Yes, there is.

5       Q.      And he -- in this one, again, he talks about

6    going to New York.  Is that correct?

7       A.      Correct.

8       Q.      What's the significance of Hancock, New York?

9       A.      Hancock, New York was a location that was

10   identified where there is a community called Islamberg.

11   It is a Muslim community.

12      Q.      Okay.  And he talks about taking what with

13   him?  You would need what?

14      A.      Coming to New York, you would need to bring a

15   long gun, an M-4, M-16, or AR-15.

16      Q.      Okay.  And what else would he need with that

17   M4?

18      A.      Along with that would be visual night-sights

19   and/or magnification devices.

20      Q.      Okay.

21      A.      And ammunition.

22      Q.      Okay.  And how much ammunition is he talking

23   about there?

24      A.      Approximately, greater than 500 rounds.

25      Q.      Okay.  Loaded for what?

1    A.        Loaded in magazines for rapid deployment.

2    Q.        Okay.  And he talks about an alternative to

3  Mr. Powell going.  Is that correct?

4    A.        Correct.

5    Q.        And who would that be?

6    A.        That was another individual by the name of

7  Sangre de Lobo, or Chris Davis, both from Texas.

8    Q.        All right.  Sangre de Lobo, is that the CS --

9    A.        Yes --

10   Q.        -- in this case?

11   A.        Yes.

12   Q.        The confidential source?

13   A.        Yes.

14   Q.        All right.  Shane Schielein here on page 154

15  of Government's Exhibit One, do you see his name?

16   A.        Yes.

17   Q.        Did Mr. Schielein ultimately arrive in

18  Chattanooga?

19   A.        Yes, he did arrive in Chattanooga.

20   Q.        That was last week?  Or, actually, I guess --

21   A.        The week before.

22   Q.        Yeah.  And what happened?

23   A.        He arrived and did set up a meeting where

24  he met with Mr. Robert Doggart, and the CS, and Sally

25  McNaulty.  (Phonetically.)

1    Q.      Okay.  Let me invite your attention to this
2 fact.  It was actually the CS that set up the meeting,
3 was it not, not Shane Schielein?
4    A.      Correct.
5    Q.      Schielein is spelled S-C-H-I-E-L-E-I-N?  Is
6 that right?
7    A.      Correct.
8    Q.      All right.  And the CS set up the meeting.
9 Is that correct?
10    A.      Correct.
11    Q.      Do you know about a Facebook page called
12 American Reapers?
13    A.      Yes, I do.
14    Q.      Explain that to the Court, if you would.
15    A.      American Reapers is a private Facebook group,
16 meaning that you can only see or join the group if you
17 are brought in by invitation.
18    Q.      Okay.  And is Mr. Doggart a member of
19 American Reapers?
20    A.      Yes, Mr. Doggart is a member of American
21 Reapers.
22    Q.      And what is American Reapers' mission
23 statement?  Or just roughly, just --
24    A.      American Reapers is a group of -- against --
25    Q.      Is it militia members?

1    A.       It's a militia-type group.

2    Q.       Okay.

3    A.       Not anti-government but against many actions

4  of the Government of the United States.

5    Q.       Okay.  And there's nothing illegal about

6  that?

7    A.       No, there's not.

8    Q.       First Amendment right to do that.  Shane

9  Schielein is also a member of American Reapers?

10   A.       Correct, he is.

11   Q.       Okay.  Down here we've got on page 161 of

12 Government's Exhibit One, the author is whom?

13   A.       The author is Robert Doggart.

14   Q.       And the recipient?

15   A.       The recipient is Shane Schielein.

16   Q.       Okay.  And they talk about what?

17   A.       They're discussing the type of action,

18 whether they were going to attack an embassy, consulate,

19 or a hostile jihadist camp, soft targets in the USA.  And

20 then Shane is also pondering this and saying all three

21 would be ideal.

22   Q.       Okay.  And by the way, where is Shane

23 Schielein located?

24   A.       Shane Schielein is located in an area near

25 Peoria, Illinois.

1    Q.       Okay.  And again, on page 163, do you see

2  this right here?  This is from Mr. Doggart.  Is that

3  right?

4    A.       Yes, it is.

5    Q.       Again, to Mr. Schielein.  Is that correct?

6    A.       Correct.

7    Q.       They talk about what force of arms we would

8  need.  Is that right?

9    A.       Yes.

10    Q.       And also -- they also talk about -- down

11  here, what's this thing about secure coms that

12  Mr. Schielein --

13    A.       Mr. Schielein was trying to have Mr. Robert

14  Doggart use secure communications instead of speaking

15  over the telephone or openly over the internet.

16    Q.       Okay.

17    A.       And Mr. Schielein was using private

18  applications on his telephone.

19    Q.       Okay.  That's supposedly impossible to trace,

20  or tap, or --

21    A.       Correct.

22    Q.       -- retrieve.  Is that correct?

23    A.       Correct.

24    Q.       Okay.  Let's look here.  Mr. Doggart gets a

25  message from Shane Schielein, is that right, at the top?

1    A.        Yes.

2    Q.        Page 167?

3    A.        Correct.

4    Q.        And what is he saying?

5    A.        That he has a commitment from Shane to

6  Mr. Robert Doggart and there's one in a group of five --

7  he's discussing the group of five for the action in New

8  York and Shane is saying that one of those group cannot

9  be trusted.

10   Q.        And down here he identifies that person.  Is

11  that correct?

12   A.        Correct.  He identifies Kevin Sturdevant as

13  someone -- not being someone you can trust.

14   Q.        Says he's a mental mess.  Is that correct?

15   A.        Correct.

16   Q.        That's what Schielein is saying to Mr.

17  Doggart on this --

18   A.        Schielein says to Mr. Doggart that Kevin

19  Sturdevant is a mental mess.

20   Q.        Okay.  Down here, Mr. Doggart sends a message

21  to Schielein and identifies Chris Powell as somebody

22  that's in.  Is that correct?

23   A.        Correct.  To Shane Schielein he says Chris

24  Powell is still in and himself, so far.

25   Q.        Okay.  And that was the fellow we talked

1  about before, Chris Powell, the guy --

2      A.       Chris Powell is --

3      Q.       -- that's northeast of Nashville?

4      A.       Correct.

5      Q.       In Moss, Tennessee?

6      A.       Correct.

7      Q.       Okay.  Okay.  Another message from Doggart to

8  Schielein, can you call me later today.  Do you see that?

9      A.       Yes, I do.

10     Q.       I think an action is warranted soon.  Do you

11 see that?

12     A.       Yes.

13     Q.       And do you -- and it talks about a worthy

14 target right there below the highlight?  Right there

15 below the highlight.

16     A.       Right.

17     Q.       Do you see it?

18     A.       Yes, I do.

19     Q.       I have a worthy target.  This conversation

20 here at the bottom of page 170, Mr. Doggart is the

21 author.  Can you read that?

22     A.       Yes.  Yes.  In the next few days or weeks,

23 there should be an action that we must commit to.

24     Q.       Okay.  Next page?

25     A.       Irrespective of the continuance of our

earthly lives.  So what do you plan, need, or require of

support from me.  And then he provides the date, '03

March 2015 is just around the corner.

Q.      Okay.  Okay.  And that's to Schielein.  Is

that correct?

A.      That is to Shane Schielein.

Q.      Okay.  Down here is Tom Lineaweaver.  Do you

see this?

A.      Yes.

Q.      And Mr. -- it's from Mr. Doggart.  Is that

right?

A.      Yes, it is.

Q.      All that is needed is what?  Do you see that

right there?

A.      All that is needed is a flashpoint.  If

necessary, Papa-Oscar-November 26th.  Target three is an

absolute enemy of our nation.

Q.      Okay.  Have you -- has the research or your

investigation revealed what target three is?

A.      Yes.  Based on our research and

investigation, Papa-Oscar-November 26th, target three was

the Hancock, New York/Islamberg location.

Q.      Okay.  Okay.  And he talks about people being

killed in the service for which the Constitution

intended.  Do you see that?

1    A.        Yes.

2    Q.        Okay.  The next one is on page 176, and this

3  is to a fellow, apparently, named Kelly Gardner.  Do you

4  see it?

5    A.        Yes, I do.

6    Q.        Okay.  And let's talk about what Mr. Doggart

7  says.

8    A.        Yes.  Mr. Robert Doggart back to Kelly Linda

9  Gardner, it says this action would be intended to cause a

10  flashpoint, lending the way for other militias to include

11  themselves in a most committed manner.  And then the

12  timing and targets have been identified for entire

13  destruction and mortality in order to demonstrate that

14  the actions of the American Patriots shall require

15  attention.

16            This will be a complicated intrusion upon

17  hate groups that wish for America to be subjugated to the

18  forces of other nations.  It is our intent to set these

19  organizations down with a casualty ratio of greater than

20  30 to one.

21            If you may wish to consider a level of

22  participation, I ask that you respond by PM with your

23  gunnery skills and assets at your disposal.  Please do

24  that and state it in detail.

25    Q.        Okay.  And then Mr. Gardner says down here

1   what?

2      A.      Mr. Gardner responds to Mr. Doggart, I'm a

3   qualified expert on rifle, M16, and pistol, and .45 by

4   the army.  I have over 20 years of service with active

5   and reserve time in the army.  I currently don't have any

6   viable weapons.  I live in Citrus County, Florida.

7      Q.      Okay.  That's good.  So this is a

8   conversation that is occurring between Mr. Doggart and --

9   who lives where, by the way?

10     A.      Mr. Doggart lives in Signal Mountain,

11  Tennessee.

12     Q.      Okay.  In Sequatchie County?

13     A.      In Sequatchie County, Tennessee.

14     Q.      Okay.  And this fellow here is in Citrus

15  County, Florida.  Is that right?

16     A.      Correct.

17     Q.      By the way, the 30 to one ratio, is that

18  a theme that you see over and over throughout the

19  investigation?

20     A.      That is a consistent theme that does come up

21  on other occasions.

22     Q.      Explain to the Court what this means.

23     A.      The 30 to one ratio is just a discussion when

24  attacking a target and fighting against an enemy that the

25  individual would be able to take out 30 targets.

```
1    Q.        Before he, himself, would be --

2    A.        Before he, himself, would be taken out.

3    Q.        Okay.

4              THE COURT:  And in that discussion is target

5    considered property or human?

6              THE WITNESS:  Human.  Human targets.

7    BY MR. PIPER:

8    Q.        Okay.  Down here another message to Chris --

9    a fellow named Chris Davis.  Is that correct?

10   A.        Yes.

11   Q.        On page 178.  We already saw where Mr.

12   Doggart identified Chris Davis as being a fellow in

13   Texas.  Is that right?

14   A.        Correct.

15   Q.        Read what Mr. Doggart says here.

16   A.        Mr. Doggart says to Chris Davis, Mr. Davis

17   and the other seven of us, now hear this, PON-26, target

18   three intelligence gathered.  Action imminent.  You must

19   all be capable of traveling to the designated meeting

20   location.  You must be capable of individual or group

21   operations, provisioned by yourselves.  Attack approach

22   L.

23   Q.        Go ahead and read the rest of that, too.

24   A.        There are others attempting to dissuade this

25   action.  I will move alone if necessary.  Do not respond
```

1   to this message.  Further instructions to follow.

2   Remember, we are warriors that have no fear.  Who is not

3   ready?  Respectfully, that is all.

4      Q.      Okay and then Mr. Davis says -- no, that's

5   not correct.  It's a fellow named Jordan Brown.  Do you

6   see this?

7      A.      Yes, I do.

8              MR. HOSS:  What page?

9              MR. PIPER:  I'm sorry, page 178 and 179.

10  BY MR. PIPER:

11     Q.      The bottom of page 178, the top of page 179,

12  Mr. Brown says what?

13     A.      Mr. Jordan Brown to Mr. Robert Doggart, it

14  says, Mr. Doggart, you've got my support.  What's going

15  on?

16     Q.      Okay.  There's a fellow named Pinkerton down

17  here.  Do you see this?

18     A.      Yes, sir.

19     Q.      Okay.  What's he say?

20     A.      Mr. Pinkerton says to Mr. Doggart,

21  47-year-old expert rifle, expert bow, Oregon, and (541)

22  513-3420.

23     Q.      Okay.  And Pinkerton's name appears again.

24  Is that correct?

25     A.      Yes, it does.

1    Q.      Okay.  And Mr. Doggart responds on the bottom
2  of page 179 there.  Do you see that?
3    A.      Yes.
4    Q.      What does he say that's highlighted?
5    A.      Yeah.  Mr. Doggart responds to Mr. Pinkerton,
6  it is good that volunteers from around the nation are
7  stepping up to begin a very difficult decision on all our
8  persons, but it is the righteous action to take.  I have
9  added your name to the manifest of members.
10          Our flight shall not last long, for the
11 volunteers who are contacting me are qualified in many
12 areas of combat.  If we must move, I shall arrange for
13 legal representation to assure that we are not vilified
14 among the liberal press, for they will certainly try.
15   Q.      Okay.  And then down here, Mr. Doggart says
16 to Mr. Pinkerton, again?
17   A.      Mr. Doggart says to Mr. Pinkerton,
18 location/date is known to all except two.  Intelligence
19 is being gathered at this time.  Confidentiality is
20 essential.
21   Q.      All right.  Down here at the bottom of page
22 182, do you see that?
23   A.      Yes, sir.
24   Q.      Read that for us, please.
25   A.      You're talking about with the --

 1    Q.        Highlight, Ms. Harris, Mr. Rizzo.

 2    A.        Okay.  I have it.  Thank you.  From Mr.

 3  Doggart to Brandy Harris, Ms. Harris/Mr. Rizzo, I shall

 4  agree to await your actions if that is why you are

 5  attempting to contact me.  Make no mistake, though, I

 6  shall move on my own completely independent of any other

 7  organization, as a gorilla fighter.

 8            I have not been able to download the RedPhone

 9  application.  I ask that you not be offended by what must

10  appear nonresponsiveness on my part.

11    Q.        Okay.  And the RedPhone application was, in

12  fact, the application that was the secure communications

13  that Mr. Schielein -- one of the types of secure

14  communications.  Is that right?

15    A.        That's our understanding.  It's some type of

16  secure communication type of application.

17    Q.        Down here, author Robert Doggart to four

18  other individuals -- actually, not true, three other

19  individuals.  No, there are four.  I'm sorry.  Do you see

20  that?

21    A.        Yes, sir.

22    Q.        Shane Schielein, Jim Roark, R-O-A-R-K, Kevin

23  Sturdevant, and Chris Powell.  Is that right?

24    A.        Yes, sir.

25    Q.        Read the second one here, if you will.

1      A.      So Mr. Doggart says, so I must know if you

2 are willing, able, and have the resources to be named

3 after you commit to carry out carefully-considered

4 attacks at three targets here in our own beloved nation.

5 They are FEMA, jihadists, and foreign consulates of

6 certain countries, that are the foreign and domestic

7 enemies of the Constitution of the United States and her

8 people.

9      Q.      Then down here, the last one from Chris

10 Powell?

11      A.      Chris Powell says I'm good to go, have a few

12 targets in mind, myself, still have recon to do.

13      Q.      Okay.  And right here, Mr. Doggart responds?

14      A.      Mr. Doggart responds excellent, any

15 intelligence you can gather before our in-person meeting

16 will be most helpful.  Bring maps.  Our reconnoiter

17 activities are essential to our success, which will be

18 Americas's success.

19      Q.      Okay.  Reconnoiter, I think, is a somewhat,

20 perhaps, archaic term, or reconnaissance or surveillance.

21 Is that correct?

22      A.      Correct.

23      Q.      See this down here, the next one for Mr.

24 Doggart to a fellow of the name E.J. Laughter?

25      A.      Yes, sir.

1    Q.        Read that highlighted portion for us.

2    A.        Mr. Doggart says I am an American Patriot and

3   now command a battalion of a militia.  I do not believe

4   you are aware of how close this nation is to civil

5   insurrection.  I do not want this to occur; but if so,

6   we 50 --

7    Q.        Millimeter?

8    A.        -- millimeter patriot gunners shall carry the

9   day.  Our enemies around the world shall be watching us

10  for any chance to attack.  Our submarine force will not

11  permit this to happen.

12   Q.        Okay.  Submarine force seems to be a bit of a

13  non sequitur here.  Is that correct?

14   A.        Correct.

15   Q.        Have you heard Mr. Doggart on the Title III

16  wiretap discuss submarine captains and other things that

17  he thinks are happening with submarines?

18   A.        Correct.  Yes, sir.

19   Q.        Do you know if anything is happening with our

20  submarines?  Our submarine commanders are being relieved,

21  as Mr. Doggart said on the wire, or is that --

22   A.        I am not aware of it, but he did speak of

23  that matter.

24   Q.        Okay.  And you are aware that there was a

25  wiretap in this case, were you not?

1    A.        Yes, sir.

2    Q.        You are the affiant for the wire.  Is that

3  correct?

4    A.        Yes, sir.

5              MR. PIPER:  Your Honor, for the record, I

6  will note that I have provided Mr. Hoss this morning with

7  the affidavit to the wiretap.  It is still under seal.

8  I have not had it unsealed, yet, and I need to do that.

9              But out of an abundance of caution, knowing

10  that Agent Smith was going to testify today, I provided

11  that to Mr. Hoss this morning.

12             THE COURT:  Well, this is a public hearing.

13  So are you moving to unseal the complaint and the

14  affidavit at this point, which would seem to --

15             MR. PIPER:  I'm sure the Judge -- moving to

16  unseal the complaint and the affidavit is probably a

17  foregone conclusion is my guess, Judge.

18             THE COURT:  All right.  Well, that will be

19  granted without objection if that's what you're doing.  I

20  can't tell.

21             MR. PIPER:  Well, I'm not eager to move to

22  unseal it, Your Honor.  I don't know that there is any

23  reason for me to unseal it at this point.

24             THE COURT:  My point is this is a public

25  hearing.

1            MR. PIPER: I understand that, Your Honor.

2            THE COURT: And you just made these

3 communications part of the public record as Exhibit One.

4 Now, whether anybody would know to come and ask for them

5 and get them, I don't know.

6            But if you're not moving to unseal the

7 criminal complaint, I guess I need -- I'll need to hear

8 why at some point. We don't necessarily need to do it

9 right now, though.

10            MR. PIPER: Okay.

11            THE COURT: Even though it's a public

12 hearing, there might be reasons that you don't want to

13 unseal it.

14            MR. PIPER: Well, it's an ongoing

15 investigation, Your Honor. I've already spoken to

16 Mr. Hoss on three occasions about this. I think that

17 maybe the Court would make the ultimate decision and it

18 wouldn't be up to the parties, but --

19            THE COURT: Well, if there is a motion

20 made -- is anybody moving to unseal it at this point?

21            MR. PIPER: I'm not, Your Honor.

22            THE COURT: Mr. Hoss isn't moving to unseal

23 it at this point, apparently. But there are -- I mean,

24 I don't know who is in the audience of this group or

25 not.

1              MR. PIPER:  I'm guessing it's some of

2     Mr. Doggart's family members, Your Honor, and one legal

3     assistant from the U.S. Attorney's office.

4              THE COURT:  What was your question to the

5     witness?

