IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

AT CHATTANOOGA

---

UNITED STATES OF AMERICA, :

Plaintiff, :

v. : 1:15-CR-39

ROBERT R. DOGGART, :

Defendant. :

---

Chattanooga, Tennessee
February 6, 2017

BEFORE: THE HONORABLE CURTIS L. COLLIER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

PERRY H. PIPER
Assistant United States Attorney
U. S. Department of Justice
Office of the United States Attorney
1110 Market Street, Suite 515
Chattanooga, Tennessee 37402

SAEED AHMED MODY
United States Department of Justice
601 D Street
Washington, D. C. 20044

JURY TRIAL
FIRST DAY OF TRIAL
EXCERPT OF PROCEEDINGS
GOVERNMENT'S OPENING STATEMENT

APPEARANCES: (Continuing)

FOR THE DEFENDANT:

RAYMOND GARTH BEST
Best Law Office, PLLC
707 Georgia Avenue, Suite 300
Chattanooga, Tennessee 37402

JONATHAN T. TURNER
Speek, Webb, Turner & Newkirk
631 Cherry Street
Chattanooga, Tennessee 37402

LESLIE A. CORY
Attorney at Law
Post Office Box 11320
Chattanooga, Tennessee 37401

\- - -

MR. MODY: "This gun is made for one thing, and that's to kill people." That's what the defendant Robert Doggart told a man he was trying to persuade to go carry out a brutal and deadly attack on an unsuspecting community in upstate New York. And what did he tell that man just three weeks later? "I don't want to kill children, but there's always collateral damage." That's what the defendant said as he laid out a detailed and explicit plan to drive up, with other gunmen, to go attack a community of men, women, and children living in New York.

Now, what the defendant didn't know was that the man he was talking to was a confidential source of the FBI. What

the defendant didn't know was that that confidential source was wearing a wire so the FBI could hear and record everything the defendant was saying. And what the defendant didn't know was that the FBI had been watching him here in Chattanooga for over two months and they would arrest him before he got anywhere close to being able to carry out this brutal attack. That's why we're here today, and that's why we're here talking about the defendant's solicitation of people to carry out a crime of violence and not the defendant's successful execution of a deadly attack, because the FBI did its job and they did their job well.

Now, who was this community the defendant wanted to target? It was a community of African Americans from New York City who had moved to upstate New York in the late '80s. They wanted to find a better place for themselves and for their families, and they've been there ever since. You're also going to hear that this community of Americans was of the Islamic faith and so they called their community Islamberg.

Now, why did the defendant want to attack them? The evidence will show that the defendant read on the Internet that this community was going to carry out an attack and he believed that, the defendant also read on the Internet that the FBI and other law enforcement wouldn't do anything about it. So instead of "See something, say something," which we've all heard before, the defendant didn't say anything to law

enforcement; instead, he came out with a detailed plan of attack to go up to the community, burn down buildings, and kill people indiscriminately.

Now, make no mistake, this case is not just about the defendant's words, this is not just about talk, it's about the defendant's actions and his conduct. You're going to hear during this case that the defendant recruited people, online and in phone calls, from his home on Signal Mountain, and that he went and visited people that he believed could help him execute this plan. He took trips to Nashville and Easley, South Carolina, to meet up with people that he believed would help him execute this deadly attack, and he took with him guns and ammunition to show these people that he was serious in making sure this attack happened.

Now, you're going to hear that despite the defendant's best efforts to keep his recruitment of other people quiet, the FBI found out about it and they acted. You're going to hear from Agent James Smith that the FBI got a tip from a confidential source in early February of 2015 that the defendant was posting messages on Facebook about carrying out some type of attack. You're going to hear that the confidential source was a civilian who was paid for information that otherwise law enforcement couldn't get, and you're going to hear that the FBI asked that source to reach out to the defendant over Facebook and try to learn more

information about who he wanted to attack and whether or not this was actually serious.

You're going to hear that the source did reach out to the defendant over Facebook and they had several phone calls, as well, afterwards. And you're going to hear on those phone calls that the defendant talked about a specific and explicit plan go attack the community in New York; he talked about the types of guns they would use, the types of ammunition, the types of explosives, the getaway route. And all this was recorded for you to hear. Now, you're not going to be hearing from the confidential source in this case, because he died of natural causes a few months ago. However, you will be able to see those Facebook messages and hear those calls for yourself.

You're going to hear from Agent Smith that after the FBI found out the defendant was actively recruiting people, they decided to go to a federal court and get a court order to listen to the defendant's phone calls. And you're going to hear that they wanted to listen to the defendant's phone calls in realtime for two reasons, (1) they wanted to make sure that the defendant didn't get anywhere near being able to carry out this attack, and (2) they wanted to see if there was anyone else involved in making this plot. You're also going to hear that they got a Facebook search warrant to look at his messages to people that he was also soliciting online just

like he had done the confidential source.