6              MR. PIPER:  I can't remember at this point,

7     Your Honor.

8              THE COURT:  All right.  Well, then let's move

9     on to the next one.

10             MR. PIPER:  Thank you.

11             THE COURT:  I think you --

12             MR. PIPER:  Oh, I know what it was, Judge.

13    I was informing the Court that I had turned over the

14    affidavit --

15             THE COURT:  Correct.

16             MR. PIPER:  -- to Mr. Hoss, and the

17    application, and the order, which is required under 18

18    USC Section 2518.

19             THE COURT:  I don't know what Judge Carter's

20    sealing order said.  I don't know if it allowed that or

21    not.

22             MR. PIPER:  Allowed to turn over the

23    affidavit?

24             THE COURT:  Right.  Typically --

25             MR. PIPER:  I doubt that it did, Judge.

THE COURT: Typically, it just says that, you know, you all get a copy. So are you wanting to make a, shall we call it, a nunc pro tunc approval of that?

MR. PIPER: Well, that -- well, I know --

THE COURT: Because it's required.

MR. PIPER: I know the arrest affidavit was under seal and it remained under seal a week ago Friday, ten days ago. No, it was last Monday, I'm sorry, seven days. There's no question that's true. The Title III affidavit, Your Honor, is signed by Judge Mattice, as the Court is well aware.

THE COURT: Right. I'm trying to find where the order was made sealing the criminal complaint, which is what the affidavit was attached to.

MR. PIPER: The affidavit for arrest, Your Honor, I think we're talking --

THE COURT: Yeah, I think we are. Are you talking about you turned over the affidavit for the Title III?

MR. PIPER: I am, Your Honor.

THE COURT: All right. Well, that sounds like it's going to be between you and Judge Mattice at some point.

MR. PIPER: Thank you, Your Honor. I'm just trying to make the Court aware.

THE COURT:  What about the affidavit for the complaint?

MR. PIPER:  And it was under seal, Your Honor, and I asked Judge Carter to keep it under seal. Neither party moved to have it under sealed last Monday.

MR. HOSS:  By design.

THE COURT:  Yes, I'm sure that's by design. But at some point, I -- I'll need to hear what is the basis for -- I don't have -- in the record, apparently, there is no order, other than the one that was -- at least, the clerk's office is saying there's no order sealing it.

MR. PIPER:  Well, Judge, I think it was under seal when it was submitted, and there was no order unsealing it.

THE COURT:  Well, that's what I'm looking for, and I'm not finding that order.  I'm seeing where Mr. Smith, or Agent Smith, asked for it.

MR. PIPER:  And it was -- it was written on affidavit -- I'm sorry, on the application and the complaint.  On the arrest warrant and the complaint, it says under seal.

THE COURT:  Well, yeah, I agree.  There's no basis for why it is under seal.  There is no order. There's a request for it to be under seal.  I believe you

1  when you say it was the intent of Judge Carter to have it

2  filed under seal.  All right.  I don't -- I don't think

3  there is dispute about that.

4          It looks like the reasoning for it was,

5  that it should be sealed, due to the nature of the

6  investigation.  When is your plan about presenting this,

7  assuming you make a probable cause showing to the grand

8  jury?

9          MR. PIPER:  April 28th, I think, is the next

10 grand jury, Judge.

11         THE COURT:  So next Tuesday?

12         MR. PIPER:  A week from tomorrow, yes, ma'am.

13         THE COURT:  It sounds like you have the

14 Title III issue and you have this sealed issue.

15         MR. PIPER:  Thank you.

16         THE COURT:  Are there any other questions for

17 Agent Smith before we turn it over to Mr. Hoss?

18         MR. PIPER:  No, I have some more questions,

19 Your Honor.

20         THE COURT:  Okay.

21         MR. PIPER:  Thank you.

22 BY MR. PIPER:

23   Q.      Agent Smith, has the defendant spoken with

24 other people about the threat to burn the mosque, or

25 burning of the mosque?

1    A.        Yes, he has.

2    Q.        And this is -- I think you've got some

3 handwritten notes on here, but can you see who this is to

4 right here?

5    A.        That transcript is with Anita Gaunt.

6 (Phonetically.)

7    Q.        And who do we think Anita or Nita is?

8    A.        We understand that that is Mr. Doggart's

9 sister.

10    Q.        Okay.  And this occurred on March 17th.  Is

11 that correct?

12    A.        March 17th of this year.

13    Q.        Okay.  And Mr. Doggart says what here in the

14 highlighted portion?

15               THE COURT:  Let me understand this.  I'm

16 sorry, I -- I see some blue handwritten ink on here.  I

17 assume that's not --

18               MR. PIPER:  No, it's his notes, Your Honor.

19               THE COURT:  Agent Smith's notes?

20               MR. PIPER:  Uh-huh.

21               THE COURT:  Okay.  So this is now a

22 communication between the defendant and his sister?

23               MR. PIPER:  Yes.  I'm sorry.

24 BY MR. PIPER:

25    Q.        Picked up off the wire.  Is that correct?

     A.      Correct.  This was picked up with the wire,
with the T-3.

               THE COURT:  Okay.  So are we off of Exhibit
One, now?

               MR. PIPER:  We are, Your Honor.

               THE COURT:  All right.  Do you want to
provide that?

               THE WITNESS:  Yes, ma'am.

               THE COURT:  Although, I think probably you
have the marked copy.

               MR. PIPER:  I do have the marked copy, Your
Honor, and I'll be happy to hand --

               THE COURT:  Do you want this copy back?  All
right.  Mr. Piper, I've got a clip if you can't find one.

               All right.  And so now what you are showing
the witness is what somebody at the FBI claims is a
transcription of the wiretap, right?
BY MR. PIPER:

     Q.      This is a line sheet, is it not, Agent Smith?

     A.      Yes, it is.

     Q.      And when monitors are listening to
conversations, they try to type and then go back and
listen and try to fill it in?

     A.      Right.  This is a rough draft transcript.

     Q.      Rough draft, thank you.

1           THE COURT:   Thank you.

2   BY MR. PIPER:

3       Q.      And this unidentified female is a lady named

4   Anita or Nita.   Is that correct?

5       A.      Correct.

6       Q.      And what does the defendant say to her?

7       A.      Mr. Doggart says, well, I've got all my

8   documents here for the little plan up in New York.  Yeah,

9   I told the guys today, I said, you know, we're not going

10  up there to kill people, that's not what we're going up

11  there for.  We're going up there to burn down a school, a

12  mosque, and a cafeteria.  That's our objective.  And that

13  way they will be nonfunctional.

14      Q.      Okay.  And then this is a call to a lady

15  named Dot.  Is that correct?

16      A.      Correct.

17      Q.      And who do we believe Dot is?

18      A.      We understand Dot to be an ex-mother-in-law.

19      Q.      An ex-mother-in-law?  Is that correct?

20      A.      Ex-mother-in-law of Mr. Doggart.

21      Q.      And what does he say down here?

22      A.      Mr. Doggart said I'm just trying to keep up

23  with my emails.  I've got this battalion that I command

24  and they want to go up to a place and take action.

25  There's all these people all over the country that want

1    to start what we call a flashpoint.  A flashpoint is --

2    and it's unintelligible.  So sick and tired of the crap

3    that the government is pulling that we go take a small

4    military installation or we go burn down a Muslim church,

5    or something like that.

6        Q.        I think it's important for the record to

7    establish that we don't believe Nita or Dot are a part of

8    this.  Is that right?

9        A.        Correct, we do not.

10       Q.        He's just talking to them about what his

11   plans are.  Is that correct?

12       A.        Correct.

13       Q.        This is to CS-1.  Is that right?  This is

14   another phone call on a line sheet?

15       A.        Correct.  This is a phone call from Mr.

16   Doggart to the confidential source.

17       Q.        All right.  Tell us about that.

18       A.        Yeah, I downloaded photographs of the

19   property and I think that I have identified the three

20   targets besides the people, and the three targets are the

21   mosque, the kitchen, and the school.  While I don't think

22   we have to worry about anything else, the rest of that

23   stuff won't make any difference if they don't have their

24   mosque, their kitchen, and their school.

25       Q.        Okay.  Now, are you aware that Mr. Doggart

1 and CS-1 met in Nashville, Tennessee?

2     A.     Yes, sir. They --

3     Q.     Okay. And that's included in your affidavit,

4 is it not?

5     A.     Yes, sir.

6     Q.     And did they talk about at that -- how long

7 did that meeting last?

8     A.     That meeting was, approximately, four hours.

9     Q.     Okay.

10     A.     Three-and-a-half to four hours.

11     Q.     Part of that was lunch. Is that right?

12     A.     Correct.

13     Q.     And then they went to where after lunch?

14     A.     To a hotel room.

15     Q.     Okay. Did Mr. Doggart have anything when

16 they went to the hotel room?

17     A.     When they went to the hotel room, Mr. Doggart

18 had his weapons with him, which included a shotgun, an

19 M-4 type assault rifle, a handgun, and then other

20 documents, papers, that included Google satellite

21 pictures of the --

22     Q.     Of what?

23     A.     -- those pictures were of the

24 Islamberg/Hancock, New York area, just the overview

25 satellite images, documents that were the New York State

gun laws, as far as reciprocation and carrying weapons across state lines. Also, included were all of the individuals who were in the government of the Delaware County, which it covers Hancock, New York and Islamberg as --

Q.      Okay.

A.      -- far as the mayor, the law enforcement officials. And then there was also a map document that showed the distance and the route to travel from Signal Mountain, Tennessee to the Hancock, New York/Islamberg area.

Q.      What was the purpose -- when CS-1 and Mr. Doggart met in Nashville, was this a monitored and recorded conversation?

A.      Yes, it was.

Q.      What was the purpose of them meeting?

A.      The purpose of the meeting was to discuss the planning for the reconnaissance and attack that would occur in Hancock, New York.

Q.      Okay. And did that, in fact, occur? Did they discuss the reconnaissance and various plans of attack for Islamberg?

A.      Yes.

Q.      All right. And did Mr. Doggart go so far as to point out buildings on the map?

A.        Yes.  On the overhead images, he pointed out the locations of what he believed to be the school, the cafeteria, and the mosque.

Q.        All right.  On Thursday before the arrest of the defendant occurred, was there a meeting that took place at the City Cafe?

A.        Yes, there was.

Q.        And who attended that meeting?

A.        At that meeting was Mr. Robert Doggart, the confidential source, Shane Schielein, and Sally McNaulty.

Q.        Okay.  And Ms. McNaulty is either the mother or surrogate mother of Mr. Schielein?

A.        We understand her to be a surrogate mother figure for Shane Schielein.

Q.        And he's from Peoria.  Is that correct?

A.        Correct.

Q.        Schielein had actually been in Chattanooga the week before, too -- is that right -- from Peoria?

A.        Correct.

Q.        And he came back the following week.  Is that right?

A.        Correct.

Q.        The week before, he did not see Mr. Doggart. Is that correct?

A.        No, he did not.

1    Q.        All right.  So they meet at the City Cafe.

2  And what do they discuss, generally?

3    A.        Generally, they just review the

4  reconnaissance that needs to occur, and the attack on

5  the mosque, and attacking that location, and what's

6  necessary.

7    Q.        Mr. Schielein does not commit to doing this

8  at that point.  Is that right?

9    A.        No, he does not.

10    Q.        He says give me a day or two to think about

11  it?

12    A.        Right.

13    Q.        And, of course, the CS is acting like he

14  wants to do it.  Is that correct?

15    A.        Correct.

16    Q.        And Ms. McNaulty, I guess, is an innocent

17  bystander here, somewhat.  Is that right?

18    A.        Correct.

19    Q.        After that meeting occurred, did the

20  defendant call a fellow in South Carolina that night?

21    A.        Yes, he did contact --

22    Q.        And who was that guy in South Carolina that

23  he called?

24    A.        In South Carolina is William Tent.

25    Q.        Okay.  And prior to this entire incident,

1    Mr. Doggart had driven to Greenville, South Carolina.

2    Is that correct?

3        A.        That is correct.

4        Q.        To see whom?

5        A.        To see William Tent.

6        Q.        And who else?

7        A.        Along with his daughter.

8        Q.        And grandchildren?

9        A.        And grandchildren.

10                 THE COURT:  Who is that, Mr. Tent's

11   grandchildren?

12   BY MR. PIPER:

13       Q.        No.  Mr. Doggart's daughter and grandchildren

14   live near Greenville, South Carolina.  Isn't that

15   correct?

16       A.        Correct.

17       Q.        And so he had a two-fold purpose for going to

18   the Greenville area.  Is that right?

19       A.        Correct.

20       Q.        And did he ultimately see his daughter and

21   grandchildren?

22       A.        Yes, he did.

23       Q.        Y'all were surveying him during this

24   encounter.  Is that right?

25       A.        Yes, sir.

Q.      And were still up on the Title III.  Is that
right?

A.      Yes, sir.

Q.      Did Mr. Tent and Mr. Doggart meet during that
encounter, during his trip to Greenville, South Carolina?
Do you recall?

A.      No, they did not.

Q.      All right.  Prior to that, did Mr. Tent and
Mr. Doggart discuss going to Hancock, New York, going to
Islamberg?

A.      Yes, they did.

Q.      And what did they discuss, generally
speaking?

A.      They discussed the targets at that location
and what was needed as far as to destroy those buildings,
and discussing the need for demolition.

Q.      Okay.  And what did Mr. Tent say?

A.      Mr. Tent, initially, said he had an EOD guy
and described that as a demolition guy, and then he later
described himself as the demolition guy.

Q.      Okay.  He was the EOD guy; that's what Tent
said?

A.      Correct.

Q.      All right.  But they did meet in Greenville.
Is that right?

```
1    A.        No, they did not.

2    Q.        Mr. Doggart came back home?

3    A.        Yes, he did.

4    Q.        By the way, when Mr. Doggart went to

5    Greenville, did he stay with his daughter, or did he stay

6    in a hotel, or motel?

7    A.        He stayed in a hotel.

8    Q.        Okay.  Did he carry firearms with him on that

9    trip?

10   A.        Yes, he did carry firearms.

11   Q.        What kind of firearms?

12   A.        A shotgun, a pistol, handgun, and we believe

13   an M-4 style --

14   Q.        Okay.

15   A.        -- assault type weapon.

16   Q.        So he had two long weapons and we think a

17   handgun.  Is that right?

18   A.        That's my understanding.

19   Q.        Mr. Doggart, does he state on the wire that

20   he always -- he goes everywhere armed?  Is that correct?

21   A.        Yes.

22   Q.        So does he say if he ever goes anywhere that

23   he's not armed?

24   A.        I know he does discuss being armed.

25   Q.        Okay.  He has a carry permit.  Is that right?
```

A.      And he does have a legal carry permit.

Q.      Okay.  Does he have a carry permit for an M-4 type weapon or the shotgun, to carry it around?

A.      The permit for Tennessee is a handgun permit for the state of Tennessee.

Q.      Okay.  But he carried the M-4 type weapon and the shotgun to South Carolina, as well?

A.      Correct.  That's my understanding.

Q.      And he put that in the hotel room?

A.      Yes, sir.  That's my understanding from the surveillance.

Q.      All right.  After he gets back -- let's go back to the City Cafe.  After the meeting at the City Cafe, does he make a call to Tent that night?

A.      The phone call is that evening, or that night, to Mr. Tent in South Carolina from Mr. Doggart.

Q.      Okay.  Do you have a copy of the affidavit in front of you?

A.      Yes, sir.

Q.      The arrest affidavit?

A.      Yes, sir.

Q.      Okay.  Turn to page 7, if you would, paragraph 13.  Okay.  And that's on April 9th.  Is that correct?

A.      Yes, it is.

Q.      Tell us what Mr. Doggart said to Mr. Tent.
During the call?

A.      I'm sorry, I'm just getting down to the part.
During the call, Mr. Doggart stated that he would be
traveling by himself to Hancock, New York to conduct
surveillance.  Doggart claimed that the two needed to be
careful when speaking on the phone about the plan.

         Doggart asked the individual if he still had
his other specialist fellow who had materials to make
fireworks.  The individual replied in the affirmative.

Q.      Okay.  And the individual, we just don't
identify Tent in the affidavit, but that's who that is.
Is that correct?

A.      Correct.  That phone call was to William
Tent.

Q.      So Tent tells Doggart that he has this guy
that can make fireworks.  Is that right?

A.      Correct.

Q.      Now, fireworks -- Mr. Doggart, in fairness,
doesn't really try to hide his language on the wire
through about 26 days of interception, does he?

A.      No.

Q.      I mean, this is -- this is the next to the
last day before we take it down, and he uses somewhat of
a code.  Although, it's probably not a hard code to

1  break, is it, fireworks?

2      A.      Right.  I mean, we inferred that the

3  fireworks referred to their previous conversations which

4  discussed the explosives.

5      Q.      Okay.  Right.  And Mr. Tent said he did have

6  somebody that could do the fireworks.  Is that correct?

7      A.      Correct.

8      Q.      We later found out, by the way, from Tent

9  that that's not true; he didn't have somebody that could

10 do fireworks.  Is that right?

11     A.      Correct.  Tent was interviewed by the FBI.

12     Q.      Shortly after Mr. Doggart was taken down?

13     A.      Correct.

14     Q.      Okay.

15     A.      After this -- the arrest had occurred and

16 Mr. Tent stated that he did not have the demolition

17 expert or the expertise, himself.

18     Q.      Okay.  But Mr. Doggart is asking Tent as if

19 he does have somebody.  Is that right?

20     A.      Correct.

21     Q.      And he says he's going up to Hancock on

22 Saturday, which I think would have been April 11th?

23     A.      April 11th.

24     Q.      All right.  What happened on April 10th?

25     A.      April 10th, Mr. Doggart was arrested.

1  Q.  Okay.

2  A.  And a search was conducted.

3  Q.  How was he arrested, by the way?

4  A.  He was arrested at the Signal Mountain Police

5 Department.

6  Q.  Okay.  Good.  Did we have somebody from

7 Signal Mountain call him?

8  A.  Yes, we did.

9  Q.  And what happened when the Signal Mountain

10 police officer called Mr. Doggart?

11  A.  When Mr. Doggart was contacted by the Signal

12 Mountain Police Department, they had asked him to come up

13 there in reference to a previous complaint.  And he did

14 agree to come up and meet with them, and he also provided

15 information that he understood about a religious war that

16 was occurring and a militia group that was going up to

17 the Hancock, New York area, or Islamberg, to conduct a

18 preemptive strike.

19  Q.  A preemptive strike?

20  A.  Yes.

21  Q.  And he says this on the wire.  Is that

22 correct?

23  A.  Correct.

24  Q.  To a Signal Mountain police lieutenant?

25  A.  Yes, it was one of the officers of the Signal

Mountain Police Department.

Q.      Okay.  And the police lieutenant says?

A.      He says okay.

Q.      Come on up to the office?

A.      Correct.

Q.      And then Mr. Doggart comes to the office.  Is that right?

A.      He does travel up to the police department.

Q.      And is he arrested at that point?

A.      He was -- he did go inside the building, and my understanding is he came back out to take some sort weapons off his person to be able to enter the police department, and then after that was taken into custody without incident.

MR. PIPER:  Okay.  May I have just one second, Your Honor?

THE COURT:  Yes.