You're going to hear that after the defendant and the confidential source had several phone calls, they decided to meet in person and so they met up in Nashville. And you'll hear during that meeting the defendant brought with him maps that he'd printed online to show the source exactly how they would attack the community in New York, and that he also brought with him the gun that he said was made for killing people.

Now, in this case you're going to be hearing a lot of recordings of phone calls, and I mean a lot of -- a lot of phone calls, about 30. And I'm going to ask for your patience as you listen to those, because it will be incredibly important for you to not only hear the defendant solicit and persuade people to go commit this attack but it will also be important for you to hear the defendant talk to his friends and acquaintances about what he was doing and why he was doing it, because you're going to be asked to assess the defendant's state of mind during this case.

You're going to hear during those calls the defendant was soliciting other people as well, and there's a couple in particular we're going to talk about. One was a man in South Carolina. You're going to hear the defendant and this man had several conversations, and that this man promised the defendant that he could provide more men to help execute

this operation, because the defendant wanted to get 20 gunners or gunmen to carry out this operation. And this man told the defendant that he had a special skill, EOD, or explosives. You'll hear that the defendant and this man then had conversations about the best way to effectively burn down and blow up buildings in the community, and they talked about Molotov cocktails and other explosives.

You'll hear the defendant also communicated with another man over Facebook from central Illinois. And at first those conversations were on Facebook, but then they had a face-to-face meeting here in Chattanooga at the City Café in April of 2015. And at that meeting was also the confidential source. And the three of them, during that meeting in person, talked about the defendant's plan of attack. And during that meeting and in that recorded meeting you're going to hear the defendant give in explicit detail how he imagined this attack going down. You'll hear him say that after the first bomb they went off -- that went off, people would run from their homes, and that would be when they would gun them down. And that's when he said, "I don't want to kill children, but there's always collateral damage."

Now, this community, this unsuspecting community in New York, was a community of about a hundred men, women, and children. You're going to hear that during the summertime their numbers increase because they have a summer camp for

boys and girls from all over the country to come and attend and they do sports and they do secular activities and they also do religious classes at their mosque. And you're going to hear that their mosque is the center of their community, just like any other church or place of worship. And you're going to hear that the defendant wanted to target three specific buildings, including the mosque.

Now, the other thing you're going to hear the defendant talk about is that he believed that there was an uprising coming to overthrow the government, and that people like him would come together to overthrow the government, and that this attack on this community could be the flashpoint that brought those people together. So you're going to hear that this wasn't just about trying to stop something that he believed was going to happen because he read it on the Internet but this was about starting something as well.

Now, the other thing you're going to hear is that there are times where people try to talk the defendant out of this plan, to tell him to knock it off, to talk some sense into him. And there will be times in these conversations where the defendant does waver, where the defendant talks about postponing the plan of attack, waiting for martial law to be imposed by the United States government, waiting to go do recon himself by going up to New York and checking out the community. And it's going to be important for you to listen

to those calls and understand that although the defendant wavers, he never changes direction and he never disavows his plan of attack.

Now, you're going to hear from another FBI agent named Cathy Fuller. She is going to tell you that she helped perform the search of the defendant's home after he was arrested, and that the FBI recovered several firearms. You're going to see for yourself a 12-gauge shotgun that the defendant described as "the meanest shotgun on earth" and one that he intended to use during the attack, and you'll hear that on the phone calls. You'll get to see for yourself that the defendant had an M-400 assault rifle with over a thousand rounds of ammunition, including tracer ammunition, and you're going to hear on calls that the defendant said he would use this weapon during the attack, and that he would use tracer ammunition because it would scare the men, women, and children as they carried out this attack.

Now, there is going to be a lot of evidence in this case, but at the end of the day this case is simple. The defendant planned a brutal and deadly attack on an unsuspecting community of people in New York, including burning down their buildings and indiscriminately killing people. But his plan required more people, and so he went about soliciting and persuading people to join him. The defendant wanted to act as judge, jury, and executioner of

this community.

Now, the defendant has -- the Judge has already told you about the standard that we have in this case, the burden we bear, and it's a burden the government gladly bears.

Now, the defendant has been charged in a superseding indictment with soliciting other people to go burn down buildings in upstate New York and also with making threats about the attack over the telephone. And at the end of this case Mr. Piper and myself will have a chance to come argue to you about why we think there is only one verdict that is supported by the evidence you're going to hear, and that verdict is guilty. Thank you.

END OF EXCERPT

I, Elizabeth B. Coffey, do hereby certify that I reported in machine shorthand the proceedings in the above-styled cause, and that this transcript is an accurate excerpt of said proceedings.

s/Elizabeth B. Coffey
Elizabeth B. Coffey,
Official Court Reporter