BY MR. PIPER:

Q.      When Agent Galloway interviewed him, are you familiar with some of the particulars of the interview?

A.      Yes, I am.

Q.      Did Mr. Doggart state -- this is on a Friday. Is that correct?

A.      Yes, it was.

Q.      Did Mr. Doggart state what he was going to do

1    the next day?

2       A.        Mr. Doggart did state that he was going to

3    travel to the Hancock, New York area on Saturday.

4       Q.        Okay.  As he had told Tent on Thursday night

5    and as he told the CS and some other people on Friday

6    afternoon.  Is that correct?

7       A.        Correct.

8                 MR. PIPER:  May I have just a second, Your

9    Honor?

10                THE COURT:  Yes.

11                MR. PIPER:  That's all I'm going to have,

12   Judge.

13                THE COURT:  Cross.

14                       **CROSS EXAMINATION**

15   BY MR. HOSS:

16      Q.        Agent Smith, let's, I guess, start where you

17   ended, his arrest at Signal Mountain.  When he was called

18   to the police department, Mr. Doggart came voluntarily to

19   the police department.  Is that correct?

20      A.        Yes, sir.

21      Q.        And when he walked inside the police

22   department, he had a knife on him.  Is that correct?

23      A.        I believe that's what he -- I was not there,

24   present at that location, but my understanding is he told

25   the police department he had a knife that he needed to

1  put in his vehicle.

2      Q.      And they asked him to go back outside and put

3  that in his car?

4      A.      Yes, sir.

5      Q.      And he did that, right?

6      A.      Yes, sir.  There was a knife in the vehicle.

7  Yes, sir.

8      Q.      He didn't enter the police department

9  carrying guns, correct?

10      A.      I'm not aware, but I wasn't there.  But I'm

11  not aware.

12      Q.      And nobody has ever told you that he tried to

13  enter that police department carrying guns.  Is that

14  correct?

15      A.      No one told me that, no, sir.

16      Q.      All right.  And they asked him to put the

17  knife in his car.  He put the knife in his car and he

18  came back in.  And, like you said, he was arrested

19  without incident.  Is that correct?

20      A.      Yes, sir.

21      Q.      Let's talk about the conversation that Signal

22  Mountain had with Mr. Doggart.  Who at Signal Mountain

23  had that conversation with him before he drove down there

24  to turn himself in?  Or not to turn himself in, but

25  before he came to the police department.

1    A.        I don't have it here in front of me.  It was

2    one of the individuals at the department.  I'm not sure

3    if it was --

4    Q.        You mentioned --

5              (Whereupon, an instruction was given by the

6              court reporter.)

7    A.        It may have been a lieutenant.  It was one of

8    the officers at the Signal Mountain Police Department.

9    BY MR. HOSS:

10   Q.        Mike Williams?  Lieutenant Mike Williams,

11   does that ring a bell?

12   A.        Mike Williams is the chief there.

13   Q.        He's the chief?

14   A.        But I don't believe he's the one who made the

15   telephone call.

16   Q.        All right.  That conversation, explain to me

17   again, what did Mr. Doggart tell that lieutenant in that

18   conversation?

19   A.        I don't have the actual transcript of it.  It

20   is part of the Title III communication.  But just he did

21   agree to come up there to meet with them, but he also

22   mentioned that there was a militia group that he was

23   aware of -- and I am paraphrasing -- but a militia group

24   that he's aware of that was going to do a preemptive

25   strike to Hancock, New York or Islamberg.

```
 1      Q.        So he's reporting this to a police officer,
 2  who he knows to be a police officer.  Is that correct?
 3      A.        Correct.
 4      Q.        And this would have been on Friday night,
 5  April the 9th?  Or April 10th?
 6      A.        April 10th.
 7      Q.        April 10th?
 8      A.        Yes, sir.
 9      Q.        And so he's reporting to him that there is a
10  Christian -- or a militia group, a preemptive strike, a
11  religious war that's going on.  Is that correct?
12      A.        Correct.
13      Q.        And that he wanted to give him information
14  about it?  Is that right?
15      A.        Correct.
16      Q.        Mr. Doggart, I think you testified,
17  cooperated during the arrest.  There was not an issue, at
18  all, correct?
19      A.        Correct.
20      Q.        And even since then he's cooperated with you
21  as far as obtaining some firearms that were left behind
22  in his vehicle.  Is that right?
23      A.        Correct.
24      Q.        And just so the Court understands, after he
25  was arrested, you had reason to believe that he had guns
```

1    in his car.  Is that correct?

2       A.       Correct.

3       Q.       And you and Agent Galloway contacted my

4    office and he consented to let you guys go up there and

5    get the two firearms out of his vehicle.  Is that right?

6       A.       Correct.

7       Q.       Did -- in the interview that Agent Galloway

8    did of Mr. Doggart, did you participate?  Were you

9    present in the room?

10       A.       No, I was not.

11       Q.       Were you watching it?

12       A.       No, sir, I was not.

13       Q.       Okay.  Was up it tape recorded?

14       A.       It was recorded, yes, sir.

15       Q.       Was it videotaped?

16       A.       It was videotaped, yes, sir.

17       Q.       Where did the interview -- where was it

18    conducted?

19       A.       It was conducted at the FBI office in

20    Chattanooga.

21       Q.       All right.  And how long -- and how long did

22    the interview last?

23       A.       Approximately, four hours.

24       Q.       Was he Mirandized?

25       A.       Yes, he was.

Q.      Do you know if he signed a written Miranda warning?  If you know, you know.  If you don't know, you don't know.

A.      Yes, sir, he did.

Q.      Okay.  And in that interview process, he answered all the questions that you and Agent Galloway had.  Is that right?

A.      From what I'm aware, he answered the questions that were --

Q.      Of Agent Galloway?

A.      Correct.

Q.      Chronologically, as far as the trips that you've testified about today, the first one was the Nashville trip.  Is that correct?

A.      Correct.  The trip that we became aware of while our investigation was ongoing, the one was to Nashville on March 17th.

Q.      And then after that was the South Carolina trip?

A.      Correct.  South Carolina was the next trip that occurred.

Q.      And then after that, we have the City Cafe meeting?

A.      Correct.

Q.      Okay.  But that's the order of those three;

1  Nashville, South Carolina and City Cafe?

2     A.      Yes, sir.

3     Q.      Let's talk about -- let's talk about

4  Nashville, first.  I guess, first, the M-4 that you say

5  Mr. Doggart took to Nashville, is there any prohibition

6  about him traveling with an M-4 from Chattanooga to

7  Nashville?

8     A.      I'm not aware of any.

9     Q.      He's got a carry permit?

10    A.      Correct.  Yes, sir.

11    Q.      Right?

12    A.      Yes.

13    Q.      That's for handguns?

14    A.      Correct.

15    Q.      But is there any prohibition under state or

16 federal law that prohibits him from taking a shotgun or

17 an M-4 from Chattanooga to Nashville?

18    A.      I'm not aware of any prohibition, no, sir.

19    Q.      Did you follow him?  I guess, were you part

20 of that surveillance team?

21    A.      I was not part of the surveillance team but

22 there was a surveillance team that was following Mr.

23 Doggart.

24    Q.      Okay.  And you testified that they went to

25 lunch and then met up at a hotel room.  Is that correct?

1      A.        Yes, sir.

2      Q.        Is there videotape of that meeting in the

3  hotel room?

4      A.        We do have a portion of videotape but it

5  mainly is audio recording.  There was a video device that

6  was used.  I don't know how effective the video device

7  was, but there's an audio recording of the entire --

8      Q.        What was the video device?

9      A.        It's a hat, but it just -- I think the

10 battery runs out before the end of -- before the end of

11 the meeting period.

12     Q.        And the only person Mr. Doggart met in the

13 meeting in Nashville was this Sangre de Lobo?

14     A.        Correct.

15     Q.        And what does that stand for?

16     A.        I believe that's "Blood of the Wolf".

17     Q.        Okay.  And who came up with that name?

18     A.        That was a name --

19     Q.        I've accused -- I've accused Mr. Piper of

20 coming up --

21               THE COURT:  Wait.  Mr. Hoss, one more time,

22 let the witness finish --

23               MR. HOSS:  I'm sorry, Your Honor.

24               THE COURT:  -- so that our court reporter

25 can actually take down your question and his answer.

1    So were you finished?  He said who came up with the name.

2      A.        I do not know who came up with the name.

3    BY MR. HOSS:

4      Q.        Was it a law enforcement agent or Mr. De

5    Lobo, himself?

6      A.        I don't know.

7      Q.        Is that his real name?

8      A.        I do not believe that's his real name, no,

9    sir.

10     Q.        But the only individual Mr. Doggart met with

11   was the "Blood of the Wolf" character?

12     A.        Correct.

13     Q.        And you said that it lasted, approximately,

14   up to three-and-a-half to four hours.  Is that right?

15     A.        Correct.

16     Q.        In the hotel room, you said some documents

17   were exchanged.  How do you know that documents were

18   exchanged?

19     A.        The documents were left with the confidential

20   source.  They were discussed on the recording.

21     Q.        Okay.

22     A.        And we're in possession of those now.

23     Q.        Okay.  And what documents do those consist

24   of, maps?

25     A.        Those were -- those were the printed

1    documents which were the -- like a Google map-type

2    satellite pictures, the gun laws of the state of New

3    York, the individuals in Delaware County, which covers

4    Hancock, New York, as far as public officials,

5    government -- state government officials.

6         Q.        Yes, sir.

7         A.        There are additional documents, just a

8    welcome document to the individual Sangre de Lobo because

9    he did pick him up at the airport.  And there's a

10   booklet, a Constitution, Declaration of Independence.

11        Q.        So Mr. Doggart picks the "Blood of the Wolf"

12   character up at the airport?

13        A.        Yes, sir.

14        Q.        And then they go to lunch.  Where did they go

15   to lunch?

16        A.        Ruby Tuesdays.

17        Q.        And then they went to a hotel?

18        A.        Yes, sir.

19        Q.        Which hotel?

20        A.        I will have to check the name for sure.  I

21   believe it's the Airport Inn.

22        Q.        And did he take him back to the airport after

23   the meeting?

24        A.        No, sir.

25        Q.        Okay.  He just leaves Mr. De Lobo at the

1   hotel and Mr. Doggart leaves and comes home?

2     A.     Mr. Doggart leaves the hotel and travels back

3   to Signal Mountain.

4     Q.     And correct me if I'm wrong, there was talk

5   on the communications that Mr. De Lobo was providing to

6   you that at some point Mr. Doggart was going to leave

7   Nashville and go directly to Hancock, New York.  Isn't

8   that correct?

9     A.     There was talk prior to their meeting.  It

10   was prior talk picked up in the Title III communications

11   about Mr. Doggart traveling to New York.  But at the time

12   when they had the meeting, we did not believe Mr. Doggart

13   was going to travel straight to New York after that.

14     Q.     Okay.  But you would -- I mean, throughout

15   this case, plans were made and plans get changed fairly

16   often, right?

17     A.     Yes, sir, there's different planning in the

18   communications.

19     Q.     And many of these plans never come through or

20   come to fruition?

21     A.     Correct.

22     Q.     This being one of them, that Mr. Doggart is

23   meeting this gentleman in Nashville and he's going to

24   drive immediately to Hancock, New York and do something,

25   right?  And that doesn't actually ever occur.  That plan

1    gets changed would be a better way to ask that question.

2        A.        Right, that plan had changed.

3        Q.        And the same like, for example, with South

4    Carolina -- well, before we move to South Carolina, one

5    other question.  You mentioned that he brought with him a

6    handgun, his M-4, and a shotgun.  How do you know that to

7    be true?  Did Mr. De Lobo see those things?

8        A.        Mr. De Lobo, the confidential source, did see

9    those weapons.  We have surveillance that was watching

10   and did see them go to the trunk of the vehicle on three

11   different occasions.

12       Q.        Okay.

13       A.        That matches up with the audio recordings

14   when they are discussing weapons, also.

15       Q.        Okay.  So let's talk about the next trip,

16   South Carolina.  The plan, I think as Mr. Piper asked

17   you, was a two-purpose trip to South Carolina; one being

18   to see Mr. Tent and the other to see his daughter and

19   grandchildren.  Is that correct?

20       A.        Yes, sir.

21       Q.        Okay.  And you knew about this trip in

22   advance.  Is that right?

23       A.        Correct.

24       Q.        Were you part of the surveillance during the

25   South Carolina trip?

 1      A.          I was not.  The FBI did conduct surveillance.

 2  I was not part of the surveillance team.

 3      Q.          How long did he travel?  How long was he

 4  gone?  How many days?

 5      A.          He traveled on a Sunday and returned on a

 6  Tuesday.

 7      Q.          And so, he saw his daughter and

 8  grandchildren.  Is that right?

 9      A.          Yes, sir.

10      Q.          Never saw or met up with Mr. Tent?

11      A.          No, sir.

12      Q.          You were monitoring him on his phone at that

13  time.  Is that right?

14      A.          That's correct.

15      Q.          Did he talk to Mr. Tent?

16      A.          Yes, he did.

17      Q.          Okay.  And what did they discuss?

18      A.          They --

19      Q.          While -- I'm talking about while physically

20  he is in South Carolina and Mr. Tent is in South

21  Carolina.

22      A.          Right.  They discussed many things.  Some of

23  the discussions involved politics, where Mr. Doggart was

24  going to be running for president and Mr. Tent was going

25  to be running for vice president.  They discussed a radio

1   show where they would be announcing that decision to run

2   together.

3         They did discuss getting together to meet,

4   which was the prior plan, to meet to discuss the tactics

5   of New York.  And Mr. Tent discussed that he was unable

6   to meet on Sunday because he was watching his children

7   and his wife was away, and he wasn't able to get away at

8   that time.  And then they discussed doing a radio show

9   that evening, and the radio show did occur.

10     Q.      But no discussion about any trips to Hancock,

11   New York to burn down a mosque?

12     A.      My understanding is the discussions mainly

13   were politics and them discussing to meet together while

14   they were there in South Carolina.

15     Q.      Now --

16         THE COURT:  Before you move on off that

17   topic, what do you mean you understand the radio show did

18   occur?

19         THE WITNESS:  I'm sorry if I said it wrong.

20   The radio show -- they discussed being on a radio show,

21   and then on Sunday evening while they were both in South

22   Carolina they did call in to do a radio show.

23   BY MR. HOSS:

24     Q.      They weren't physically present together?

25     A.      They weren't present at a station anywhere

1  but they did call in to the radio show.

2      Q.      Did you listen to that?

3      A.      I did not listen.  Other agents in the FBI

4  did listen.

5      Q.      Did -- now, before that trip, Mr. Tent had

6  promised this EOD guy, being able to provide an explosive

7  detonation guy for this Hancock trip.  Isn't that

8  correct?

9      A.      That's correct.

10     Q.      And Mr. Tent has since told you that the guy

11 never existed?  Is that right?

12     A.      He was interviewed by the FBI, and just a

13 very brief summary of that interview was that he told the

14 FBI that he did not have the specialist and he did not

15 have that expertise.

16     Q.      I guess my question is why didn't the two

17 ever meet.  I mean, physically, how many miles apart are

18 they in South Carolina?  What are we talking about?

19     A.      I would guess it was less than 20 miles.

20     Q.      Okay.  So a 30-minute car ride.  Why didn't

21 the two ever meet each other?

22     A.      I don't know for sure why they didn't meet.

23 There were different reasons provided by both individuals

24 on why they couldn't.

25     Q.      What did Mr. Doggart tell you?

1    A.        Mr. Doggart, on the Title III communication,

2  had told the confidential source that his -- he was not

3  feeling well physically from being with the grandchildren

4  and was tired and had fallen asleep, or taken medication,

5  something to that effect.  Mr. Doggart had told -- and

6  then he told Mr. Tent that he just -- there was -- I'd

7  have to see the transcript of it.  He provided two

8  different reasons why he couldn't meet.  And then

9  Mr. Tent provided his own reasons.

10    Q.        And why was that?

11    A.        The one reason Mr. Tent had stated was that

12  he was watching his children and his wife was not there,

13  so he could not get away.  Another reason that he said

14  he had been raided by the police and taken in for

15  questioning.

16    Q.        Who did he tell that to?

17    A.        He told that to Mr. Doggart.

18    Q.        After he had -- Mr. Doggart had returned back

19  to Chattanooga?

20    A.        After Mr. Doggart had returned back to

21  Chattanooga.

22    Q.        Okay.  And was that true?

23    A.        We were not able -- I don't believe it is.

24  We weren't able to confirm that he was ever approached by

25  any law enforcement or taken in for any questioning.

1    Q.        And in the -- when you interviewed Tent -
2    not you, but when the FBI interviewed Tent and he told
3    you that he didn't have the demolition expert or he
4    didn't have the knowledge, himself, the same is true for
5    Mr. Doggart.  Isn't that correct?  Mr. Doggart doesn't
6    have demolition background, or explosive background, or
7    knowledge that you're aware of to pull off the use of
8    explosives or demolition.  Would you agree with that?
9    A.        Yeah.  I'm not aware of him having any
10   demolition background.
11   Q.        And so after -- it was after Tent tells Mr.
12   Doggart that he was raided by law enforcement that this
13   fireworks code popped up.  Is that correct?
14   A.        It was not in that conversation.  It was a
15   conversation, approximately, a week later.
16   Q.        About a week later.  And in total, Mr.
17   Doggart was in South Carolina for three days?
18   A.        It was --
19   Q.        Four days?  Multiple days?
20   A.        -- roughly, two days total, but it's from
21   Sunday through Tuesday.
22   Q.        Okay.
23   A.        Sunday evening through Tuesday around
24   noontime.
25   Q.        Let's get to the City Cafe meeting.  You

1  said that it involved a confidential source.  That was

2  Mr. De Lobo.  Is that right?

3      A.        Yes, sir.

4      Q.        So Doggart, De Lobo, Shane Schielein, and Ms.

5  McNaulty were the four people at that meeting?

6      A.        Correct.

7      Q.        And was that videotaped and audio taped, as

8  well?

9      A.        There was video and audio, and we did have a

10  surveillance team that was able to view portions of the

11  meeting in the restaurant, also.

12      Q.        Have you reviewed the videotape of that?

13      A.        I've seen portions of it.

14      Q.        Is it better than the video of the Nashville

15  hotel?

16      A.        It's more useful for audio purposes.  It's

17  just the angle of the video camera is not conducive to

18  seeing everyone's faces.

19      Q.        I know what I forgot to ask you.  In the

20  South Carolina case, you actually took out an arrest

21  warrant for Mr. Doggart and Mr. Tent before Mr. Doggart

22  left to drive down to South Carolina.  Isn't that

23  correct?

24      A.        Correct.

25      Q.        And why didn't -- why wasn't that ever

1    served?

2        A.        The arrest warrant was going to be served if

3    Mr. Doggart met with Mr. Tent because it was a warrant

4    based on a conspiracy.  And the conspiracy we were

5    identifying was them meeting together.

6        Q.        And so, did you take that warrant out in the

7    Eastern District of Tennessee?

8        A.        Yes, sir.

9        Q.        Okay.  And did you provide the affidavit for

10   that warrant?

11       A.        Yes, I did.

12       Q.        Okay.  And it was never served or executed?

13       A.        No, sir.

14       Q.        Okay.  And it was based on a conspiracy

15   charge?

16       A.        Correct.

17       Q.        I guess, to date, none of these other

18   individuals have been charged.  Is that correct?

19       A.        They have not.

20       Q.        All right.  Mr. Tent, Shane Schielein,

21   neither one of those two, or any of the people on the

22   Facebook post that Mr. Piper asked you about, nobody else

23   has been charged?

24       A.        I'm not aware of any charges.

25       Q.        The CS who was at the City Cafe meeting,

1  he's a paid -- he was a paid informant?

2      A.      He is a paid informant.

3      Q.      How much is he paid?

4      A.      I'm not aware of how much he's been paid for

5  his -- my understanding for this investigation is there

6  have been no payments to date.

7      Q.      But he expected payment?

8      A.      I believe so, yes, sir.

9      Q.      Right.  And I think you --

10     A.      He's an informant --

11     Q.      I think you put that in one of your

12  affidavits.

13     A.      Yes, sir.  He's an informant managed by

14  agents in another field office.

15     Q.      In the state of Texas?

16     A.      Correct.

17     Q.      So when this whole thing began, when the FBI

18  first started looking at Mr. Doggart, was that based on

19  the CS, Mr. De Lobo, providing information about his

20  knowledge of Mr. Doggart to the government?

21     A.      Correct.

22     Q.      That was?

23     A.      Yes.

24     Q.      So he came to you with Mr. Doggart and what

25  he believed Mr. Doggart to be doing?

1    A.        Yes.  He had a working relationship with a

2    case agent in the field office in Texas and he brought

3    this to their attention.

4    Q.        And what was their prior relationship?

5    A.        He's -- Mr. Doggart?

6    Q.        Before the FBI began investigating Mr.

7    Doggart, I guess what I'm asking is:  What do you know

8    about Mr. -- "Blood of the Wolf", that character, what

9    his relationship with Mr. Doggart was?

10   A.        I'm not aware of a prior relationship between

11   the confidential source and Mr. Doggart prior to us

12   becoming aware of it in February.

13   Q.        But the two men, when you started, knew each

14   other?  Sangre de Lobo and Mr. Doggart knew each other

15   when you started your investigation?

16   A.        Correct.  The confidential source became

17   aware of Mr. Doggart in approximately -- around the time

18   frame of November of 2014.  He began communicating with

19   Mr. Doggart in February of 2015.

20   Q.        These Facebook posts, just so I understand

21   it, and I won't go through them like Mr. Piper did, but

22   how did the FBI come into possession of these?

23   A.        We served a search warrant to Facebook.

24   Q.        To Facebook?

25   A.        Correct.

Q.      And when was that served?

A.      It was served in March.  I'd have to see the
date from the communication to see the exact date.

Q.      Okay.  It was served in March and it was
issued out of the Eastern District of Tennessee?

A.      It was issued out of the Eastern District of
Tennessee.

Q.      And did you provide the affidavit for the
Facebook search warrant?

A.      No, I did not.  I believe it was another
agent in our field office.

Q.      And these messages that you reviewed, are
these private messages on Facebook?  You're familiar --

A.      I am.  I -- some of those are -- the ones
that we were reviewing were private messages between
individuals.

Q.      Okay.  Are there others that are not private
messages?

A.      Well, the Facebook search warrant covers
everything that would be associated with Mr. Robert
Doggart's Facebook account; so any type of public posts,
private posts, or private messaging.

Q.      Okay.  Now, what has been admitted as Exhibit
One, it looks like it's all private messaging.  Is there
additional documents that you obtained beyond Exhibit One

1  that you got from Facebook that showed the public posts?

2    A.        I'd have to see -- I mean, if that's not

3  covering every page -- I mean, it covers everything

4  that's associated with this account.  But I know what we

5  were discussing right here with the exhibit, those were

6  private messages within Facebook.

7    Q.        All of those messages highlighted in yellow

8  were private messages.  Is that correct?

9    A.        I believe they are, yes, sir.  The ones where

10 it shows the author and recipient are private messages.

11   Q.        Now, is it your contention that these were

12 sent in interstate commerce?

13   A.        Yes, sir.

14   Q.        Okay.  And how is that?

15   A.        The individuals -- well, Facebook -- this was

16 served to California where Facebook maintains its data,

17 but also the individuals that were being communicated

18 with that we have identified so far, Shane Schielein was

19 in Peoria, Illinois, the confidential source was in the

20 state of Texas.  We have identified individuals in the

21 state of Oregon and in the state of Florida.

22   Q.        That's where they were at the time these were

23 sent, or that's just where they maintain an address?

24   A.        That's where they maintain an address.  We

25 are able to confirm, at least with the confidential

1  source, where he was present at the time of him receiving

2  the messages, and there's ongoing investigation with the

3  FBI with other the individuals identified in there.  At

4  some point, we may be able to confirm the actual

5  locations where it was received, the messages for the

6  others.

7      Q.      Now, I didn't see any communications on here

8  with Sangre de Lobo, but I might have missed them.  Are

9  there some private messages with the "Blood of the Wolf"?

10     A.      We just know there was a message -- and I

11  don't believe it was highlighted in there -- a message

12  providing a telephone number to the confidential source

13  to contact him by telephone.

14     Q.      Okay.  You testified that Mr. Doggart was a

15  member of the American Reapers.  And the American Reapers

16  is a Facebook group?  Is that right?

17     A.      Correct.  It's a private Facebook group.

18     Q.      And how do you know that he's member of the

19  American Reapers?

20     A.      The returns from Facebook we have, it shows

21  that he's -- he was communicating within that group, and

22  then also the information from the confidential source,

23  information provided by him was that Mr. Doggart was

24  involved in that -- within that private Facebook group.

25     Q.      And when you say was involved, do you mean

1    that he was a member of that private Facebook group?

2        A.       Communicating within that private Facebook

3    group.

4        Q.       Okay.  So how do private groups on Facebook

5    work?  You have to be invited?  There's an invitation

6    sent to you and you can join them?

7        A.       That's my understanding, that you have to be

8    given an invitation.  You can't publicly search for it or

9    ask to join.

10       Q.       And do you know if an invitation was sent to

11   him and he joined this on Facebook?

12       A.       I'm not aware of how he became a member of

13   the group.

14       Q.       So your testimony that he's a member of it is

15   just based on communications with some people that you

16   know to be members?

17       A.       I'd have to see that Facebook -- he is within

18   that group.  And me saying he's a member of that group is

19   he's communicating within that private Facebook group.

20       Q.       Who all are members of American Reapers that

21   he's communicating with?

22       A.       There's, approximately, 1700 to 1800

23   individuals that are members of the group, the private

24   Facebook group.

25       Q.       Yes, sir.

A.          And I don't have it here in front of me, but he's communicating with --

Q.          Shane Schielein?

A.          -- Shane Schielein, and Chris Powell, and also Kevin Sturdevant, and Richard Pinkerton.

Q.          They're all members of this group?

A.          Those are all members he's communicating with in the group.

Q.          Okay.  The line sheets with phone calls to his two family members, his sister and then to Dot, where he's making these statements, how would you describe their response to him?

A.          They continued on with the conversation and did not respond directly.

Q.          They didn't -- they just kind of okay, okay, okay?  Were they dismissive of him, do you think?  How would you --

A.          Yeah, they moved on with the conversation and they didn't acknowledge it directly and just continued on with the conversation.

Q.          And Dot is his ex-mother-in-law.  Is that correct?

A.          That's our understanding from our investigation.  That is his ex-mother-in-law.

Q.          You did do a search warrant of his residence.

1    Is that correct?

2        A.        That is correct.

3        Q.        And you secured some computers.  Is that

4    right?

5        A.        Yes, sir.

6        Q.        And too early to tell what's on those?  Have

7    you guys had a chance to look on them?

8        A.        They're still continuing to process the

9    evidence.

10       Q.        At some point during your monitoring of him,

11   Mr. Doggart, his comments about Islamberg and Hancock,

12   New York turned, instead of a preemptive strike, into a

13   reactive strike.  Is that correct?

14       A.        I know he had a conversation with a gentleman

15   we believe to be in Texas --

16       Q.        Right.

17       A.        -- by the name of Larry Smith where he was

18   discussing the plan of action and Larry Smith had

19   recommended to him that he take more of a reactive

20   approach in waiting for the government to commit some of

21   these actions, the martial law and other actions, and

22   not to be preemptive so that you are not seen in such a

23   negative light.

24       Q.        The condition precedent before he were to do

25   something, or this group would do something, would be the

1    government, U.S. Government, would institute martial law

2    and then they would react to that.  Is that correct?

3        A.        That's correct.  It was talking about the

4    government conducting some type of martial law type

5    exercises in the Southwest United States.

6        Q.        That was the discussion for some point, for a

7    few days, in the wire interception.  Is that right?

8        A.        Correct.

9        Q.        Did that change back?

10       A.        We just had that discussion.  And then later,

11   after that discussion, we did not have any more talk

12   about the reactive status.  It was the talk of moving

13   forward with going to do the recon in New York and that's

14   where the discussion ended.

15       Q.        Okay.  And when Mr. -- when Mr. Doggart was

16   arrested and you -- and Agent Galloway asked him what he

17   was doing, his plan that he said that he was doing the

18   next day was just to travel to Hancock, New York,

19   correct?

20       A.        It was my --

21       Q.        He was not going to take any guns with him.

22   He wasn't going to assault anybody.  He wasn't going to

23   burn down any mosques.  He was to go up there to do

24   reconnaissance?

25       A.        That was my understanding.  The travel on

1  Saturday was to do reconnaissance.

2    Q.    By himself?

3    A.    Correct.

4    Q.    Nobody is going with him?

5    A.    That's what I understand it to be, yes, sir.

6          MR. HOSS:  Just one second, Your Honor.

7          THE COURT:  Mr. Hoss, I don't mind giving you

8  a little time, but --

9          MR. HOSS:  We're real close, Your Honor.

10 BY MR. HOSS:

11   Q.    Agent Smith, he's charged with sending a

12 threat in interstate commerce.  Which specific threat is

13 that?

14   A.    The threats were the threats to burn down the

15 mosques --

16   Q.    Okay.

17   A.    -- in Hancock.

18   Q.    And would you agree that after he made those

19 threats his plans changed?

20   A.    Could you be more specific?

21   Q.    Well, he told you upon his interview with

22 Agent Galloway that he was just going up there to do

23 reconnaissance, and so --

24   A.    From our beginning of -- the initiation of

25 our investigation, that had been -- the planning for most

1  of the time had been to conduct the reconnaissance first,

2  before any attack would occur.  So that was the planning

3  that we -- our investigation had been following the

4  entire time.

5          MR. HOSS:  That's all, Your Honor.

6          THE COURT:  How much redirect do you have?

7          MR. PIPER:  Two minutes, Judge.

8          THE COURT:  All right.

9                    **REDIRECT EXAMINATION**

10 BY MR. PIPER:

11    Q.      This is the Facebook post with a fellow named

12 Kelly Gardner.  Do you see this?

13    A.      Yes, sir.

14    Q.      And he talks about being --

15          THE COURT:  Are you -- are you on

16 Exhibit One, by any chance?

17          MR. PIPER:  Yes.  Thank you, Your Honor, page

18 176.

19 BY MR. PIPER:

20    Q.      Do you see this here, he lives in Citrus

21 County, Florida.  Do you see that?

22    A.      Yes, sir.

23    Q.      He's identifying where he lives.  Is that

24 correct?

25    A.      Yes, sir.

1    Q.        And up here in the body of that text, he

2    talks about set these organizations down with a casualty

3    ratio of greater than 30 to one.  Do you see that?

4    A.        Yes, sir.

5    Q.        Does that meaning killing more than 30 people

6    to every one person that's lost?

7    A.        Correct.

8    Q.        When Mr. Doggart was in South Carolina, he

9    wanted to met with Mr. Tent, did he not?

10   A.        Yes, he did.

11   Q.        And he tried to find Mr. Tent's house.  Is

12   that correct?

13   A.        He did ask -- or he did try and set up a

14   meeting to go to --

15   Q.        And it was Mr. Tent that wouldn't meet with

16   him.  Is that right?

17   A.        Correct.

18   Q.        All right.  Did Mr. Doggart discuss with the

19   CS the use of a Molotov cocktail to destroy the buildings

20   up in Hancock?

21   A.        Yes, he did.

22   Q.        And that's what precipitated that

23   conversation then later with Tent about using a Molotov

24   cocktail, and Tent was talking about what?

25   A.        Using the demolition in addition to the

1  Molotov cocktail.

2      Q.       A better explosive device?

3      A.       Correct.

4      Q.       All right.  And Mr. Hoss talked about the

5  plans changing.  The day before Mr. Doggart was arrested,

6  was that the day that he had the conversation with Tent

7  about the fireworks, your other specialty fellow?

8      A.       Yes.  That was the night before he was

9  arrested.

10     Q.       The night before he was arrested, he talked

11 to Tent about the other specialty fellow with the

12 fireworks?

13     A.       Correct.

14              MR. PIPER:  That's all I'm going to have,

15 Judge.

16              THE COURT:  You're excused, Agent.  Call your

17 next witness.

18                      END OF TESTIMONY.

19          ******************************

<pre>
 1                REPORTER'S CERTIFICATE

 2

 3   STATE OF TENNESSEE:

 4   COUNTY OF HAMILTON:

 5

 6         I, Kristy L. Risner, LCR # 128, licensed
     court reporter and notary public, in and for the State
 7   of Tennessee, do hereby certify that the above
     (deposition/hearing) was reported by me and that the
 8   foregoing ___77___ pages of the transcript is a true and
     accurate record to the best of my knowledge, skills, and
 9   ability.

10

11         I further certify that I am not related to
     nor an employee of counsel or any of the parties to the
     action, nor am I in anyway financially interested in the
12   outcome of this case.

13

14         I further certify that I am duly licensed by
     the Tennessee Board of Court Reporting as a Licensed
     Court Reporter as evidenced by the LCR number and
15   expiration date following my name below.

16

17         IN WITNESS WHEREOF, I have hereunto set
     my hand and affixed my notarial seal this _____
18   day of February, 2017.

                              S/N
19
                         KRISTY LEIGH RISNER, LCR # 128
20                       Expiration date 6/30/2018.
                         Notary Public Commission
21                       Expires:  9/6/2017.

22

23

24

25
</pre>

**'**

**'03** [1] - 15:2

# 1

**10th** [5] - 43:24, 43:25, 49:5, 49:6, 49:7
**1110** [1] - 2:4
**11th** [2] - 43:22, 43:23
**128** [2] - 78:6, 78:19
**13** [1] - 41:23
**154** [1] - 9:14
**161** [1] - 11:11
**163** [1] - 12:1
**167** [1] - 13:2
**170** [1] - 14:20
**1700** [1] - 70:22
**176** [2] - 16:2, 75:18
**178** [3] - 18:11, 19:9, 19:11
**179** [3] - 19:9, 19:11, 20:2
**17th** [3] - 30:10, 30:12, 51:17
**18** [1] - 26:17
**1800** [1] - 70:22
**182** [1] - 20:22
**1:15-MJ-83** [1] - 1:7

# 2

**20** [2] - 17:4, 60:19
**2011** [1] - 3:15
**2014** [1] - 66:18
**2015** [3] - 1:12, 15:3, 66:19
**2017** [1] - 78:17
**20th** [1] - 1:12
**2518** [1] - 26:18
**26** [1] - 42:21
**26th** [2] - 15:16, 15:21
**28th** [1] - 29:9

# 3

**3** [1] - 2:17
**30** [6] - 16:20, 17:17, 17:23, 17:25, 76:3, 76:5
**30-minute** [1] - 60:20
**37377** [1] - 1:23
**37402** [1] - 2:4
**37403** [1] - 2:10

# 4

**423** [3] - 1:24, 2:5, 2:10
**45** [1] - 17:3

**46** [1] - 2:17
**47-year-old** [1] - 19:21

# 5

**50** [1] - 23:6
**500** [1] - 8:24
**513-3420** [1] - 19:22
**515** [1] - 2:4
**541** [1] - 19:21

# 6

**6** [1] - 2:22
**6/30/2018** [1] - 78:20

# 7

**7** [1] - 41:22
**75** [1] - 2:18
**752-5140** [1] - 2:5
**77** [1] - 78:8

# 8

**825-9747** [1] - 2:10
**850** [1] - 2:9
**886-2585** [1] - 1:24

# 9

**9/6/2017** [1] - 78:21
**918** [1] - 1:23
**9th** [2] - 41:23, 49:5

# A

**ability** [1] - 78:9
**able** [12] - 4:15, 17:25, 21:8, 22:2, 45:12, 59:7, 60:6, 61:23, 61:24, 63:10, 68:25, 69:4
**above-styled** [1] - 1:11
**absolute** [1] - 15:17
**abundance** [1] - 24:9
**account** [4] - 4:25, 5:1, 67:21, 68:4
**accurate** [1] - 78:8
**accused** [2] - 53:19
**acknowledge** [1] - 71:19
**acting** [1] - 37:13
**action** [11] - 11:17, 13:7, 14:10, 14:23, 16:9, 18:18, 18:25, 20:8, 32:24, 72:18, 78:11
**actions** [5] - 11:3,

16:14, 21:4, 72:21
**active** [1] - 17:4
**activities** [1] - 22:17
**actual** [2] - 48:19, 69:4
**added** [1] - 20:9
**addition** [1] - 76:25
**additional** [2] - 55:7, 67:25
**address** [2] - 68:23, 68:24
**admitted** [2] - 6:2, 67:23
**admitting** [1] - 5:25
**advance** [1] - 57:22
**affiant** [1] - 24:2
**affidavit** [21] - 3:22, 3:23, 4:1, 24:7, 24:14, 24:16, 26:14, 26:23, 27:6, 27:10, 27:14, 27:15, 27:18, 28:1, 28:20, 34:3, 41:17, 41:20, 42:12, 64:9, 67:8
**affidavits** [1] - 65:12
**affixed** [1] - 78:17
**afternoon** [1] - 46:6
**agent** [4] - 30:19, 54:4, 66:2, 67:11
**Agent** [18] - 3:14, 4:4, 4:13, 24:10, 28:18, 29:17, 29:23, 31:19, 45:19, 46:16, 50:3, 50:7, 51:6, 51:10, 73:16, 74:11, 74:22, 77:16
**agents** [3] - 3:19, 60:3, 65:14
**ago** [2] - 27:7, 27:8
**agree** [6] - 21:4, 28:23, 44:14, 48:21, 62:8, 74:18
**ahead** [1] - 18:23
**airport** [3] - 55:9, 55:12, 55:22
**Airport** [1] - 55:21
**allowed** [2] - 26:20, 26:22
**alone** [1] - 18:25
**alternative** [1] - 9:2
**Amendment** [1] - 11:8
**AMERICA** [1] - 1:5
**America** [1] - 16:17
**American** [13] - 10:12, 10:15, 10:19, 10:20, 10:22, 10:24, 11:9, 16:14, 23:2, 69:15, 69:19, 70:20
**Americas's** [1] - 22:18
**ammunition** [2] - 8:21, 8:22

**angle** [1] - 63:17
**Anita** [3] - 30:5, 30:7, 32:4
**announcing** [1] - 59:1
**answer** [1] - 53:25
**answered** [2] - 51:6, 51:8
**anti** [1] - 11:3
**anti-government** [1] - 11:3
**anyway** [1] - 78:11
**apart** [1] - 60:17
**appear** [1] - 21:10
**APPEARANCES** [1] - 2:1
**appearing** [1] - 2:6
**Appearing** [1] - 2:11
**application** [6] - 21:9, 21:11, 21:12, 21:16, 26:17, 28:20
**applications** [1] - 12:18
**approach** [2] - 18:21, 72:20
**approached** [1] - 61:24
**approval** [1] - 27:3
**April** [11] - 1:12, 29:9, 41:23, 43:22, 43:23, 43:24, 43:25, 49:5, 49:6, 49:7
**AR-15** [1] - 8:15
**archaic** [1] - 22:20
**area** [6] - 11:24, 34:24, 35:11, 38:18, 44:17, 46:3
**areas** [1] - 20:12
**armed** [3] - 40:20, 40:23, 40:24
**arms** [1] - 12:7
**army** [2] - 17:4, 17:5
**arrange** [1] - 20:12
**arrest** [11] - 3:22, 27:6, 27:15, 28:21, 36:4, 41:20, 43:15, 46:17, 49:17, 63:20, 64:2
**arrested** [10] - 43:25, 44:3, 44:4, 45:9, 47:18, 49:25, 73:16, 77:5, 77:9, 77:10
**arrive** [2] - 9:17, 9:19
**arrived** [1] - 9:23
**asleep** [1] - 61:4
**assault** [3] - 34:19, 40:15, 73:22
**assets** [1] - 16:23
**assistant** [1] - 26:3
**associated** [2] - 67:20, 68:4
**assume** [1] - 30:17

**assuming** [1] - 29:7
**assure** [1] - 20:13
**AT** [1] - 1:3
**attached** [1] - 27:14
**attack** [7] - 11:18, 18:21, 23:10, 35:18, 35:22, 37:4, 75:2
**attacking** [2] - 17:24, 37:5
**attacks** [1] - 22:4
**attempting** [2] - 18:24, 21:5
**attended** [1] - 36:8
**attention** [3] - 10:1, 16:15, 66:3
**ATTORNEY'S** [1] - 2:3
**Attorney's** [1] - 26:3
**audience** [1] - 25:24
**audio** [6] - 53:5, 53:7, 57:13, 63:7, 63:9, 63:16
**author** [5] - 11:12, 11:13, 14:21, 21:17, 68:10
**authored** [1] - 7:8
**AUTUMN** [1] - 1:23
**avenues** [1] - 4:3
**await** [1] - 21:4
**aware** [22] - 23:4, 23:22, 23:24, 27:11, 27:25, 33:25, 47:10, 47:11, 48:23, 48:24, 51:8, 51:15, 52:8, 52:18, 62:7, 62:9, 64:24, 65:4, 66:10, 66:12, 66:17, 70:12

# B

**background** [3] - 62:6, 62:10
**based** [5] - 15:20, 64:4, 64:14, 65:18, 70:15
**basis** [2] - 28:9, 28:24
**battalion** [2] - 23:3, 32:23
**battery** [1] - 53:10
**BE** [1] - 1:11
**became** [2] - 51:15, 66:16, 70:12
**becoming** [1] - 66:12
**began** [3] - 65:17, 66:6, 66:18
**begin** [1] - 20:7
**beginning** [1] - 74:24
**behind** [1] - 49:21
**bell** [1] - 48:11
**beloved** [1] - 22:4
**below** [3] - 14:14,

14:15, 78:15
**best** [1] - 78:8
**better** [3] - 57:1, 63:14, 77:2
**between** [7] - 5:5, 8:3, 17:8, 27:22, 30:22, 66:10, 67:15
**beyond** [1] - 67:25
**big** [1] - 5:12
**bit** [1] - 23:12
**Blood** [5] - 53:16, 54:11, 55:11, 66:8, 69:9
**blue** [1] - 30:16
**Board** [1] - 78:14
**body** [1] - 76:1
**booklet** [1] - 55:10
**bottom** [4] - 14:20, 19:11, 20:1, 20:21
**bow** [1] - 19:21
**Brandy** [1] - 21:3
**break** [1] - 43:1
**brief** [1] - 60:13
**bring** [3] - 5:10, 8:14, 22:16
**brought** [3] - 10:17, 57:5, 66:2
**Brown** [2] - 19:5, 19:13
**brown** [1] - 19:12
**BRYAN** [1] - 2:8
**building** [1] - 45:10
**buildings** [3] - 35:25, 39:15, 76:19
**Bureau** [1] - 3:11
**burn** [7] - 4:4, 29:24, 32:11, 33:4, 59:11, 73:23, 74:14
**burning** [1] - 29:25
**BY** [19] - 3:5, 4:18, 5:18, 6:7, 18:7, 19:10, 29:22, 30:24, 31:18, 32:2, 38:12, 45:18, 46:15, 48:9, 54:3, 59:23, 74:10, 75:10, 75:19
**bystander** [1] - 37:17

## C

**Cafe** [8] - 36:6, 37:1, 41:13, 41:14, 51:22, 52:1, 62:25, 64:25
**cafeteria** [2] - 32:12, 36:3
**California** [1] - 68:16
**camera** [1] - 63:17
**camp** [1] - 11:19
**cannot** [1] - 13:8
**capable** [2] - 18:19,

18:20
**captains** [1] - 23:16
**car** [5] - 47:3, 47:17, 50:1, 60:20
**careful** [1] - 42:7
**carefully** [1] - 22:3
**carefully-considered** [1] - 22:3
**Carolina** [25] - 37:20, 37:22, 37:24, 38:1, 38:14, 39:5, 41:7, 41:16, 51:18, 51:20, 52:1, 57:4, 57:16, 57:17, 57:25, 58:20, 58:21, 59:14, 59:22, 60:18, 62:17, 63:20, 63:22, 76:8
**carried** [1] - 41:6
**carry** [9] - 22:3, 23:8, 40:8, 40:10, 40:25, 41:1, 41:2, 41:3, 52:9
**carrying** [3] - 35:1, 47:9, 47:13
**Carter** [2] - 28:4, 29:1
**Carter's** [1] - 26:19
**Carthage** [1] - 6:23
**CASE** [1] - 1:7
**case** [8] - 3:19, 3:20, 9:10, 23:25, 56:15, 63:20, 66:2, 78:12
**casualty** [2] - 16:19, 76:2
**caution** [1] - 24:9
**certain** [1] - 22:6
**certainly** [1] - 20:14
**CERTIFICATE** [1] - 78:1
**certify** [3] - 78:7, 78:10, 78:13
**chance** [3] - 23:10, 72:7, 75:16
**change** [1] - 73:3
**changed** [4] - 56:15, 57:1, 57:2, 74:19
**changing** [1] - 74:19
**character** [3] - 54:11, 55:12, 66:8
**charge** [1] - 64:15
**charged** [3] - 64:18, 64:23, 74:11
**charges** [2] - 4:6, 64:24
**Chattanooga** [8] - 9:18, 9:19, 36:17, 50:20, 52:6, 52:17, 61:19, 61:21
**CHATTANOOGA** [3] - 1:3, 2:4, 2:10
**check** [1] - 55:20

**chief** [2] - 48:12, 48:13
**children** [2] - 59:6, 61:12
**Chris** [17] - 5:5, 6:17, 7:9, 7:25, 9:7, 13:21, 13:23, 14:1, 14:2, 18:8, 18:9, 18:12, 18:16, 21:23, 22:9, 22:11, 71:4
**Christian** [1] - 49:10
**Chronologically** [1] - 51:12
**church** [1] - 33:4
**Citrus** [3] - 17:6, 17:14, 75:20
**City** [8] - 36:6, 37:1, 41:13, 51:22, 52:1, 62:25, 64:25
**civil** [1] - 23:4
**claimed** [1] - 42:6
**claims** [1] - 31:16
**clerk's** [1] - 28:11
**clip** [1] - 31:14
**close** [2] - 23:4, 74:9
**cocktail** [3] - 76:19, 76:24, 77:1
**code** [3] - 42:25, 62:13
**combat** [1] - 20:12
**coming** [2] - 8:14, 53:20
**command** [2] - 23:3, 32:23
**commanders** [1] - 23:20
**comments** [2] - 72:11
**commerce** [2] - 68:12, 74:12
**Commission** [1] - 78:20
**commit** [4] - 14:23, 22:3, 37:7, 72:20
**commitment** [1] - 13:5
**committed** [1] - 16:11
**committing** [1] - 7:24
**communicated** [1] - 68:17
**communicating** [7] - 66:18, 69:21, 70:2, 70:19, 70:21, 71:2, 71:7
**communication** [7] - 4:5, 7:11, 21:16, 30:22, 48:20, 61:1, 67:3
**communications** [10] - 5:4, 12:14, 21:12, 21:14, 25:3, 56:5, 56:10, 56:18, 69:7, 70:15
**community** [2] - 8:10,

8:11
**complaint** [8] - 24:13, 24:16, 25:7, 27:13, 28:2, 28:21, 44:13
**completely** [1] - 21:6
**complicated** [1] - 16:16
**computers** [1] - 72:3
**coms** [1] - 12:11
**conclusion** [1] - 24:17
**condition** [2] - 7:25, 72:24
**conducive** [1] - 63:17
**conduct** [4] - 42:5, 44:17, 58:1, 75:1
**conducted** [2] - 44:2, 50:18, 50:19
**conducting** [1] - 73:4
**confidential** [13] - 9:12, 33:16, 36:10, 54:19, 57:8, 61:2, 63:1, 66:11, 66:16, 68:19, 68:25, 69:12, 69:22
**confidentiality** [1] - 20:19
**confirm** [3] - 61:24, 68:25, 69:4
**consented** [1] - 50:4
**consider** [1] - 16:21
**considered** [2] - 18:5, 22:3
**consist** [1] - 54:23
**consistent** [1] - 17:20
**conspiracy** [3] - 64:4, 64:14
**Constitution** [3] - 15:24, 22:7, 55:10
**consulate** [1] - 11:18
**consulates** [1] - 22:5
**contact** [2] - 21:5, 37:21, 69:13
**contacted** [2] - 44:11, 50:3
**contacting** [1] - 20:11
**contention** [1] - 68:11
**continuance** [1] - 14:25
**continued** [2] - 71:13, 71:19
**continuing** [1] - 72:8
**controversy** [1] - 5:13
**conversation** [19] - 6:10, 6:16, 7:3, 8:2, 14:19, 17:8, 35:14, 47:21, 47:23, 48:16, 48:18, 62:14, 62:15, 71:13, 71:18, 71:20, 72:14, 76:23, 77:6
**conversations** [2] -

31:22, 43:3
**cooperated** [2] - 49:17, 49:20
**copy** [11] - 4:9, 5:8, 5:9, 5:10, 5:23, 27:2, 31:10, 31:11, 31:13, 41:17
**corner** [1] - 15:3
**correct** [144] - 4:1, 6:14, 6:17, 6:24, 7:4, 7:12, 7:13, 8:6, 8:7, 9:3, 9:4, 10:9, 10:10, 11:10, 12:5, 12:6, 12:21, 12:22, 12:23, 13:3, 13:11, 13:12, 13:14, 13:15, 13:22, 13:23, 14:4, 14:6, 15:5, 17:16, 18:9, 18:14, 19:5, 19:24, 22:21, 22:22, 23:13, 23:14, 23:18, 24:3, 30:11, 30:25, 31:1, 32:4, 32:5, 32:15, 32:16, 32:19, 33:11, 33:12, 33:15, 34:12, 36:15, 36:16, 36:19, 36:22, 36:24, 37:14, 37:15, 37:18, 38:2, 38:3, 38:15, 38:16, 38:19, 39:23, 40:20, 41:8, 41:24, 42:13, 42:14, 42:18, 43:6, 43:7, 43:11, 43:13, 43:20, 44:22, 44:23, 45:5, 45:23, 46:6, 46:7, 46:19, 46:22, 47:9, 47:14, 47:19, 49:2, 49:3, 49:11, 49:12, 49:15, 49:18, 50:1, 50:2, 50:6, 51:11, 51:14, 51:15, 51:20, 51:24, 52:10, 52:14, 52:25, 53:14, 54:12, 54:15, 56:4, 56:8, 56:21, 57:19, 57:23, 58:14, 60:8, 60:9, 62:5, 62:13, 63:6, 63:23, 63:24, 64:16, 64:18, 65:16, 65:21, 66:16, 66:25, 68:8, 69:17, 71:22, 72:1, 72:2, 72:13, 73:2, 73:3, 73:19, 74:3, 75:24, 76:7, 76:12, 76:17, 77:3, 77:13
**Correct** [7] - 10:4, 10:7, 26:15, 33:9, 49:19, 49:23, 73:8
**COUNSEL** [1] - 2:1

counsel [1] - 78:11
countries [1] - 22:6
country [1] - 32:25
County [7] - 17:6,
17:12, 17:13, 17:15,
35:4, 55:3, 75:21
COUNTY [1] - 78:4
course [1] - 37:13
Court [9] - 10:14,
17:22, 25:17, 26:13,
27:11, 27:25, 49:24,
78:14, 78:14
COURT [55] - 1:1,
4:11, 4:15, 5:11,
5:16, 5:20, 5:24, 6:2,
18:4, 24:12, 24:18,
24:24, 25:2, 25:11,
25:19, 25:22, 26:4,
26:8, 26:11, 26:15,
26:19, 26:24, 27:1,
27:5, 27:12, 27:17,
27:21, 28:1, 28:7,
28:16, 28:23, 29:11,
29:13, 29:16, 29:20,
30:15, 30:19, 30:21,
31:3, 31:6, 31:9,
31:13, 32:1, 38:10,
45:17, 46:10, 46:13,
53:21, 53:24, 59:16,
74:7, 75:6, 75:8,
75:15, 77:16
court [4] - 1:13, 48:6,
53:24, 78:6
covering [1] - 68:3
covers [4] - 35:4, 55:3,
67:19, 68:3
crap [1] - 33:2
criminal [2] - 25:7,
27:13
CROSS [1] - 46:14
Cross [2] - 2:17, 46:13
CS [9] - 9:8, 9:24,
10:2, 10:8, 37:13,
46:5, 64:25, 65:19,
76:19
CS-1 [3] - 33:13, 34:1,
35:12
custody [1] - 45:13

**D**

data [1] - 68:16
date [7] - 15:2, 64:17,
65:6, 67:3, 78:15,
78:20
daughter [6] - 38:7,
38:13, 38:20, 40:5,
57:18, 58:7
Davis [6] - 9:7, 18:9,
18:12, 18:16, 19:4

DAVIS [1] - 2:9
days [10] - 14:22,
27:8, 27:9, 42:21,
58:4, 62:17, 62:19,
62:20, 73:7
De [7] - 54:4, 56:5,
57:7, 57:8, 63:2,
63:4, 65:19
de [7] - 9:7, 9:8, 53:13,
55:8, 55:25, 66:14,
69:8
decision [3] - 20:7,
25:17, 59:1
Declaration [1] -
55:10
defendant [7] - 7:2,
7:5, 29:23, 30:22,
32:6, 36:5, 37:20
Defendant [2] - 1:9,
2:11
Delaware [2] - 35:3,
55:3
demolition [9] - 39:16,
39:19, 39:20, 43:16,
62:3, 62:6, 62:8,
62:10, 76:25
demonstrate [1] -
16:13
department [10] -
45:8, 45:13, 46:18,
46:19, 46:22, 46:25,
47:8, 47:13, 47:25,
48:2
Department [4] - 44:5,
44:12, 45:1, 48:8
deployment [1] - 9:1
deposition/hearing
[1] - 78:7
describe [1] - 71:11
described [2] - 39:19,
39:20
design [2] - 28:6, 28:7
designated [1] - 18:19
destroy [2] - 39:15,
76:19
destruction [1] -
16:13
detail [1] - 16:24
detonation [1] - 60:7
device [4] - 53:5, 53:6,
53:8, 77:2
devices [1] - 8:19
difference [1] - 33:23
different [5] - 4:3,
56:17, 57:11, 60:23,
61:8
difficult [1] - 20:7
Direct [1] - 2:17
DIRECT [1] - 3:4
directly [3] - 56:7,

71:14, 71:19
discuss [12] - 4:4,
23:16, 35:17, 35:21,
37:2, 39:9, 39:12,
40:24, 58:17, 59:3,
59:4, 76:18
discussed [8] - 39:14,
43:4, 54:20, 58:22,
58:25, 59:5, 59:8,
59:20
discussing [7] -
11:17, 13:7, 39:16,
57:14, 59:13, 68:5,
72:18
discussion [7] -
17:23, 18:4, 59:10,
73:6, 73:10, 73:11,
73:14
discussions [2] -
58:23, 59:12
dismissive [1] - 71:16
disposal [1] - 16:23
dispute [1] - 29:3
dissuade [1] - 18:24
distance [1] - 35:9
DISTRICT [2] - 1:1, 1:2
District [3] - 64:7,
67:5, 67:6
document [4] - 4:19,
6:5, 35:8, 55:8
documents [11] -
4:20, 32:8, 34:20,
34:25, 54:16, 54:17,
54:19, 54:23, 55:1,
55:7, 67:25
doggart [1] - 42:4
DOGGART [1] - 1:8
Doggart [125] - 5:1,
5:5, 7:9, 7:22, 8:3,
9:24, 10:18, 10:20,
11:13, 12:2, 12:14,
12:24, 13:6, 13:17,
13:18, 13:20, 14:7,
14:20, 15:10, 16:6,
16:8, 17:2, 17:8,
17:10, 18:12, 18:15,
18:16, 19:13, 19:14,
19:20, 20:1, 20:5,
20:15, 20:17, 21:3,
21:17, 22:1, 22:13,
22:14, 22:24, 23:2,
23:15, 23:21, 30:13,
32:7, 32:20, 32:22,
33:16, 33:25, 34:15,
34:17, 35:13, 35:24,
36:9, 36:23, 38:1,
39:4, 39:9, 40:2,
40:4, 40:19, 41:16,
42:1, 42:6, 42:8,
42:16, 42:19, 43:12,

43:18, 43:25, 44:10,
44:11, 45:6, 45:22,
45:25, 46:2, 46:18,
47:22, 48:17, 49:16,
50:8, 52:5, 52:23,
53:12, 54:10, 55:11,
56:1, 56:2, 56:6,
56:11, 56:12, 56:22,
58:23, 60:25, 61:1,
61:5, 61:17, 61:18,
61:20, 62:5, 62:12,
62:17, 63:4, 63:21,
64:3, 65:18, 65:20,
65:24, 65:25, 66:5,
66:7, 66:9, 66:11,
66:14, 66:17, 66:19,
69:14, 69:23, 72:11,
73:15, 76:8, 76:18,
77:5
Doggart's [6] - 3:20,
6:11, 26:2, 30:8,
38:13, 67:21
domestic [1] - 22:6
done [1] - 7:21
Dot [6] - 32:15, 32:17,
32:18, 33:7, 71:10,
71:21
doubt [2] - 5:12, 26:25
Down [1] - 13:20
down [27] - 7:18,
11:11, 12:10, 13:10,
15:7, 16:19, 16:25,
18:8, 19:16, 20:15,
20:21, 21:17, 22:9,
22:23, 32:11, 32:21,
33:4, 42:3, 42:24,
43:12, 47:23, 53:25,
59:11, 63:22, 73:23,
74:14, 76:2
download [1] - 21:8
downloaded [1] -
33:18
draft [2] - 31:24, 31:25
drive [2] - 56:24, 63:22
driven [1] - 38:1
drove [1] - 47:23
due [1] - 29:5
duly [2] - 3:2, 78:13
during [8] - 38:23,
39:4, 39:5, 42:2,
42:4, 49:17, 57:24,
72:10

**E**

E.J [1] - 22:24
eager [1] - 24:21
early [1] - 72:6
earthly [1] - 15:1
Eastern [3] - 64:7,

67:5, 67:6
EASTERN [1] - 1:2
effect [1] - 61:5
effective [1] - 53:6
either [1] - 36:11
elitereporter@
bellsouth.net [1] -
1:24
emails [1] - 32:23
embassy [1] - 11:18
employed [2] - 3:10,
3:11
employee [1] - 78:11
encounter [2] - 38:24,
39:5
end [2] - 53:10
END [1] - 77:18
ended [2] - 46:17,
73:14
enemies [2] - 22:7,
23:9
enemy [2] - 15:17,
17:24
enforcement [5] -
3:17, 35:7, 54:4,
61:25, 62:12
enter [3] - 45:12, 47:8,
47:13
entire [4] - 16:12,
37:25, 53:7, 75:4
EOD [3] - 39:18,
39:21, 60:6
equipment [2] - 4:11,
4:16
ESQUIRE [2] - 2:3, 2:8
essential [2] - 20:20,
22:17
establish [1] - 33:7
evening [4] - 41:15,
59:9, 59:21, 62:23
everywhere [1] -
40:20
evidence [2] - 1:14,
72:9
evidenced [1] - 78:14
ex [5] - 32:18, 32:19,
32:20, 71:21, 71:24
ex-mother-in-law [5] -
32:18, 32:19, 32:20,
71:21, 71:24
exact [1] - 67:3
Examination [3] -
2:17, 2:17, 2:18
EXAMINATION [3] -
3:4, 46:14, 75:9
examined [1] - 3:3
example [1] - 57:3
excellent [1] - 22:14
except [1] - 20:18
exchanged [2] -

54:17, 54:18
**excused** [1] - 77:16
**executed** [1] - 64:12
**exercises** [1] - 73:5
**exhibit** [1] - 68:5
**Exhibit** [12] - 2:22, 4:9, 5:23, 5:25, 6:6, 9:15, 11:12, 25:3, 31:3, 67:23, 67:25, 75:16
**existed** [1] - 60:11
**expected** [1] - 65:7
**expert** [5] - 17:3, 19:21, 43:17, 62:3
**expertise** [2] - 43:17, 60:15
**expiration** [1] - 78:15
**Expiration** [1] - 78:20
**Expires** [1] - 78:21
**explain** [3] - 10:14, 17:22, 48:16
**explosive** [3] - 60:6, 62:6, 77:2
**explosives** [2] - 43:4, 62:8

## F

**facebook** [1] - 2:22
**Facebook** [28] - 4:23, 6:11, 10:11, 10:15, 64:22, 66:20, 66:23, 66:24, 67:9, 67:13, 67:19, 67:21, 68:1, 68:6, 68:15, 68:16, 69:16, 69:17, 69:20, 69:24, 70:1, 70:2, 70:4, 70:11, 70:17, 70:19, 70:24, 75:11
**faces** [1] - 63:18
**fact** [3] - 10:2, 21:12, 35:20
**fair** [1] - 6:9
**fairly** [1] - 56:15
**fairness** [1] - 42:19
**fallen** [1] - 61:4
**familiar** [3] - 4:6, 45:20, 67:13
**family** [2] - 26:2, 71:10
**fantastic** [1] - 4:17
**far** [10] - 3:25, 13:24, 35:1, 35:7, 35:24, 39:15, 49:21, 51:12, 55:4, 68:18
**FBI** [15] - 3:13, 5:6, 6:14, 31:16, 43:11, 50:19, 58:1, 60:3, 60:12, 60:14, 62:2, 65:17, 66:6, 66:22, 69:3

**fear** [1] - 19:2
**February** [3] - 66:12, 66:19, 78:17
**federal** [1] - 52:16
**Federal** [1] - 3:11
**fellow** [14] - 6:17, 13:25, 16:3, 17:14, 18:9, 18:12, 19:5, 19:16, 22:24, 37:20, 42:9, 75:11, 77:7, 77:11
**FEMA** [1] - 22:5
**female** [1] - 32:3
**few** [3] - 14:22, 22:11, 73:7
**field** [3] - 65:14, 66:2, 67:11
**fighter** [1] - 21:7
**fighting** [1] - 17:24
**figure** [1] - 36:14
**filed** [1] - 39:12
**fill** [1] - 31:23
**financially** [1] - 78:11
**finish** [1] - 53:22
**finished** [1] - 54:1
**firearms** [5] - 40:8, 40:10, 40:11, 49:21, 50:5
**fireworks** [10] - 42:10, 42:17, 42:19, 43:1, 43:3, 43:6, 43:10, 62:13, 77:7, 77:12
**First** [1] - 11:8
**first** [8] - 3:2, 3:16, 6:17, 51:13, 52:4, 65:18, 75:1
**five** [2] - 13:6, 13:7
**flashpoint** [4] - 15:15, 16:10, 33:1
**flight** [1] - 20:10
**Florida** [4] - 17:6, 17:15, 68:21, 75:21
**fold** [1] - 38:17
**follow** [2] - 19:1, 52:19
**following** [5] - 1:14, 36:20, 52:22, 75:3, 78:15
**follows** [1] - 3:3
**force** [3] - 12:7, 23:10, 23:12
**forces** [1] - 16:18
**foregoing** [1] - 78:8
**foregone** [1] - 24:17
**foreign** [2] - 22:5, 22:6
**forgot** [1] - 63:19
**FORT** [1] - 2:9
**forward** [1] - 73:13
**four** [8] - 21:17, 21:19, 34:8, 34:10, 50:23, 54:14, 62:19, 63:5

**frame** [1] - 66:18
**Friday** [4] - 27:7, 45:22, 46:5, 49:4
**front** [3] - 41:18, 48:1, 71:1
**fruition** [1] - 56:20

## G

**Galloway** [7] - 45:19, 50:3, 50:7, 51:6, 51:10, 73:16, 74:22
**Gardner** [5] - 16:3, 16:9, 16:25, 17:2, 75:12
**gather** [1] - 22:15
**gathered** [2] - 18:18, 20:19
**Gaunt** [1] - 30:5
**generally** [3] - 37:2, 37:3, 39:12
**gentleman** [2] - 56:23, 72:14
**given** [3] - 4:9, 48:5, 70:8
**Google** [2] - 34:20, 55:1
**gorilla** [1] - 21:7
**government** [9] - 11:3, 33:3, 35:3, 55:5, 65:20, 72:20, 73:1, 73:4
**Government** [2] - 11:4, 73:1
**Government's** [4] - 4:9, 5:23, 9:15, 11:12
**grand** [2] - 29:7, 29:10
**grandchildren** [8] - 38:8, 38:9, 38:11, 38:13, 38:21, 57:19, 58:8, 61:3
**granted** [1] - 24:19
**greater** [3] - 8:24, 16:19, 76:3
**Greenville** [6] - 38:1, 38:14, 38:18, 39:5, 39:24, 40:5
**group** [2] - 10:15, 10:16, 10:24, 11:1, 13:6, 13:7, 13:8, 18:20, 25:24, 44:16, 48:22, 48:23, 49:10, 69:16, 69:17, 69:21, 69:24, 70:1, 70:3, 70:13, 70:18, 70:19, 70:23, 70:24, 71:6, 71:8, 72:25
**groups** [2] - 16:17, 70:4

**guess** [11] - 9:20, 24:17, 25:7, 37:16, 46:16, 52:4, 52:19, 60:16, 60:19, 64:17, 66:7
**guessing** [1] - 26:1
**gun** [3] - 8:15, 35:1, 55:2
**gunners** [1] - 23:8
**gunnery** [1] - 16:23
**guns** [4] - 47:9, 47:13, 49:25, 73:21
**guy** [10] - 14:1, 37:22, 39:18, 39:19, 39:20, 39:21, 42:16, 60:6, 60:7, 60:10
**guys** [3] - 32:9, 50:4, 72:7

## H

**half** [2] - 34:10, 54:14
**HAMILTON** [1] - 78:4
**Hancock** [20] - 8:8, 15:22, 35:4, 35:10, 35:19, 39:9, 42:5, 43:21, 44:17, 46:3, 48:25, 55:4, 56:7, 56:24, 59:10, 60:7, 72:11, 73:18, 74:17, 76:20
**hancock** [1] - 8:9
**hand** [4] - 5:8, 5:15, 31:12, 78:17
**handed** [1] - 5:20
**handgun** [5] - 34:19, 40:12, 40:17, 41:4, 57:6
**handguns** [1] - 52:13
**handwritten** [2] - 30:3, 30:16
**happy** [1] - 31:12
**hard** [1] - 42:25
**harm's** [1] - 7:24
**Harris** [2] - 21:1, 21:3
**Harris/Mr** [1] - 21:3
**hat** [1] - 53:9
**hate** [1] - 16:17
**hear** [3] - 18:17, 25:7, 28:8
**heard** [2] - 1:14, 23:15
**hearing** [4] - 1:12, 24:12, 24:25, 25:12
**helpful** [1] - 22:16
**hereby** [1] - 78:7
**hereunto** [1] - 78:16
**hide** [1] - 42:20
**highlight** [3] - 14:14, 14:15, 21:1
**highlighted** [7] - 5:13,

7:6, 20:4, 23:1, 30:14, 68:7, 69:11
**highlights** [6] - 5:2, 5:3, 5:4, 5:7, 6:8, 6:13
**himself** [11] - 13:24, 18:1, 18:2, 39:20, 42:5, 43:17, 47:24, 54:5, 62:4, 74:2
**home** [2] - 40:2, 56:1
**Honor** [27] - 4:10, 4:13, 5:23, 6:1, 24:5, 24:22, 25:1, 25:15, 25:21, 26:2, 26:7, 27:10, 27:16, 27:20, 27:24, 28:4, 29:19, 30:18, 31:5, 31:12, 45:16, 46:9, 53:23, 74:6, 74:9, 75:5, 75:17
**Honorable** [1] - 1:13
**HOSS** [14] - 2:8, 2:9, 6:1, 19:8, 28:6, 46:15, 48:9, 53:23, 54:3, 59:23, 74:6, 74:9, 74:10, 75:5
**Hoss** [11] - 2:17, 4:10, 24:6, 24:11, 25:16, 25:22, 26:16, 29:17, 53:21, 74:7, 77:4
**hostile** [1] - 11:19
**hotel** [14] - 34:14, 34:16, 34:17, 40:6, 40:7, 41:9, 52:25, 53:3, 54:16, 55:17, 55:19, 56:1, 56:2, 63:15
**hours** [4] - 34:8, 34:10, 50:23, 54:14
**house** [1] - 76:11
**human** [2] - 18:5, 18:6
**Human** [1] - 18:6

## I

**ideal** [1] - 11:21
**identified** [7] - 8:10, 16:12, 18:12, 33:19, 68:18, 68:20, 69:3
**identifies** [3] - 13:10, 13:12, 13:21
**identify** [2] - 4:13, 42:12
**identifying** [2] - 64:5, 75:23
**Ill** [8] - 23:15, 27:9, 27:19, 29:14, 39:1, 48:20, 56:10, 61:1
**illegal** [1] - 11:5
**Illinois** [2] - 11:25,

68:19
**images** [2] - 34:25, 36:1
**immediately** [1] - 56:24
**imminent** [1] - 18:18
**important** [1] - 33:6
**impossible** [1] - 12:19
**IN** [2] - 1:1, 78:16
**in-person** [1] - 22:15
**incident** [3] - 37:25, 45:14, 47:19
**include** [1] - 16:10
**included** [4] - 34:3, 34:18, 34:20, 35:2
**Independence** [1] - 55:10
**independent** [1] - 21:6
**individual** [8] - 9:6, 17:25, 18:20, 42:8, 42:10, 42:11, 54:10, 55:8
**individuals** [14] - 7:13, 21:18, 21:19, 35:3, 48:2, 55:3, 60:23, 64:18, 67:16, 68:15, 68:17, 68:20, 69:3, 70:23
**inferred** [1] - 43:2
**informant** [4] - 65:1, 65:2, 65:10, 65:13
**information** [7] - 2:22, 4:23, 44:15, 49:13, 65:19, 69:22, 69:23
**informing** [1] - 26:13
**initiation** [1] - 74:24
**ink** [1] - 30:16
**Inn** [1] - 55:21
**innocent** [1] - 37:16
**inside** [2] - 45:10, 46:21
**installation** [1] - 33:4
**instead** [2] - 12:14, 72:12
**institute** [1] - 73:1
**instruction** [1] - 48:5
**instructions** [1] - 19:1
**insurrection** [2] - 7:16, 23:5
**intelligence** [3] - 18:18, 20:18, 22:15
**intended** [2] - 15:25, 16:9
**intent** [2] - 16:18, 29:1
**interception** [2] - 42:21, 73:7
**interested** [1] - 78:11
**internet** [1] - 12:15
**interstate** [4] - 4:5, 7:11, 68:12, 74:12

**interview** [7] - 45:20, 50:7, 50:17, 50:22, 51:5, 60:13, 74:21
**interviewed** [5] - 43:11, 45:19, 60:12, 62:1, 62:2
**intrusion** [1] - 16:16
**investigating** [1] - 66:6
**Investigation** [1] - 3:12
**investigation** [12] - 15:19, 15:21, 17:19, 25:15, 29:6, 51:16, 65:5, 66:15, 69:2, 71:24, 74:25, 75:3
**invitation** [4] - 10:17, 70:5, 70:8, 70:10
**invite** [1] - 10:1
**invited** [1] - 70:5
**involved** [4] - 58:23, 63:1, 69:24, 69:25
**Irrespective** [1] - 14:25
**Islamberg** [7] - 8:10, 35:4, 35:22, 39:10, 44:17, 48:25, 72:11
**Islamberg/Hancock** [1] - 34:24
**issue** [2] - 29:14, 49:17
**issued** [2] - 67:5, 67:6
**IT** [1] - 1:11

## J

**James** [1] - 3:7
**JAMES** [3] - 1:18, 3:1, 3:9
**jihadist** [1] - 11:19
**jihadists** [1] - 22:5
**Jim** [1] - 21:22
**job** [1] - 3:16
**join** [3] - 10:16, 70:6, 70:9
**joined** [1] - 70:11
**Jordan** [2] - 19:5, 19:13
**Judge** [16] - 4:14, 5:14, 24:15, 24:17, 26:12, 26:19, 26:25, 27:10, 27:22, 28:4, 28:13, 29:1, 29:10, 46:12, 75:7, 77:15
**jury** [2] - 29:8, 29:10

## K

**keep** [2] - 28:4, 32:22
**Kelly** [3] - 16:3, 16:8,

75:12
**Kevin** [4] - 13:12, 13:18, 21:22, 71:5
**kill** [1] - 32:10
**killed** [1] - 15:24
**killing** [1] - 76:5
**kind** [2] - 40:11, 71:15
**kitchen** [2] - 33:21, 33:24
**knife** [5] - 46:22, 46:25, 47:6, 47:17
**knowing** [1] - 24:9
**knowledge** [4] - 62:4, 62:7, 65:20, 78:8
**known** [1] - 20:18
**knows** [1] - 49:2
**Kristy** [1] - 78:6
**KRISTY** [2] - 1:22, 78:19

## L

**lady** [2] - 32:3, 32:14
**LANE** [1] - 1:23
**language** [1] - 42:20
**Larry** [2] - 72:17, 72:18
**last** [8] - 9:20, 20:10, 22:9, 27:8, 28:5, 34:7, 42:24, 50:22
**lasted** [1] - 54:13
**Laughter** [1] - 22:24
**law** [14] - 3:16, 32:18, 32:19, 32:20, 35:7, 52:16, 54:4, 61:25, 62:12, 71:21, 71:24, 72:21, 73:1, 73:4
**laws** [2] - 35:1, 55:2
**LCR** [4] - 1:22, 78:6, 78:14, 78:19
**least** [2] - 28:11, 68:25
**leave** [1] - 56:6
**leaves** [2] - 55:25, 56:1, 56:2
**Lee** [1] - 1:13
**left** [3] - 49:21, 54:19, 63:22
**legal** [3] - 20:13, 26:2, 41:1
**LEIGH** [1] - 78:19
**lending** [1] - 16:10
**less** [1] - 60:19
**level** [1] - 16:21
**liberal** [1] - 20:14
**licensed** [2] - 78:6, 78:13
**Licensed** [1] - 78:14
**Lieutenant** [1] - 48:10
**lieutenant** [4] - 44:24, 45:2, 48:7, 48:17

**light** [1] - 72:23
**Linda** [1] - 16:8
**line** [3] - 31:19, 33:14, 71:9
**Lineaweaver** [1] - 15:7
**lines** [1] - 35:2
**listen** [4] - 31:23, 60:2, 60:3, 60:4
**listening** [1] - 31:21
**live** [2] - 17:6, 38:14
**lives** [5] - 15:1, 17:9, 17:10, 75:20, 75:23
**loaded** [2] - 8:25, 9:1
**Lobo** [14] - 9:7, 9:8, 53:13, 54:5, 55:8, 55:25, 56:5, 57:7, 57:8, 63:2, 63:4, 65:19, 66:14, 69:8
**located** [4] - 6:21, 6:22, 11:23, 11:24
**location** [6] - 8:9, 15:22, 18:20, 37:5, 39:14, 46:24
**location/date** [1] - 20:18
**locations** [2] - 36:2, 69:5
**look** [3] - 7:6, 12:24, 72:7
**looking** [2] - 28:16, 65:18
**looks** [2] - 29:4, 67:24
**lost** [1] - 76:6
**lunch** [5] - 34:11, 34:13, 52:25, 55:14, 55:15

## M

**M-16** [1] - 8:15
**M-4** [9] - 8:15, 34:19, 40:13, 41:2, 41:6, 52:4, 52:6, 52:17, 57:6
**M16** [1] - 17:3
**M4** [1] - 8:17
**ma'am** [2] - 29:12, 31:8
**magazines** [1] - 9:1
**Magistrate** [1] - 1:13
**magnification** [1] - 8:19
**maintain** [2] - 68:23, 68:24
**maintains** [1] - 68:16
**managed** [1] - 65:13
**manifest** [1] - 20:9
**manner** [1] - 16:11
**map** [3] - 35:8, 35:25, 55:1

**map-type** [1] - 55:1
**maps** [2] - 22:16, 54:24
**March** [6] - 15:3, 30:10, 30:12, 51:17, 67:2, 67:4
**marked** [4] - 4:8, 6:6, 31:10, 31:11
**MARKET** [1] - 2:4
**martial** [3] - 72:21, 73:1, 73:4
**matches** [1] - 57:13
**materials** [1] - 42:9
**matter** [1] - 23:23
**Mattice** [2] - 27:10, 27:22
**mayor** [1] - 35:7
**McNaulty** [4] - 9:25, 36:10, 36:11, 63:5
**mcNaulty** [1] - 37:16
**mean** [9] - 25:23, 42:23, 43:2, 56:14, 59:17, 60:17, 68:2, 68:3, 69:25
**meaning** [2] - 10:16, 76:5
**means** [1] - 17:22
**medication** [1] - 61:4
**meet** [14] - 37:1, 39:4, 39:24, 44:14, 48:21, 59:3, 59:4, 59:6, 59:13, 60:17, 60:21, 60:22, 61:8, 76:15
**meeting** [28] - 9:23, 10:2, 10:8, 18:19, 22:15, 34:7, 34:8, 35:16, 35:17, 36:5, 36:8, 36:9, 37:9, 41:13, 51:23, 53:2, 53:11, 53:13, 55:23, 56:9, 56:12, 56:23, 62:25, 63:5, 63:11, 64:5, 64:25, 76:14
**member** [9] - 10:18, 10:20, 11:9, 69:15, 69:18, 70:1, 70:12, 70:14, 70:18
**members** [9] - 10:25, 20:9, 26:2, 70:16, 70:20, 70:23, 71:6, 71:7, 71:10
**men** [1] - 66:13
**mental** [2] - 13:14, 13:19
**mentioned** [3] - 48:4, 48:22, 57:5
**mess** [2] - 13:14, 13:19
**message** [7] - 12:25, 13:20, 14:7, 18:8,

19:1, 69:10, 69:11
**messages** [11] - 67:12, 67:13, 67:15, 67:18, 68:6, 68:7, 68:8, 68:10, 69:2, 69:5, 69:9
**messaging** [3] - 7:8, 67:22, 67:24
**met** [9] - 9:24, 34:1, 35:13, 52:25, 53:12, 54:10, 58:10, 64:3, 76:9
**might** [2] - 25:12, 69:8
**Mike** [3] - 48:10, 48:12
**miles** [2] - 60:17, 60:19
**military** [1] - 33:4
**militia** [7] - 10:25, 11:1, 23:3, 44:16, 48:22, 48:23, 49:10
**militia-type** [1] - 11:1
**militias** [1] - 16:10
**millimeter** [2] - 23:7, 23:8
**mind** [2] - 22:12, 74:7
**minutes** [1] - 75:7
**Miranda** [1] - 51:1
**Mirandized** [1] - 50:24
**missed** [1] - 69:8
**mission** [1] - 10:22
**mistake** [1] - 21:5
**Molotov** [3] - 76:19, 76:23, 77:1
**Monday** [2] - 27:8, 28:5
**monitored** [1] - 35:13
**monitoring** [2] - 58:12, 72:10
**monitors** [1] - 31:21
**morning** [2] - 24:6, 24:11
**mortality** [1] - 16:13
**mosque** [9] - 4:5, 29:24, 29:25, 32:12, 33:21, 33:24, 36:3, 37:5, 59:11
**mosques** [2] - 73:23, 74:15
**Moss** [2] - 6:22, 14:5
**most** [3] - 16:11, 22:16, 74:25
**motel** [1] - 40:6
**mother** [8] - 32:18, 32:19, 32:20, 36:11, 36:12, 36:13, 71:21, 71:24
**motion** [1] - 25:19
**Mountain** [13] - 17:10, 35:10, 44:4, 44:7, 44:9, 44:12, 44:24,

45:1, 46:17, 47:22, 48:8, 56:3
**MOUNTAIN** [1] - 1:23
**move** [7] - 18:25, 20:12, 21:6, 24:21, 26:8, 57:4, 59:16
**moved** [2] - 28:5, 71:18
**moving** [6] - 24:13, 24:15, 25:6, 25:20, 25:22, 73:12
**MR** [70] - 3:5, 4:12, 4:17, 4:18, 5:14, 5:18, 5:22, 6:1, 6:4, 6:7, 18:7, 19:8, 19:9, 19:10, 24:5, 24:15, 24:21, 25:1, 25:10, 25:14, 25:21, 26:1, 26:6, 26:10, 26:12, 26:16, 26:22, 26:25, 27:4, 27:6, 27:15, 27:20, 27:24, 28:3, 28:6, 28:13, 28:19, 29:9, 29:12, 29:15, 29:18, 29:21, 29:22, 30:18, 30:20, 30:23, 30:24, 31:5, 31:11, 31:18, 32:2, 38:12, 42:15, 45:18, 46:8, 46:11, 46:15, 48:9, 53:23, 54:3, 59:23, 74:6, 74:9, 74:10, 75:5, 75:7, 75:10, 75:17, 75:19, 77:14
**multiple** [1] - 62:19
**Muslim** [2] - 8:11, 33:4
**must** [6] - 14:23, 18:18, 18:20, 20:12, 21:9, 22:1

# N

**name** [16] - 3:6, 3:8, 9:6, 9:15, 19:23, 20:9, 22:24, 53:17, 53:18, 54:1, 54:2, 54:7, 54:8, 55:20, 72:17, 78:15
**named** [9] - 6:17, 16:3, 18:9, 19:5, 19:16, 22:2, 32:3, 32:15, 75:11
**Nashville** [15] - 6:25, 14:3, 34:1, 35:13, 51:14, 51:17, 52:1, 52:4, 52:5, 52:7, 52:17, 53:13, 56:7, 56:23, 63:14
**nation** [4] - 15:17, 20:6, 22:4, 23:4

**nations** [1] - 16:18
**nature** [1] - 29:5
**near** [2] - 11:24, 38:14
**necessarily** [1] - 25:8
**necessary** [3] - 15:16, 18:25, 37:6
**need** [11] - 8:13, 8:14, 8:16, 12:8, 15:1, 24:8, 25:7, 25:8, 28:8, 39:16
**needed** [5] - 15:13, 15:15, 39:15, 42:6, 46:25
**needs** [2] - 7:21, 37:4
**negative** [1] - 72:23
**never** [4] - 56:19, 58:10, 60:11, 64:12
**New** [28] - 8:6, 8:8, 8:9, 8:14, 13:7, 15:22, 32:8, 34:24, 34:25, 35:4, 35:10, 35:19, 39:9, 42:5, 44:17, 46:3, 48:25, 55:2, 55:4, 56:7, 56:11, 56:13, 56:24, 59:5, 59:11, 72:12, 73:13, 73:18
**next** [14] - 7:23, 14:22, 14:24, 16:2, 22:23, 26:9, 29:9, 29:11, 42:23, 46:1, 51:20, 57:15, 73:18, 77:17
**night** [8] - 8:18, 37:20, 41:14, 41:16, 46:4, 49:4, 77:8, 77:10
**night-sights** [1] - 8:18
**Nita** [3] - 30:7, 32:4, 33:7
**nobody** [3] - 47:12, 64:22, 74:4
**non** [1] - 23:13
**none** [1] - 64:17
**nonfunctional** [1] - 32:13
**nonresponsiveness** [1] - 21:10
**noontime** [1] - 62:24
**northeast** [2] - 6:25, 14:3
**notarial** [1] - 78:17
**notary** [1] - 78:6
**Notary** [1] - 78:20
**note** [1] - 24:6
**notes** [3] - 30:3, 30:18, 30:19
**nothing** [1] - 11:5
**notice** [1] - 5:2
**November** [3] - 15:16, 15:21, 66:18
**number** [2] - 69:12,

78:14
**Number** [1] - 6:6
**nunc** [1] - 27:3

# O

**objection** [3] - 5:25, 6:3, 24:19
**objective** [1] - 32:12
**obtained** [1] - 67:25
**obtaining** [1] - 49:21
**occasions** [3] - 17:21, 25:16, 57:11
**occur** [8] - 23:5, 35:19, 35:20, 37:4, 56:25, 59:9, 59:18, 75:2
**occurred** [5] - 30:10, 36:5, 37:19, 43:15, 51:21
**occurring** [2] - 17:8, 44:16
**OF** [6] - 1:2, 1:5, 2:1, 77:18, 78:3, 78:4
**offended** [1] - 21:9
**office** [6] - 26:3, 28:11, 45:4, 45:6, 50:4, 50:19, 65:14, 66:2, 67:11
**OFFICE** [1] - 2:3
**officer** [3] - 44:10, 49:1, 49:2
**officers** [1] - 44:25, 48:8
**officials** [3] - 35:8, 55:4, 55:5
**often** [1] - 56:16
**One** [12] - 2:22, 4:9, 5:23, 5:25, 6:6, 9:15, 11:12, 25:3, 31:4, 67:24, 67:25, 75:16
**one** [36] - 3:19, 6:18, 7:6, 8:5, 13:6, 13:8, 16:2, 16:20, 17:17, 17:23, 21:13, 21:25, 22:9, 22:23, 26:2, 26:9, 28:10, 31:14, 44:25, 45:15, 47:15, 48:2, 48:7, 48:14, 51:13, 51:16, 53:21, 56:22, 57:4, 57:17, 61:11, 64:21, 65:11, 74:6, 76:3, 76:6
**ones** [2] - 67:14, 68:9
**ongoing** [3] - 25:14, 51:16, 69:2
**openly** [1] - 12:15
**operations** [1] - 18:21
**order** [10] - 16:13, 26:17, 26:20, 27:13,

28:10, 28:11, 28:14, 28:17, 28:24, 51:25
**Oregon** [2] - 19:21, 68:21
**organization** [1] - 21:7
**organizations** [2] - 16:19, 76:2
**Oscar** [2] - 15:16, 15:21
**outcome** [1] - 78:12
**outside** [2] - 6:23, 47:2
**overhead** [1] - 36:1
**overview** [1] - 34:24
**own** [3] - 21:6, 22:4, 61:9

# P

**page** [21] - 2:16, 2:21, 6:11, 9:14, 10:11, 11:11, 12:1, 13:2, 14:20, 14:24, 16:2, 18:11, 19:8, 19:9, 19:11, 20:2, 20:21, 41:22, 68:3, 75:17
**pages** [1] - 78:8
**paid** [5] - 65:1, 65:2, 65:3, 65:4
**Papa** [2] - 15:16, 15:21
**Papa-Oscar-November** [2] - 15:16, 15:21
**papers** [1] - 34:20
**paragraph** [1] - 41:23
**paraphrasing** [1] - 48:23
**part** [10] - 21:10, 25:3, 33:7, 34:11, 42:3, 48:20, 52:19, 52:21, 57:24, 58:2
**participate** [1] - 50:8
**participation** [1] - 16:22
**particulars** [1] - 45:20
**parties** [2] - 25:18, 78:11
**party** [1] - 28:5
**Patriot** [1] - 23:2
**patriot** [1] - 23:8
**Patriots** [1] - 16:14
**payment** [1] - 65:7
**payments** [1] - 65:6
**people** [11] - 15:23, 22:8, 29:24, 32:10, 32:25, 33:20, 46:5, 63:5, 64:21, 70:15, 76:5
**Peoria** [4] - 11:25,

36:15, 36:18, 68:19
**perhaps** [1] - 22:20
**period** [1] - 53:11
**permit** [7] - 23:11, 40:25, 41:1, 41:2, 41:4, 52:9
**PERRY** [1] - 2:3
**person** [5] - 13:10, 22:15, 45:12, 53:12, 76:6
**persons** [1] - 20:8
**phone** [7] - 33:14, 33:15, 41:15, 42:7, 42:14, 58:12, 71:9
**Phonetically** [2] - 9:25, 30:6
**photographs** [1] - 33:18
**physically** [4] - 58:19, 59:24, 60:17, 61:3
**pick** [1] - 55:9
**picked** [3] - 30:25, 31:1, 56:10
**picks** [1] - 55:11
**pictures** [3] - 34:21, 34:23, 55:2
**Pinkerton** [6] - 19:16, 19:20, 20:5, 20:16, 20:17, 71:5
**Pinkerton's** [1] - 19:23
**piper** [1] - 64:22
**Piper** [7] - 2:17, 2:18, 5:12, 31:14, 53:19, 57:16, 66:21
**PIPER** [59] - 2:3, 3:5, 4:12, 4:17, 4:18, 5:14, 5:18, 5:22, 6:4, 6:7, 18:7, 19:9, 19:10, 24:5, 24:15, 24:21, 25:1, 25:10, 25:14, 25:21, 26:1, 26:6, 26:10, 26:12, 26:16, 26:22, 26:25, 27:4, 27:6, 27:15, 27:20, 27:24, 28:3, 28:13, 28:19, 29:9, 29:12, 29:15, 29:18, 29:21, 29:22, 30:18, 30:20, 30:23, 30:24, 31:5, 31:11, 31:18, 32:2, 38:12, 45:15, 45:18, 46:8, 46:11, 75:7, 75:10, 75:17, 75:19, 77:14
**pistol** [2] - 17:3, 40:12
**place** [2] - 32:24, 36:6
**placing** [1] - 7:24
**Plaintiff** [2] - 1:6, 2:6
**plan** [10] - 15:1, 29:6, 32:8, 42:7, 56:25,

57:2, 57:16, 59:4, 72:18, 73:17
**planning** [4] - 35:18, 56:17, 74:25, 75:2
**plans** [7] - 33:11, 35:21, 56:15, 56:19, 74:19, 77:5
**PM** [1] - 16:22
**point** [16] - 24:14, 24:23, 24:24, 25:8, 25:20, 25:23, 26:6, 27:23, 28:8, 35:25, 37:8, 45:9, 56:6, 69:4, 72:10, 73:6
**pointed** [1] - 36:1
**Police** [4] - 44:4, 44:12, 45:1, 48:8
**police** [15] - 44:10, 44:24, 45:2, 45:8, 45:12, 46:18, 46:19, 46:21, 46:25, 47:8, 47:13, 47:25, 49:1, 49:2, 61:14
**politics** [2] - 58:23, 59:13
**PON-26** [1] - 18:17
**pondering** [1] - 11:20
**popped** [1] - 62:13
**portion** [3] - 23:1, 30:14, 53:4
**portions** [2] - 63:10, 63:13
**possession** [2] - 54:22, 66:22
**post** [2] - 64:22, 75:11
**posts** [4] - 66:20, 67:21, 67:22, 68:1
**Powell** [20] - 5:5, 6:17, 6:21, 6:22, 7:2, 7:9, 7:10, 7:18, 7:20, 7:25, 8:3, 9:3, 13:21, 13:24, 14:1, 14:2, 21:23, 22:10, 22:11, 71:4
**precedent** [1] - 72:24
**precipitated** [1] - 76:22
**preemptive** [6] - 44:18, 44:19, 48:24, 49:10, 72:12, 72:22
**present** [5] - 46:24, 50:9, 59:24, 59:25, 69:1
**presenting** [1] - 29:6
**president** [2] - 58:24, 58:25
**press** [1] - 20:14
**previous** [2] - 43:3, 44:13
**printed** [1] - 54:25

**private** [19] - 10:15, 12:17, 67:13, 67:15, 67:17, 67:22, 67:24, 68:6, 68:8, 68:10, 69:9, 69:17, 69:24, 70:1, 70:2, 70:4, 70:19, 70:23
**pro** [1] - 27:3
**probable** [1] - 29:7
**process** [2] - 51:5, 72:8
**prohibition** [3] - 52:5, 52:15, 52:18
**prohibits** [1] - 52:16
**promised** [1] - 60:6
**property** [2] - 18:5, 33:19
**provide** [4] - 31:7, 60:6, 64:9, 67:8
**provided** [7] - 24:6, 24:10, 44:14, 60:23, 61:7, 61:9, 69:23
**provides** [1] - 15:2
**providing** [3] - 56:5, 65:19, 69:12
**provisioned** [1] - 18:21
**Public** [1] - 78:20
**public** [8] - 24:12, 24:24, 25:3, 25:11, 55:4, 67:21, 68:1, 78:6
**publicly** [1] - 70:8
**pull** [1] - 62:7
**pulling** [1] - 33:3
**purpose** [5] - 35:12, 35:16, 35:17, 38:17, 57:17
**purposes** [1] - 63:16
**put** [8] - 5:7, 6:13, 41:9, 47:1, 47:2, 47:16, 47:17, 65:11

## Q

**qualified** [2] - 17:3, 20:11
**questioning** [3] - 7:25, 61:15, 61:25
**questions** [4] - 29:16, 29:18, 51:6, 51:9

## R

**radio** [8] - 58:25, 59:8, 59:9, 59:17, 59:20, 59:22, 60:1
**raided** [2] - 61:14, 62:12
**rapid** [1] - 9:1

**ratio** [4] - 16:19, 17:17, 17:23, 76:3
**react** [1] - 73:2
**reactive** [3] - 72:13, 72:19, 73:12
**read** [6] - 14:21, 18:15, 18:23, 20:24, 21:25, 23:1
**ready** [1] - 19:3
**real** [3] - 54:7, 54:8, 74:9
**really** [1] - 42:20
**Reapers** [10] - 10:12, 10:15, 10:19, 10:21, 10:24, 11:9, 69:15, 69:19, 70:20
**Reapers'** [1] - 10:22
**reason** [4] - 24:23, 49:25, 61:11, 61:13
**reasoning** [1] - 29:4
**reasons** [4] - 25:12, 60:23, 61:8, 61:9
**received** [2] - 6:5, 69:5
**receiving** [1] - 69:1
**recipient** [5] - 7:7, 7:9, 11:14, 11:15, 68:10
**reciprocation** [1] - 35:1
**recognize** [1] - 4:19
**recommended** [1] - 72:19
**recon** [2] - 22:12, 73:13
**reconnaissance** [8] - 22:20, 35:18, 35:21, 37:4, 73:24, 74:1, 74:23, 75:1
**reconnoiter** [1] - 22:16
**Reconnoiter** [1] - 22:19
**record** [6] - 5:12, 24:5, 25:3, 28:9, 33:6, 78:8
**recorded** [3] - 35:14, 50:13, 50:14
**recording** [3] - 53:5, 53:7, 54:20
**recordings** [1] - 57:13
**redirect** [2] - 2:18, 75:6
**REDIRECT** [1] - 75:9
**RedPhone** [2] - 21:8, 21:11
**reference** [1] - 44:13
**referred** [1] - 43:3
**related** [1] - 78:10
**relationship** [4] - 66:1, 66:4, 66:9, 66:10
**relieved** [1] - 23:20

**religious** [2] - 44:15, 49:11
**remained** [1] - 27:7
**remember** [2] - 19:2, 26:6
**REMEMBERED** [1] - 1:11
**replied** [1] - 42:10
**reported** [1] - 78:7
**reporter** [3] - 48:6, 53:24, 78:6
**Reporter** [1] - 78:14
**REPORTER'S** [1] - 78:1
**reporting** [2] - 49:1, 49:9
**Reporting** [1] - 78:14
**represent** [1] - 5:11
**representation** [1] - 20:13
**request** [1] - 28:25
**require** [2] - 15:1, 16:14
**required** [2] - 26:17, 27:5
**research** [2] - 15:18, 15:20
**reserve** [1] - 17:5
**residence** [1] - 71:25
**resources** [1] - 22:2
**respectfully** [1] - 19:3
**respond** [3] - 16:22, 18:25, 71:14
**responds** [5] - 17:2, 20:1, 20:5, 22:13, 22:14
**response** [1] - 71:12
**rest** [2] - 18:23, 33:22
**restaurant** [1] - 63:11
**retrieve** [1] - 12:22
**return** [1] - 6:10
**returned** [5] - 2:22, 4:24, 58:5, 61:18, 61:20
**returns** [1] - 69:20
**revealed** [1] - 15:19
**review** [1] - 37:3
**reviewed** [2] - 63:12, 67:12
**reviewing** [1] - 67:15
**Richard** [1] - 71:5
**ride** [1] - 60:20
**rifle** [3] - 17:3, 19:21, 34:19
**righteous** [1] - 20:8
**ring** [1] - 48:11
**Risner** [1] - 78:6
**RISNER** [2] - 1:22, 78:19

**Rizzo** [2] - 21:1, 21:3
**Roark** [1] - 21:22
**ROARK** [1] - 21:22
**Robert** [12] - 5:1, 5:5, 7:8, 9:24, 11:13, 12:13, 13:6, 16:8, 19:13, 21:17, 36:9, 67:20
**ROBERT** [1] - 1:8
**room** [8] - 34:14, 34:16, 34:17, 41:9, 50:9, 52:25, 53:3, 54:16
**rough** [2] - 31:24, 31:25
**roughly** [2] - 10:23, 62:20
**rounds** [1] - 8:24
**route** [1] - 35:9
**Ruby** [1] - 55:16
**run** [1] - 59:1
**running** [2] - 58:24, 58:25
**runs** [1] - 53:10

## S

**S-M-I-T-H** [1] - 3:9
**Sally** [2] - 9:24, 36:10
**Sangre** [6] - 9:7, 9:8, 53:13, 55:8, 66:14, 69:8
**satellite** [3] - 34:20, 34:25, 55:2
**Saturday** [3] - 43:22, 46:3, 74:1
**saw** [3] - 18:11, 58:7, 58:10
**Schielein** [32] - 9:14, 9:17, 10:3, 10:5, 11:9, 11:15, 11:23, 11:24, 12:5, 12:12, 12:13, 12:17, 12:25, 13:16, 13:18, 13:21, 13:23, 14:8, 15:4, 15:6, 21:13, 21:22, 36:10, 36:12, 36:14, 36:17, 37:7, 63:4, 64:20, 68:18, 71:3, 71:4
**SCHIELEIN** [1] - 10:5
**school** [4] - 32:11, 33:21, 33:24, 36:2
**seal** [11] - 24:7, 27:7, 28:3, 28:4, 28:14, 28:22, 28:24, 28:25, 29:2, 78:17
**sealed** [3] - 28:5, 29:5, 29:14
**sealing** [3] - 26:20,

27:13, 28:12
**search** [9] - 2:23, 4:24, 6:10, 44:2, 66:23, 67:9, 67:19, 70:8, 71:25
**second** [4] - 21:25, 45:16, 46:8, 74:6
**Section** [1] - 26:18
**secure** [5] - 12:11, 12:14, 21:12, 21:13, 21:16
**secured** [1] - 72:3
**see** [40] - 4:16, 6:20, 7:18, 9:15, 10:16, 12:1, 14:8, 14:11, 14:17, 15:8, 15:13, 15:25, 16:4, 17:18, 19:6, 19:17, 20:2, 20:22, 21:19, 30:3, 30:16, 36:23, 38:4, 38:5, 38:20, 57:7, 57:8, 57:10, 57:18, 61:7, 67:2, 67:3, 68:2, 69:7, 70:17, 75:12, 75:20, 75:21, 76:3
**See** [1] - 22:23
**seeing** [2] - 28:17, 63:18
**seem** [1] - 24:14
**sending** [1] - 74:11
**sends** [1] - 13:20
**sent** [4] - 68:12, 68:23, 70:6, 70:10
**Sequatchie** [2] - 17:12, 17:13
**sequitur** [1] - 23:13
**served** [8] - 64:1, 64:2, 64:12, 66:23, 67:1, 67:2, 67:4, 68:16
**service** [2] - 15:24, 17:4
**set** [7] - 9:23, 10:2, 10:8, 16:18, 76:2, 76:13, 78:16
**seven** [2] - 18:17, 27:8
**shall** [8] - 16:14, 20:10, 20:12, 21:3, 21:6, 23:8, 23:9, 27:3
**Shane** [19] - 9:14, 10:3, 11:15, 11:20, 11:22, 11:24, 12:25, 13:5, 13:8, 13:23, 15:6, 21:22, 36:10, 36:14, 63:4, 64:20, 68:18, 71:3, 71:4
**shane** [1] - 11:8
**sheet** [2] - 31:19, 33:14

**sheets** [1] - 71:9
**shortly** [1] - 43:12
**shotgun** [6] - 34:18, 40:12, 41:3, 41:7, 52:16, 57:6
**show** [8] - 59:1, 59:8, 59:9, 59:17, 59:20, 59:22, 60:1
**showed** [2] - 35:9, 68:1
**showing** [2] - 29:7, 31:15
**shows** [2] - 68:10, 69:20
**sick** [1] - 33:2
**sights** [1] - 8:18
**sign** [1] - 3:23
**Signal** [13] - 17:10, 35:9, 44:4, 44:7, 44:9, 44:11, 44:24, 44:25, 46:17, 47:21, 47:22, 48:8, 56:3
**SIGNAL** [1] - 1:23
**signed** [2] - 27:10, 51:1
**significance** [1] - 8:8
**sister** [3] - 30:9, 30:22, 71:10
**skills** [2] - 16:23, 78:8
**small** [1] - 33:3
**Smith** [14] - 3:7, 3:14, 4:4, 4:13, 24:10, 28:18, 29:17, 29:23, 31:19, 46:16, 72:17, 72:18, 74:11
**SMITH** [2] - 1:18, 3:1
**Smith's** [1] - 30:19
**soft** [1] - 11:19
**solicitation** [1] - 4:4
**someone** [2] - 13:13
**somewhat** [3] - 22:19, 37:17, 42:24
**soon** [1] - 14:10
**sorry** [11] - 5:6, 5:14, 19:9, 21:19, 27:8, 28:20, 30:16, 30:23, 42:3, 53:23, 59:19
**sort** [1] - 45:11
**sounds** [2] - 27:21, 29:13
**source** [13] - 9:12, 33:16, 36:10, 54:20, 57:8, 61:2, 63:1, 66:11, 66:16, 68:19, 69:1, 69:12, 69:22
**South** [25] - 37:20, 37:22, 37:24, 38:1, 38:14, 39:5, 41:7, 41:16, 51:18, 51:20, 52:1, 57:3, 57:4,

57:16, 57:17, 57:25, 58:20, 59:14, 59:21, 60:18, 62:17, 63:20, 63:22, 76:8
**Southwest** [1] - 73:5
**speaking** [2] - 12:14, 39:13, 42:7
**specialist** [2] - 42:9, 60:14
**specialty** [2] - 77:7, 77:11
**specific** [2] - 74:12, 74:20
**spell** [1] - 3:8
**spelled** [1] - 10:5
**spoken** [2] - 25:15, 29:23
**stand** [1] - 53:15
**start** [2] - 33:1, 46:16
**started** [3] - 65:18, 66:13, 66:15
**state** [14] - 16:24, 35:2, 40:19, 41:5, 45:22, 45:25, 46:2, 52:15, 55:2, 55:5, 65:15, 68:20, 68:21
**State** [4] - 34:25, 78:6
**STATE** [1] - 78:3
**statement** [2] - 7:23, 10:23
**statements** [1] - 71:11
**States** [3] - 11:4, 22:7, 73:5
**STATES** [2] - 1:1, 1:5
**station** [1] - 59:25
**status** [1] - 73:12
**stay** [2] - 40:5
**stayed** [1] - 40:7
**stepping** [1] - 20:7
**still** [6] - 13:24, 22:12, 24:7, 39:1, 42:8, 72:8
**straight** [1] - 56:13
**STREET** [2] - 2:4, 2:9
**strike** [6] - 44:18, 44:19, 48:25, 49:10, 72:12, 72:13
**stuff** [1] - 33:23
**Sturdevant** [4] - 13:12, 13:19, 21:23, 71:5
**style** [1] - 40:13
**styled** [1] - 1:11
**subjugated** [1] - 16:17
**submarine** [4] - 23:10, 23:12, 23:16, 23:20
**submarines** [2] - 23:17, 23:20
**submitted** [1] - 28:14
**success** [2] - 22:17,

22:18
**SUITE** [1] - 2:4
**summary** [1] - 60:13
**Sunday** [5] - 58:5, 59:6, 59:21, 62:21, 62:23
**support** [3] - 3:22, 15:2, 19:14
**supposedly** [1] - 12:19
**surrogate** [2] - 36:12, 36:13
**surveillance** [11] - 22:20, 41:11, 42:6, 52:20, 52:21, 52:22, 57:9, 57:24, 58:1, 58:2, 63:10
**surveying** [1] - 38:23
**Susan** [1] - 1:13
**sworn** [1] - 3:2

## T

**T-3** [1] - 31:2
**tactics** [1] - 59:4
**talks** [7] - 8:5, 8:12, 9:2, 14:13, 15:23, 75:14, 76:2
**tap** [1] - 12:20
**tape** [1] - 50:13
**taped** [1] - 63:7
**target** [8] - 14:14, 14:19, 15:16, 15:19, 15:21, 17:24, 18:4, 18:17
**targets** [9] - 11:19, 16:12, 17:25, 18:6, 22:4, 22:12, 33:20, 39:14
**team** [5] - 52:20, 52:21, 52:22, 58:2, 63:10
**telephone** [5] - 12:15, 12:18, 48:15, 69:12, 69:13
**ten** [1] - 27:8
**TENNESSEE** [5] - 1:2, 1:23, 2:4, 2:10, 78:3
**Tennessee** [16] - 6:22, 7:1, 7:10, 7:14, 14:5, 17:11, 17:13, 34:1, 35:10, 41:4, 41:5, 64:7, 67:5, 67:7, 78:7, 78:14
**Tent** [38] - 37:24, 38:5, 39:8, 39:21, 41:14, 41:16, 42:12, 42:15, 42:16, 43:5, 43:8, 43:11, 43:16, 43:18, 46:4, 57:18, 58:10,

58:15, 58:20, 58:24, 59:5, 60:5, 60:10, 61:6, 61:9, 61:11, 62:1, 62:2, 62:11, 63:21, 64:3, 64:20, 76:9, 76:15, 76:23, 76:24, 77:6, 77:11
**tent** [4] - 39:4, 39:17, 39:18, 42:1
**Tent's** [2] - 38:10, 76:11
**term** [1] - 22:20
**testified** [5] - 3:3, 49:16, 51:13, 52:24, 69:14
**testify** [1] - 24:10
**testimony** [1] - 70:14
**TESTIMONY** [1] - 77:18
**Texas** [6] - 9:7, 18:13, 65:15, 66:2, 68:20, 72:15
**text** [1] - 76:1
**THE** [60] - 1:1, 4:11, 4:15, 5:11, 5:15, 5:16, 5:17, 5:20, 5:24, 6:2, 18:4, 18:6, 24:12, 24:18, 24:24, 25:2, 25:11, 25:19, 25:22, 26:4, 26:8, 26:11, 26:15, 26:19, 26:24, 27:1, 27:5, 27:12, 27:17, 27:21, 28:1, 28:7, 28:16, 28:23, 29:11, 29:13, 29:16, 29:20, 30:15, 30:19, 30:21, 31:3, 31:6, 31:8, 31:9, 31:13, 32:1, 38:10, 45:17, 46:10, 46:13, 53:21, 53:24, 59:16, 59:19, 74:7, 75:6, 75:8, 75:15, 77:16
**theme** [2] - 17:18, 17:20
**themselves** [1] - 16:11
**thinks** [1] - 23:17
**threat** [4] - 7:11, 29:24, 74:12
**threats** [4] - 4:5, 74:14, 74:19
**three** [16] - 8:1, 11:20, 15:16, 15:19, 15:21, 18:18, 21:18, 22:4, 25:16, 33:19, 33:20, 34:10, 51:25, 54:14, 57:10, 62:17
**three-and-a-half** [2] - 34:10, 54:14
**throughout** [2] -

17:18, 56:14
**Thursday** [2] - 36:4, 46:4
**timing** [1] - 16:12
**tired** [2] - 33:2, 61:4
**Title** [8] - 23:15, 27:9, 27:19, 29:14, 39:1, 48:20, 56:10, 61:1
**today** [4] - 14:8, 24:10, 32:9, 51:13
**together** [5] - 59:2, 59:3, 59:13, 59:24, 64:5
**Tom** [1] - 15:7
**tomorrow** [1] - 29:12
**took** [3] - 36:5, 52:5, 63:20
**top** [3] - 7:6, 12:25, 19:11
**topic** [1] - 59:17
**total** [2] - 62:16, 62:20
**trace** [1] - 12:19
**transcript** [5] - 30:5, 31:24, 48:19, 61:7, 78:8
**transcription** [1] - 31:17
**travel** [7] - 35:9, 45:8, 46:3, 56:13, 58:3, 73:18, 73:25
**traveled** [1] - 58:5
**traveling** [4] - 18:19, 42:5, 52:6, 56:11
**travels** [1] - 56:2
**tried** [2] - 47:12, 76:11
**trip** [12] - 39:5, 40:9, 51:14, 51:15, 51:19, 51:20, 57:15, 57:17, 57:21, 57:25, 60:5, 60:7
**trips** [2] - 51:12, 59:10
**true** [8] - 4:1, 21:18, 27:9, 43:9, 57:7, 61:22, 62:4, 78:8
**trunk** [1] - 57:10
**trust** [1] - 13:13
**trusted** [1] - 13:9
**try** [5] - 20:14, 31:22, 31:23, 42:20, 76:13
**trying** [4] - 12:13, 27:12, 27:25, 32:22
**Tuesday** [4] - 29:11, 58:6, 62:21, 62:23
**Tuesdays** [1] - 55:16
**tunc** [1] - 27:3
**turn** [5] - 26:22, 29:17, 41:22, 47:24
**turned** [3] - 26:13, 27:18, 72:12
**two** [18] - 4:3, 4:6,

7:13, 20:18, 37:10, 38:17, 40:16, 42:6, 50:5, 57:17, 60:16, 60:21, 61:7, 62:20, 64:21, 66:13, 71:10, 75:7
**two-fold** [1] - 38:17
**two-purpose** [1] - 57:17
**type** [13] - 11:1, 11:17, 21:15, 21:16, 31:22, 34:19, 40:15, 41:3, 41:6, 55:1, 67:21, 73:4
**types** [1] - 21:13
**typically** [2] - 26:24, 27:1

### U

**U.S** [3] - 2:3, 26:3, 73:1
**ultimate** [1] - 25:17
**ultimately** [2] - 9:17, 38:20
**unable** [1] - 59:5
**under** [13] - 24:7, 26:17, 27:7, 28:3, 28:4, 28:5, 28:13, 28:22, 28:24, 28:25, 29:2, 52:15
**understood** [1] - 44:15
**unidentified** [1] - 32:3
**unintelligible** [1] - 33:2
**UNITED** [2] - 1:1, 1:5
**United** [3] - 11:4, 22:7, 73:5
**unseal** [6] - 24:13, 24:16, 24:22, 24:23, 25:6, 25:13, 25:20, 25:22
**unsealed** [1] - 24:8
**unsealing** [1] - 28:15
**up** [43] - 5:15, 7:5, 9:23, 10:2, 10:8, 17:20, 20:7, 25:18, 30:25, 31:1, 32:8, 32:10, 32:11, 32:22, 32:24, 39:1, 43:21, 44:12, 44:14, 44:16, 45:4, 45:8, 48:21, 50:4, 50:13, 52:25, 53:17, 53:20, 54:1, 54:2, 54:14, 55:9, 55:12, 56:10, 57:13, 58:10, 62:13, 73:23, 74:22, 76:1, 76:13, 76:20

USA [1] - 11:19
USC [1] - 26:18
useful [1] - 63:16
uses [1] - 42:24

### V

**various** [1] - 35:21
**vehicle** [5] - 47:1, 47:6, 49:22, 50:5, 57:10
**viable** [1] - 17:6
**vice** [1] - 58:25
**video** [6] - 53:5, 53:6, 53:8, 63:9, 63:14, 63:17
**videotape** [3] - 53:2, 53:4, 63:12
**videotaped** [3] - 50:15, 50:16, 63:7
**view** [1] - 63:10
**vilified** [1] - 20:13
**visual** [1] - 8:18
**voluntarily** [2] - 46:18, 20:11
**volunteers** [2] - 20:6, 20:11
**vs** [1] - 1:7

### W

**wait** [1] - 53:21
**waiting** [1] - 72:20
**walked** [1] - 46:21
**wants** [1] - 37:14
**war** [2] - 44:15, 49:11
**warning** [1] - 51:2
**warrant** [14] - 2:23, 3:23, 4:24, 6:10, 28:21, 63:21, 64:2, 64:3, 64:6, 64:10, 66:23, 67:9, 67:19, 71:25
**warranted** [1] - 14:10
**warriors** [1] - 19:2
**watching** [5] - 23:9, 50:11, 57:9, 59:6, 61:12
**WAY** [1] - 1:23
**weapon** [3] - 40:15, 41:3, 41:6
**weapons** [7] - 17:6, 34:18, 35:1, 40:16, 45:12, 57:9, 57:14
**week** [9] - 9:20, 9:21, 27:7, 29:12, 36:18, 36:20, 36:23, 62:15, 62:16
**weeks** [1] - 14:22
**welcome** [1] - 55:8
**WHEREOF** [1] - 78:16

**whole** [1] - 65:17
**wife** [2] - 59:7, 61:12
**William** [3] - 37:24, 38:5, 42:14
**Williams** [3] - 48:10, 48:12
**willing** [1] - 22:2
**wire** [8] - 23:21, 24:2, 30:25, 31:1, 40:19, 42:20, 44:21, 73:7
**wiretap** [2] - 23:16, 23:25, 24:7, 31:17
**wish** [2] - 16:17, 16:21
**wit** [1] - 1:14
**WITNESS** [6] - 5:15, 5:17, 18:6, 31:8, 59:19, 78:16
**witness** [5] - 3:2, 26:5, 31:16, 53:22, 77:17
**Wolf** [4] - 54:11, 55:11, 66:8, 69:9
**Wolf"** [1] - 53:16
**WOOD** [1] - 2:9
**world** [2] - 23:9
**worry** [1] - 33:22
**worthy** [2] - 14:13, 14:19
**written** [2] - 28:19, 51:1

### Y

**y'all** [1] - 38:23
**year** [1] - 30:12
**years** [1] - 17:4
**yellow** [7] - 5:2, 5:3, 5:4, 5:7, 6:8, 6:13, 68:7
**York** [26] - 8:6, 8:8, 8:9, 8:14, 13:8, 32:8, 34:24, 34:25, 35:4, 35:19, 39:9, 42:5, 44:17, 46:3, 48:25, 55:3, 55:4, 56:7, 56:11, 56:13, 56:24, 59:5, 59:11, 72:12, 73:13, 73:18
**York/Islamberg** [2] - 15:22, 35:10
**yourself** [1] - 7:24
**yourselves** [1] - 18:21