1       IN THE UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF TENNESSEE

3                 AT CHATTANOOGA
    ------------------------------------------------------------
4                                   :
    UNITED STATES OF AMERICA,       :
5                                   :
               Plaintiff,           :
6                                   :
    v.                              :        1:15-CR-39
7                                   :
    ROBERT R. DOGGART,              :
8                                   :
               Defendant.           :
9   ------------------------------------------------------------
                                    Chattanooga, Tennessee
10                                  February 13, 2017

11

                BEFORE:  THE HONORABLE CURTIS L. COLLIER
12                       UNITED STATES DISTRICT JUDGE

13

14  APPEARANCES:

15

            FOR THE PLAINTIFF:
16
            PERRY H. PIPER
17          Assistant United States Attorney
            U. S. Department of Justice
18          Office of the United States Attorney
            1110 Market Street, Suite 515
19          Chattanooga, Tennessee  37402

20          SAEED AHMED MODY
            United States Department of Justice
21          601 D Street
            Washington, D. C.  20044
22

23                    JURY TRIAL
                  FIFTH DAY OF TRIAL
24              EXCERPT OF PROCEEDINGS
                  CLOSING ARGUMENTS
25

1    APPEARANCES:  (Continuing)

2

            FOR THE DEFENDANT:
3
            RAYMOND GARTH BEST
4           Best Law Office, PLLC
            707 Georgia Avenue, Suite 300
5           Chattanooga, Tennessee  37402

6           JONATHAN T. TURNER
            Speek, Webb, Turner & Newkirk
7           631 Cherry Street
            Chattanooga, Tennessee  37402
8
            LESLIE A. CORY
9           Attorney at Law
            Post Office Box 11320
10          Chattanooga, Tennessee  37401

11

12                                    – – –

13

14          MR. MODY:  "I don't want to kill children, but

15   there's always collateral damage."  Those are some of the last

16   words you heard the defendant tell the source on

17   April 9th outside the City Café.  Those are the words you got

18   to see for yourself on the hat camera.  Those are the words

19   that the defendant said to a man he believed he had solicited

20   to commit a horrific and terrible crime.  Those were the words

21   of a dangerous man who was looking to find gunners and gunmen

22   to help carry out an attack he planned for several months.

23          The defendant said that he had weapons for killing

24   people, 5000 rounds of ammunition, that you saw a fraction of,

25   weapons that he described as "not for hunting game."  These

1    are the tools of man who has a plan, these are the tools of a

2    man who is using them to solicit and recruit people to join

3    him, and these are the tools of a man who is capable of

4    carrying out an attack that he described.

5          During this trial you heard that the defendant came

6    up with a detailed plan to attack an unsuspecting community of

7    men, women, and children in upstate New York.  He plainly

8    recognized that he couldn't take out the entire community by

9    himself, so he wanted to bring other people onboard, to

10   solicit other people to commit this crime with him.

11         First he used social media to find his gunners, and

12   you got to see the Facebook posts for yourself beginning in

13   early February 2015.  He sent out a message to four or five

14   people, including Shane Shielein, that he had an operation in

15   mind, and then he widened his net to everyone he was connected

16   to by putting up a status update about needing 20 expert

17   gunners, with a target that he planned to utterly destroy.

18   You got to see those messages, and then you got to hear the

19   calls with the source and the calls on the wiretap and then

20   those in-person meetings in Nashville and at the City Café.

21   That's what this case is about, the solicitation of people to

22   commit this heinous act.  The reason we're not here talking

23   about a tragedy is because of the work of Agent James Smith

24   and the men and women of the FBI.

25         Now, in the Facebook messages he posts in February

1  2015 looking for gunners, he talks about kill ratios of 20:1

2  and 30:1.  He's not looking for people to do recon.  He's

3  looking for people to carry out an attack.  He's not looking

4  for people with good eyesight or night vision capability.  He

5  wants gunners who are master gunmen who can get a high kill

6  ratio for him.  The defendant was serious in this

7  solicitation, and the FBI took him seriously.  That's why you

8  heard from Agent Smith that they used a confidential source to

9  connect with the defendant, first on Facebook and then over

10 the phone.  They used recorded calls with the source, and then

11 got a wiretap.  They got a court order to listen to the

12 defendant's calls in realtime because they wanted to find out

13 when he was planning to attack, who he was planning to attack,

14 and who else was involved in it.  And you heard there was

15 surveillance from February till April everywhere he went,

16 tracking devices on his phone and in his two vehicles.

17         The FBI made sure that the defendant never got too

18 close to carrying out his attack, because from very, very

19 early on in these conversations you heard the defendant

20 explicitly describe wanting to take out buildings.  You first

21 heard it as early as March 6th when he told the confidential

22 source, "But, still, those guys have to be killed.  Their

23 buildings need to be burnt down.  And if we can get in there

24 and do that and get out without losing a man, even better."

25 That's as early as March 6th.

1      You heard at the meeting in Nashville where the

2  defendant told the CI, "You're going to like what you hear."

3  That's part of the sales pitch, the recruitment of the

4  confidential source in Nashville.  He brought maps and photos

5  of Islamberg to show the buildings they would attack, the

6  routes they would take, the getaway plan.  And then they go

7  back to the hotel room, and that's where the defendant takes

8  out his arsenal of weapons to show off to the source.  He even

9  tells the source explicitly, "I brought these to show you that

10 I'm serious, that I'm not kidding."  That's when he took out

11 the firearm that he said was meant for killing people and not

12 hunting game.  That's when he talked about tracer ammunition

13 that would be used to scare people because it would terrorize

14 them.  And that's when he talking about having thousands of

15 rounds of ammunition.

16     The FBI told the source to go along with the

17 defendant's plan.  That way they would always have contact

18 with the defendant and they would be sure not to lose track of

19 him.  And the defendant made sure that the confidential

20 source's commitment never changed.  In fact, there's calls and

21 conversations where the defendant asks, "Hey, you're still

22 committed, right?"  Even at the City Café he tells the source,

23 "Look, I know you're committed."  And he's not talking about

24 committed to a recon mission.  He's talking about committed to

25 an attack.  The defendant believed the source was onboard with

1  this attack, not just a recon mission, and he always made sure

2  to verify that over and over again, because people kept

3  dropping out on him, and you heard the defendant lament that,

4  that people were chickening out because they realized that he

5  was more than just talk.  He talked about how people would

6  drop off his list and his list kept getting smaller and

7  smaller.

8       Now, throughout the conversation with the defendant,

9  the source always went along with it, but he never pushed him.

10  You heard from early on the defendant -- the source would say,

11  "You call the shots.  It's your puppy."  We heard that several

12  times.  I'd never heard that phrase before, and so it stuck

13  out in my mind.  Several times he said, "This is your puppy.

14  This is your puppy," as early as March 13th and as late as

15  City Café.

16       The only facilitation the source ever did was to

17  make sure that he met up with the defendant in Nashville and

18  that they all met with up with Shane Shielein at the City Café

19  on April 9th.  The reason they met up was because the

20  defendant had told him on March 30th, "You know, I wish the

21  four of us could have gotten together," the defendant, the

22  source, Shane Shielein, and William Tint.  And you got to hear

23  that conversation for yourself, and you got to hear that

24  nobody was as serious as the defendant.

25       The City Café meeting gave a chance for the

1    defendant to solicit Shielein in person.  You saw the Facebook

2    messages where the -- Shielein had committed to carrying out

3    the attack but then he dropped off the face of the map.  So

4    this was the defendant's attempt to get him back onboard with

5    the plan.  He told him, "Hey, we're going to talk about

6    serious stuff here."  He then went on to solicit Shielein

7    about why they needed to attack Islamberg.  He called it "a

8    valid target."  And he showed his potential recruits, his

9    gunners, the maps and the buildings they would destroy.

10   Anytime the conversation strayed, he always brought the

11   conversation back to Islamberg and back to the attack.  He

12   said it was up to them and the couple guys in South Carolina

13   that he believed he had to attack this community.  He worked

14   hard to persuade Shielein to stay committed.  And at the end

15   of the day, Shielein said, "I need a day or two to think about

16   it."

17         Over and over again the defendant talked about

18   burning buildings, first on a phone call with the source on

19   March 6th, in Nashville on March 17th.  He told his sister

20   Nita about it on March 17th.  Five days later he told William

21   Tint in South Carolina, on March 22nd and March 26th.  He told

22   his friend Lenny about it two days later.  Over and over again

23   he's talking about burning down buildings, a mosque, a school,

24   a cafeteria, a place of worship, a place of gathering, a place

25   where people go to gather and eat, a mosque, a school, and a

1    cafeteria.

2          And there are some moments that the defendant says,

3    "Well, I don't want to kill people.  I just want to burn down

4    buildings."  And while the defendant may have not set out to

5    kill children or other people, he was okay with it, they were

6    collateral damage.  The buildings he needed to burn, he chose

7    0100, 1:00 a.m., not because people wouldn't be in the

8    buildings, but because there was a tactical advantage.  That's

9    when you use the tracer ammunition.  That's when you use the

10   night vision.  That's when you carry out the attack.  You

11   know, he didn't have a specific body count in mind, but he was

12   okay with it because that was the cause.  And remember, this

13   is the man who bragged about weapons for killing.  He had no

14   issue with hurting people as well as blowing up buildings.

15         Now, for the charges we discuss here today it

16   doesn't matter that the defendant somehow believed in his mind

17   that he was doing something good, that he was protecting

18   Americans.  The reality was, he was willing to kill Americans

19   instead.  You're not going to hear any instructions from the

20   Court about it's okay if he thought it was okay, that this was

21   justified, because it's nonsense.  We're a country of laws

22   that we follow.  We don't get to decide who we attack and

23   hurt.  We call real law enforcement to do a real job.

24         This trial isn't about the people of Islamberg, and

25   you're probably going to hear the defense get up and talk

1    about them a lot.  They're the victims here.  They were just

2    the target that the defendant found on the Internet and

3    different websites, that he then obsessed over for months.

4              There's no question that the defendant said some

5    wild and outrageous things in this case, but that doesn't make

6    him any less dangerous.  Look, a man who is going to kill men,

7    women, and children and blow up buildings is going to say some

8    wild stuff and some crazy stuff.  That doesn't make him any

9    less dangerous to the community he obsessed and wanted to

10   attack.

11             Threats to hurt people, a plan to hurt people, steps

12   to recruit others to join him in his plan to hurt people is

13   the reason that the defendant has been charged with the

14   following counts in this case.  This is a case not about

15   ideas, it's about actions, the actions that the defendant

16   wanted to take because of those ideas.

17             Now, the Court is going to instruct that you there's

18   been four counts, two counts of solicitation to commit a crime

19   of violence and two counts of threats in interstate commerce.

20   We're going to take those two at a time.  So let's start with

21   the solicitation counts.

22             Now, Count 1 charges the defendant with soliciting

23   another person to damage a religious building, and there's

24   going to be six elements to this charge:  "First, that the

25   defendant intended another person or persons to intentionally

 1  damage or destroy a mosque; second, that under circumstances

 2  strongly corroborative of that intent, the defendant

 3  solicited, commanded, induced, or endeavored to persuade the

 4  other person or persons to engage in the intentional damage or

 5  destruction of a mosque."  Those two elements require a little

 6  more information, so I want to go through 3 through 6 first,

 7  and then we'll come back to 1 and 2.

 8          So, "third, the damage or destruction would have

 9  been because of the building's religious character."  Now, you

10  heard over and over again the defendant talk about this and

11  say "mosque."  He knew explicitly that it was a mosque, that

12  it was a Muslim church.  He said on one call to Larry Smith on

13  March 26th, "They are the soft targets.  Pretext of soft

14  targets, in my mind, are religious buildings of the type -- of

15  the evil type, and that would be our Islamic foes."  He

16  describes it to Lenny as, "A mosque is a -- a Muslim church."

17  And so he specifically said "a mosque" over and over again.

18  You heard him say that this was a battle between Muslims and

19  non-Muslims.  He told Lenny that the attack would "hit the

20  news big time because it's anti-Muslim stuff."  At the City

21  Café, when Shielein said, "There's no peaceful Muslim

22  movement," the defendant responds that Muslims "lie real good"

23  and have "a knife in your back."  There's no question that the

24  defendant targeted the mosque because of its religious

25  character, and that the religious character played a

1   determinative role in choosing it as a target.

2           Now, "fourth, that the damage or destruction would

3   have been in interstate commerce or would have affected

4   interstate commerce."  The Court's going to give you a more

5   elaborate definition, but the fact that the defendant's plan

6   involved grabbing people from multiple states, driving from

7   Tennessee on the interstates and highways in a car to New York

8   to carry out this attack satisfies the interstate commerce

9   element.

10          "Fifth, that the damage or destruction would have

11  involved the use, attempted use, or threatened use of a

12  dangerous weapon, explosives, or fire."  Over and over again

13  the defendant talked about how he wanted to burn down these

14  buildings.  In the first conversation in Nashville he talked

15  about using a Molotov cocktail, and wished he had grenades.

16  In another call he wished he had six other -- or a half a

17  dozen grenades, but that they couldn't buy it without being

18  tracked.  And then he found William Tint, the man who said,

19  "I've got an EOD guy, an explosives guy," and then they talked

20  about the different detonators, and they would -- the way they

21  could quickly and effectively burn down buildings.

22          And, lastly, that the damage or destruction of the

23  mosque would have constituted a federal crime of violence.

24  Damaging or destroying religious real property is a crime of

25  violence.

1            So let's turn back to the first two elements that I

2    earlier talked about.  The Court's going to instruct you that

3    a defendant's state of mind can be proven indirectly from the

4    surrounding circumstances, like what the defendant said and

5    did.  And the Court will instruct you on some of the factors

6    that you can consider as you determine whether the defendant

7    intended for people like the source and William Tint to go

8    burn down the mosque and other buildings.

9            These are a few of the factors that you can

10   consider:  The fact that the defendant repeatedly solicited

11   the commission of the offense, and went on at length in

12   soliciting the commission of the offense.  You-all have

13   listened to testimony and recordings for three days.  You've

14   heard the defendant talk about his plan over and over again,

15   with the source, with William Tint, with Shielein, with people

16   over Facebook, with just family members and acquaintances.

17   The defendant was obsessed with this plan.  He brought maps to

18   show people what he intended to do.  He talked about burning

19   down buildings over a dozen times, with the confidential

20   source on March 6th, 17th, March 20th and March 25th, with his

21   sister Nita on the phone on March 17th, with William Tint on

22   March 22nd, 24th, and April 9th, with Lenny Ladner on

23   March 26th, at the City Café on April 9th, and with Steve

24   Branca on April 9th.  Over a dozen times he explicitly talking

25   about burning down buildings.

1          Another fact that you can consider is that he

2     expressly said he was serious, to anyone who would listen,

3     about the commission of the offense.  And he told his sister

4     he was going to go burn down buildings.  He told people that

5     "I'm going to bring my weapons to show you that -- what we're

6     going to use in the attack, because I want to show you that

7     I'm serious and I'm not kidding."  He used his weapons as

8     props to show people that this was not a joke, that he was

9     more than someone who talks on Facebook, he's a man of action.

10          Another factor you can consider is the fact that the

11    defendant believed or was aware that the person he solicited

12    had previously committed similar offenses.  So look at the

13    cast of characters.  You heard Agent Smith say that they gave

14    the source a back story as a way to connect with the person

15    they are trying to get information from, and so the source

16    came up with the back story that he had killed some Middle

17    Eastern people across the border, and that's how he reached

18    out to the defendant to get some advice.  And it worked.  The

19    defendant reached out to him on Facebook, and then they

20    connected over the phone.  The defendant believed he had

21    someone in the confidential source that would carry out this

22    attack for him.

23          William Tint said that he knew explosives, had a

24    military surplus supply store where they could outfit

25    everyone, and that he could get more men for the operation.

 1  The defendant believed he had someone in Tint who was willing

 2  to carry out this attack, who knew explosives, who had another

 3  man who could do explosives for them, and who could get more

 4  men, to get the 10 or 20 members that the defendant believed

 5  he wanted to use in the attack.

 6         And at the end of the day, the numbers didn't

 7  matter.  You heard the defendant and the source talk about,

 8  "Hey, if it's just you and me, the two of us, we'll go up

 9  there and do some damage.  We're such good gunners, we're

10  going to take out a lot of them before they get to us."

11         And then Shane Shielein the defendant described in a

12  meeting in Nashville as "someone you let loose in a time of

13  war."  He had a man in Shielein that he believed would carry

14  out this attack, the type of person he needed to execute the

15  plan.

16         You also heard that the defendant acquired--

17  Another factor you can consider is that the defendant acquired

18  weapons, tools, or information suited for use by the person

19  solicited or made other apparent preparations for commission

20  of the offense.  He brought weapons to Nashville.  He brought

21  weapons to South Carolina to show them to William Tint, even

22  though the meeting didn't happen.  And he told the

23  confidential source, "I'm taking my weapons to South Carolina

24  to show them what we're going to use in the attack."  He

25  printed off maps and photos to show people how they would

1   attack.  And at one point he even offered the confidential

2   source one of his weapons because the source wouldn't be able

3   to fly on the plane with them.

4        Now, we also know that the defendant was serious

5   because he tried to cover his tracks.  Although he told people

6   he knew he was being listened to, that was puffery, and made

7   him seem more serious, and made him seem more important, and

8   became an effective recruiting tool.  Time and time again the

9   defendant warned about his planned attack being discovered by

10  law enforcement.  He told the source, "Loose lips sink ships."

11  He told William Tint on April 9th that now they needed to

12  speak in code language by using the word "fireworks" instead

13  of "explosives."  The defendant's desire to keep his plan from

14  being discovered by law enforcement is more evidence that he

15  was serious in the solicitation of these people to commit the

16  attack with him.

17       Now, Count 2 charges the defendant with soliciting

18  another person to maliciously damage or destroy a building by

19  means of fire or explosive.  Now, the first two counts are

20  very similar to the counts you saw in Count 1.  So first of

21  all I want to go through Counts 3 and 4 and 5, and we'll come

22  back to 1 and 2.  So instead of a mosque because of its

23  religious character, it's simply a building that is used in

24  interstate commerce; the same building, the mosque.  So one of

25  the elements is that the building was used in interstate

1  commerce or was used in an activity affecting interstate

2  commerce.  You heard from Rashid Clark and Noori Brooks that

3  there is a summer camp every summer that brings in kids from

4  all over the country, that they use the mosque for religious

5  worship and they use it for classes.  You heard that people

6  pay a fee for room and board at the camp and that it varies,

7  but they won't turn anybody away, even if they can't afford

8  it.  You heard that the second floor of the mosque is a

9  printing press that got started in February of 2015, and that

10  they started making books and buying supplies between February

11  and April 2015 --

12        THE COURTROOM DEPUTY:  Mr. Mody, you have two

13  minutes.

14        MR. MODY:  Thank you.

15        -- and that that year in 2015, after starting the

16  new business, they made about $4000.

17        And, "fifth, that the damage or destruction would

18  have constituted a federal crime of violence."  Arson is also

19  a crime of violence.

20        And, "fourth, that the means -- the damage or

21  destruction would have been by means of fire or explosive."

22  Again, over and over again the defendant talked about using

23  fire and explosives.

24        Now, Counts 3 and 4 charge the defendant with

25  willfully making a threat in interstate commerce.  Count 3

1  specifies that the threat occurred on March 22nd, and Count 4

2  specifies that Count 3 -- that the threat occurred on

3  April 9th.  Now, this element has three counts:  First, that

4  the defendant made a threat to kill, injure, or intimidate any

5  individual; second, that he used an instrument of interstate

6  commerce like a telephone; and, third, that the defendant

7  acted knowingly and willfully.

8          You're going to hear the definition -- the Court's

9  definition of a <u>true threat</u>; the Court will instruct you that

10  it is one that is a serious statement that at its core is

11  employed when one wishes to have some affect or achieve some

12  goal through intimidation, either immediately or at some point

13  in the future.  That's exactly what he did here.  He wanted to

14  intimidate this community.  And we know William Tint took him

15  seriously, because when he said, "I want to go blow up

16  buildings," William Tint said, "Hey, I've got an explosives

17  guy."  William Tint took that suggestion seriously -- took

18  that statement seriously.

19          And the defendant's statement of going to burn down

20  buildings and hurt people is intimidation.  And you're going

21  to hear that it doesn't matter that the threat wasn't conveyed

22  directly to the target of the threat.  The effect that the

23  defendant wanted to have in making this threat was to show

24  Tint that he was serious and other people he was serious.

25          Now, it doesn't matter that the defendant talked

1    about doing recon first, because he already had his mind made

2    up.  He told the source on 3/25 that he was going to go do

3    recon, then come back and say goodbye to his family.  He told

4    Steve Branca as late as April 9th that he was going to go do

5    recon "and then come get some guys to go blow up buildings."

6    He was only beginning.  "I'm going to do recon, and I'm going

7    to blow up buildings."  So there was never any hesitation.

8         MR. PIPER:  Hey, let him have two minutes from me.

9    He can take two more minutes from me.

10        MR. MODY:  Thank you.

11        THE COURTROOM DEPUTY:  Okay.

12        MR. MODY:  Even when people tried to reason with him,

13   to say, "Look, if you attack first, you're going to be seen as

14   the bad guy," he would just shrug it off.  Larry Smith tried to

15   do that, and warned him, "Don't do it.  You're going to be seen

16   as the bad guy."

17        And the defendant said, "We're still going to do

18   this thing."  And on April 9th, the same thing, the defendant

19   made comments about burning down buildings to William Tint,

20   and William Tint took those -- those conversations seriously.

21        From the first message on Facebook to the last

22   meeting with the source and Shane at the City Café, the

23   defendant never wavered in his plan to go up and carry out

24   this attack.  It doesn't matter that the defendant's chances

25   for success were low, because the stakes were way too high.

1  That's why the FBI arrested him before he could get anywhere

2  close to carrying out his plan.

3          The Judge will instruct you that the government has

4  the burden of proof.  And I submit to you that we have met

5  that burden and the evidence of the defendant's guilt has been

6  overwhelming.  And I told you at the beginning of this case

7  that there was a lot of evidence but at the end of the day the

8  case was simple.  The defendant wanted to act as judge, jury,

9  and executioner for this community that he had read about on

10 the Internet.  He planned an attack, but he needed other

11 people to carry it out with him, and so he went and solicited

12 and recruited those people to join him and he made threats

13 about the attack over the telephone.  There's only one verdict

14 supported by the evidence, and that's guilty on Counts 1, 2,

15 3, and 4.  Thank you.

16          THE COURT:  Mr. Best.

17          MR. TURNER:  I'll proceed for the defendant, Your

18 Honor.

19          (Brief pause.)

20          MR. TURNER:  Your Honor, may it please the Court.

21          Ladies and gentlemen of the jury, when my wife woke

22 up this morning, she told me we could go to the Super Bowl.

23 I'm going to finally get to go to the Super Bowl.  Of course

24 that's not entirely true, because for me to be able to go to

25 the Super Bowl in 2018 in Minneapolis, Minnesota, the Titans

1   have to win the AFC Championship.  And of course that hasn't

2   happened yet.  That's an unknown.  That's a variable that we

3   don't know.  But not only do the Titans need to win the AFC

4   Championship, we're going to Minnesota, so I need some

5   cold-weather gear, I need something to make it through the

6   cold.  But that's really not all.  That's a year away.  So we

7   need some money.  I still need to be gainfully employed.  We

8   need to be able to afford the Super Bowl tickets.

9           You know, my wife, other than letting me go to the

10  Super Bowl potentially, gave me a beautiful daughter.  She's

11  two years old right now.  She's got to be not sick.  She needs

12  to be healthy.  If my daughter's sick, then I'm definitely not

13  going to go to the Super Bowl.  That would prevent that from

14  happening.  See, I'd like to think I have a plan to go to the

15  Super Bowl, but the truth is, I really don't.

16          You know, I've been working a lot this last week, as

17  you guys have too as jurors.  And my daughter is wanting to

18  know when I'm going to be able to spend a little more time

19  with her.  And she asked me yesterday, "Can we go to the park

20  Saturday?"  And of course I wanted to sell her yes, I wanted

21  to make plans with her.  But the truth is, I don't know if I

22  can make plans to go to the park Saturday, because there's a

23  lots of things that would need to happen.  It needs to be good

24  weather, it needs to not be raining; once again, she needs to

25  be healthy, and this trial needs to be finished, of course,

1    before I'm going to be able to do that.

2         But that's not the only situation that we look at

3    things like that.  I don't know if any of you guys play the

4    lottery; I have on occasion, not regularly.  But I think we

5    all know somebody who plays the lottery on occasion.  And what

6    do those people do?  They buy their numbers, they buy their

7    scratch-off tickets, whatever it may be, and they talk about

8    what they're going to do, right?  They're going to buy a

9    house.  They're going to pay off their mortgage.  They're

10   going to pay off their parents' mortgage.  None of their

11   friends are ever going to have to work again.  But what's

12   required?  Well, they've got to win the lottery first.  Their

13   numbers have to come up.  They have to scratch off a winner.

14   It's not an automatic.  It's not a guarantee.

15        But it's not just people that do this.  The

16   government does this, also.  You know, we've got government

17   agreements, the Iran nuclear deal, you guys, I'm sure, have

18   all heard about, other various things.  Well, the government

19   makes plans for a worst-case scenario, for a negative to

20   happen, and then they're going to be able to step in, right?

21   The government does that.  Does that mean the government's

22   committed to go annihilate Iran?  No.  But if they do certain

23   things and they become a threat, they become a danger to the

24   world, then they're in a position to do so.  Doesn't mean

25   there's a definite plan.

1              But, in all fairness, sometimes we make plans that

2    have caveats, plans that have condition precedents, and they

3    come true, right?  For instance, Donald Trump just became our

4    President, President of the United States.  And while he was

5    campaigning, there were a lot of people out

6    there——right?——that said, "Hey, when Donald Trump -- if he

7    wins this election, if he somehow pulls this off, I'm going to

8    move to Canada," right?  So what happened?  Donald Trump won

9    the election.  He's our President.  How many of those people

10   have moved to Canada?  Barbra Streisand, Miley Cyrus, Lena

11   Dunham, Amy Schumer, Jon Stewart, Cher, Chattanooga's own

12   Samuel L. Jackson, Whoopi Goldberg, even George Lopez, they

13   all said they were headed to Canada.  Not a single one of them

14   went to Canada.  So even when we have a discussion and that

15   condition comes true, we don't automatically follow through

16   with it.  Things change.  Sometimes we say things in jest.

17   Sometimes we say things outrageous that are untrue.

18             Now, in this case let's go back a little bit and

19   talk about our witnesses.  Now, we had Special Agent Smith,

20   and he was on the stand for a very long time going through a

21   lot of material.  But why was Special Agent Smith on the stand

22   for so long?  Don't you want to know why he was up there for

23   so long?  He was up there for so long because the government

24   did not provide the person speaking on those recordings.  Now,

25   we learned that the confidential source passed away.  So he

1  passed away, I understand that.  But Shane Shielein, I can

2  report to you, has not passed away.  Sally McNulty, who you

3  heard from at the City Café, she has not passed away.  William

4  Tint, I can assure you, is alive and well today, and could

5  have easily been brought here from South Carolina to testify.

6  All those assumptions you hear, "Well, he had to believe

7  this," "He had to mean this," "He had to think this," well,

8  they could have asked the person directly.  Why didn't they?

9  Why didn't they give you those people?  I can't answer that

10 for you.  But they certainly did not give you those witnesses.

11          But who did they give you?  They gave you Agent

12 Smith.  They also gave you Special Agent Fuller; in all

13 fairness, Retired Special Agent Fuller.  Special Agent Fuller

14 was in charge of the search warrant in this case.  And in all

15 due respect, she's retired, maybe she's forgotten, but she

16 didn't have a whole lot of knowledge of what she recovered.

17 She didn't know how guns worked.  She didn't know gun laws.

18 She didn't know if a gun was fully automatic, semiautomatic.

19 She thought a semiautomatic gun can fire a three-round burst.

20 You guys know -- now know that is absolutely untrue.  And this

21 is somebody with 20 years in the FBI and 6 years in the Marine

22 Corps, but, for whatever reason, she still thought that.  I

23 think we've cleared up her mistakes through other witnesses,

24 but she made a lot of mistakes on the stand about what she

25 recovered, specifically the type of firearms she recovered.

1          You heard from her, then who did you hear from?  You

2     heard from Muhammad Clark.  Muhammad Clark is a resident of

3     Islamberg.  He, we now know, is the mayor of Islamberg.  I'm

4     not sure why he wouldn't tell us he was the mayor of

5     Islamberg.  I prodded him pretty firmly on who was the leader

6     of the town, who had roles, and he told me about the trustees,

7     Hussein Adams and Ms. Tahira Smith, but he did not talk about

8     himself being the mayor.  I'm not sure why, but he didn't.

9          But here is what he did tell us:  He told us that

10    they have a summer camp in Islamberg and this summer camp's

11    been going on for years and this summer camp was canceled in

12    2015, canceled.  I'm sure they didn't like that.  They

13    canceled the summer camp.  But now we know that's not true,

14    don't we?  Because today you heard from a Mr. Brooks, Noori

15    Brooks.  What did Mr. Brooks tell you?  He took the stand,

16    swore to tell the truth, whole truth, nothing but the truth,

17    and what did he do?  He also told you summer camp was

18    canceled, canceled.  Goes right along with Mr. Clark,

19    canceled.  But what did I -- what did I keep asking?  I was

20    very curious about these book sales.  And one thing we found

21    out, we found out the books were not being sold before

22    Mr. Doggart was arrested.  His first sale of a book was in

23    June or July of 2015.  You guys remember that?  June or July

24    of 2015.  Why is that important?

25          Well, "Who did you sell the book to?

1          "I sold the book the *Moral Code*."

2          Ironically this book's called *Moral Code*.  He sold

3     it to a camper in June or July of 2015.

4          Now, I pose this question to you:  If summer camp

5     was canceled, two witnesses told you it was canceled, how did

6     Mr. Brooks sell the *Moral Code* to a camper in June of 2015?

7          Mr. Clark was very clear, "We're scared.  There may

8     be somebody out there that's going to harm our camp.  We had

9     to shut the camp down for all of 2015."  You guys remember

10    that.  He said that.

11         Well, to establish interstate commerce, which is

12    important, Mr. Brooks tries to tell you he sold a book to one

13    of those campers.  You can't have it both ways, people.  The

14    credibility of Mr. Brooks and Mr. Muhammad Clark is highly in

15    question now.  They tell you a summer camp is canceled, but

16    they also tell you they sold books to the campers.  Why are

17    there campers if it's canceled?

18         What we also learned from Muhammad Clark, that the

19    mosque isn't in business, right?  They don't pay employees.

20    They don't have a paid daycare.  They don't charge admissions

21    to events.  And I know those of you who may go to church here,

22    a lot of churches in this area do those -- do do those types

23    of things, right?  We have paid daycares, we have paid

24    employees of the church, we charge admission to a church

25    Christmas play, that sort of thing.  But I think it was very

1    clear that this mosque——and I'm using the word <u>mosque</u> and

2    <u>church</u> somewhat interchangeably, I apologize——this mosque does

3    not do that, they don't conduct business like a church we're

4    used to down here.

5           But they've got a bookstore, right?  They've got to

6    be in commerce, because they have a bookstore.  Well, what did

7    we learn?  So Mr. Clark really didn't know anything about the

8    bookstore, is what came out on cross-examination from him.  So

9    we've got a long weekend, we've got three days, all of a

10   sudden we've got a witness today that knows about the

11   bookstore, and that's Mr. Brooks, who undoubtedly lied today.

12   He said there was no summer camp, and then he said he sold a

13   book to a summer camper.  Cannot——  Both cannot be true.

14   Impossibility.  But he told us he owns the bookstore.  The

15   mosque does not own the bookstore.  Islamberg does not own the

16   bookstore.  The Muslims of America do not own the bookstore.

17   Who owns the bookstore?  Mr. and Mrs. Brooks own the

18   bookstore.  We found out the bookstore did not go into

19   operation until 2015, they didn't actually have a sale until

20   June of 2015.  Once again, I say that's an impossibility,

21   because camp was canceled.  But that's what the testimony was.

22   I question if they've ever sold a book.  But that's for you to

23   decide.

24           Now, we learned that the mosque does not participate

25   in any profits of the bookstore.  Now, they don't have any

1   profits, of course, because they're never filed taxes.  But if

2   they were to file taxes, they have not made a profit, is what

3   the testimony was today.  But they also operate rent-free.

4   They claim they're in the corner of this mosque operating a

5   legal entity, an LLC, for profit.  Although they haven't made

6   profits, they're operating for profit, but yet they have a

7   rent-free location in a mosque.  Isn't that convenient for a

8   building that needs to be in interstate commerce?  Isn't that

9   convenient they all of a sudden have a bookstore that's never

10  filed taxes, that sold a book to a camper that doesn't exist?

11  It's convenient.

12          Now, we also heard about donations -- potential

13  donations to the mosque.  Neither witness could give a

14  specific person in 2015 who made a donation from another

15  state.  Now, you heard today Mr. Brooks said his mom made a

16  donation, but he was very clear that it was in

17  2017——okay?——2017, not 2015.  The crimes alleged are 2015

18  crimes.  We have to go with 2015 here, guys.

19          Now, all right, so who else did you hear from?  You

20  heard from Christie Atkinson and Randy Atkinson.  Those were

21  character witnesses for Mr. Doggart, his daughter and

22  son-in-law.  You heard that he's a good person, that he's a

23  volunteer, that he gives countless hours both to his

24  profession, pro bono, also to his family, and donates blood, I

25  believe 22 gallons, was the testimony.  Now, I'm not the most

1    repetitive blood donor, so I'm not really sure how much

2    22 gallons is, but those of you that may donate blood on a

3    regular basis may know the answer to that.

4        Okay.  But, now, one thing you're going to get from

5    the Judge eventually is an official charge.  The Judge

6    mentioned that he sent out a draft of that.  And that's the

7    Judge's area, right?  I'm not here to tell you what the law

8    is.  But I do need to comment on it a little bit.  The Judge

9    is going to read those charges to you, and they're rather

10   long, we've got a lot of stuff to go through.  And I don't

11   want to bore you with those in my closing, but there are a few

12   things that I want to highlight, and of course the Number 1

13   thing is the presumption of innocence and the burden of proof.

14   You know, my client, just as he was on the first day of trial,

15   and just as he is now, still sits here innocent before you.

16   Okay?  Still sits here innocent.

17        Now, one charge that the Judge is going to give you

18   is called entrapment, okay?  And I'm not going to go through

19   all the -- the fine details of that, but entrapment.  What

20   entrapment means, in a nutshell, is that the government got

21   involved and the government persuaded my client to commit

22   these crimes that he wouldn't have otherwise committed.  Now,

23   that's for you to decide.  But what I want to point out to you

24   is, it's the government's burden -- as you'll see in those

25   instructions, it's the government's burden to prove beyond a

1   reasonable doubt that the government did not entrap my client.

2   I don't have to prove they did.  They have to prove that they

3   did not.

4           Now, it's also allowed -- just because I argue

5   entrapment and that the CS entrapped my client does not mean I

6   can't also argue that the elements of the offense were not

7   met.  So I want to be very careful here that in no way are we

8   agreeing that any crime was committed.  We still believe

9   there's major issues with the elements of these offenses I'll

10  get into shortly, but we also believe the only reason my

11  client is here today is because of the involvement of the

12  government and the government pushing this case forward

13  through the use of a confidential source.

14          So let's think about this confidential source a

15  little bit.  Who was he?  He appears, in his audio recordings,

16  to have an accent, right?  He's from El Paso?  I believe--  We

17  hear a couple different names, Roberto, Sangre de Lobo, but we

18  don't know who he really is.  And the testimony was, he passed

19  away a couple years ago.  But what -- what do we do know about

20  this person?  Well, first of all, we know he's a civilian.

21  He's not a government agent, not an FBI agent or any agent.

22  And we know he made a lot of money off the government, almost

23  a quarter million dollars, was the testimony, that he's made

24  acting as a source for the government.  We also learned that

25  he is paid to push cases along.  He doesn't get money if he

1  doesn't get results, I believe was the testimony.  So he's

2  paid to push cases along.  In our case we learned, even more

3  so than that, he got a bonus, 10,000-dollar lump sum payment.

4  Now, he had passed away, so it's our understanding that money

5  went to his family.  But he got a bonus in this case, for some

6  reason or another, an additional $10,000.  And we didn't hear

7  any testimony that he's paying taxes on that money, either.

8  What we do hear testimony of -- or we hear recordings of is

9  that he's paid for his house, that he doesn't have any credit

10  card debt.  He said all that stuff at the City Café.  So he

11  definitely appears that he is profiting at the government's

12  expense, if you will, our expense, taxpayers' expense.

13        So, now, what else do we know about Shielein -- I'm

14  sorry, Mr. -- confidential source?  We know he says he knows

15  of a Middle Eastern camp across the border, and he's going to

16  go over there and take those people out, right?  Well, let me

17  rephrase that.  He did go over there and take those people

18  out, right?  We all heard that.  He's telling my client, in an

19  effort to move this along, get my client to commit crimes and

20  attempt to get my client to commit crimes, he's saying that

21  he's already taken out a camp, he's already gone and killed

22  Muslims, or "Middle Easterners" I believe is the word that he

23  uses.

24        My client asks him--  What's he say?  He says, "Was

25  law enforcement looking into this?"  He seems shocked.  I

1   think he says, "Oh.  Is law enforcement looking into this?"

2           "No.  They were with me."

3           He tells my client -- in an effort to get him to go

4   along with him, to get him to talk about criminal activity, he

5   tells him that he's killed people and that law enforcement is

6   working with him.

7           What else do we know about the CS?  Well, we know my

8   client met him in person in Nashville.  But what we also know

9   about that is, he met him in Nashville because the CS pushed

10  that forward.  The CS -- my -- you heard recordings of

11  Mr. Doggart saying, "Don't buy a plane ticket."

12          Then you hear recordings, say, "Hey, I bought a

13  plane ticket, but it's nonrefundable."  I believe the

14  testimony was, Mr. Doggart even asked to give him a refund out

15  of his own pocket, he asked -- he offered to pay that back,

16  but the CS said, "No, I've got to come on into town."  So he

17  comes on into town, and -- and my client does meet him.

18  Obviously you heard that meeting.

19          Then what else does the CS do to move this case

20  forward?  Well, obviously he continues to call my client.  If

21  you'll go back and look at the transcripts, you'll see the

22  incoming calls from the CS to my client are way greater than

23  the outgoing calls.  He proceeds to set up a meeting, right?

24          Shane Shielein, that's a figure -- another figure

25  you didn't get to hear from.  I'm sure he could have added a

 1   lot of insight on this case.  He wasn't here.  But you got to

 2   hear some of him, right?  He's on there.  Now, remember that's

 3   not offered for the truth of the matter asserted.  That's only

 4   offered for context.  I know the government pointed back to

 5   many statements by Mr. Shielein, Mr. Tint, and Ms. McNulty,

 6   and they -- sure seems like they want you to believe them for

 7   the truth of the matter.  But the ruling is, they're not

 8   offered for the truth.

 9           But Mr. Shielein is not here, right?  Mr. Doggart

10   says, a few different times——I believe he's talking to

11   Mr. Tint——"I've lost contact with this guy.  I'm not talking

12   to him.  I don't know what's -- what's going on."  So what

13   happens?  The CS makes contact with Mr. Shielein, he bridges a

14   gap, he builds a bridge, however you want to say it.  He

15   brings Shane Shielein back into the picture.  Why does he do

16   that?  Well, because he's trying to entrap my client, because

17   he's trying to further a criminal activity.  He thinks Shane

18   Shielein is necessary.

19           Now, let's talk about the CS.  Does he do these

20   things on his own?  I don't think -- I don't think so.  The

21   testimony from Agent Smith was, when he does these things,

22   when Mr. Best asked repeatedly, "Well, the CS did this," what

23   would Mr. -- Agent Smith say almost every time?  "We have

24   instructed him to do this.  We have instructed him to move the

25   case along."  So this isn't a situation of a freelance person.

1   This isn't a situation of somebody that just builds this case

2   on their own, puts a bow around it, knocks on the FBI's door,

3   and says, "Here's your case."  That's not what happened here.

4   The CS was working directly with the FBI.  They were there

5   with him when he was making some of these phone calls.  They

6   were talking in his ear, I'm sure.  But they're definitely

7   telling him what to say, they're telling him what to do.  And

8   they told him to set up a meeting in Nashville, which he did.

9   And they told him to set up a meeting in Chattanooga, which he

10  did.  My client showed up to that meeting 55 minutes after it

11  started.  Shane Shielein, Sally McNulty, and the confidential

12  source were there 55 minutes prior.  The confidential source

13  set that meeting up; I think that's undisputed from the

14  evidence.  There's communication on Facebook between the

15  confidential source and not only Shane Shielein but there's

16  also direct communication with the confidential source and

17  Sally McNulty.  Now, I know the government -- the testimony

18  today was, they were trying to keep her out of the meeting,

19  but that's not the way I took that communication.

20          So we've got the CS pushing this case along, but

21  what do we learn every time the CS pushes this case along?  We

22  learn that there's not a plan, just like what I talked about

23  in my very initial opening.  We talk about things all the

24  time.  We talk about big things, little things, going to the

25  park, going to the Super Bowl, and we have caveats, we have

1    condition precedents, and those condition precedents have to

2    come true for a plan to particularize.  But in this particular

3    case we don't even just have that issue, because we definitely

4    never had recon.  Undisputed proof, we didn't have recon.  We

5    also never have a definite plan.

6         Now, think about that, guys.  You heard all of these

7    recordings.  You heard the number of participants that were

8    needed for a plan change numerous times.  You heard, "Well,

9    we're going to take out the three buildings;" "We're going to

10   take out the whole place," at one point.  You heard all kinds

11   of things.  You've heard night vision goggles were absolutely

12   necessary.  You've heard a machete was necessary.  You've

13   heard ten guys were necessary at one time.  You've heard about

14   needing to have weapons -- certain weapons.  You've heard

15   about BDUs or cold-weather uniforms.  You've heard about body

16   armor or Kevlar.  You've heard about Mr. Doggart having his

17   bags packed and ready to go.  We know that's not true.  You've

18   heard about explosives.  You've heard about grenades.  You've

19   heard about training and meeting with the team to prepare.

20   You've heard about encrypted communication devices.  You've of

21   course heard about the recon, one more time.  You've heard

22   about William Tint.

23        And, interestingly, it came up earlier today, you've

24   also heard about the mosque, right?  This is the transcript.

25   It was part of Government's Exhibit 307T.  Okay?  "Anyway, you

1  know--" Robert Doggart speaking, "Anyway, you know, obviously

2  in the entry point there's a little guard shack that's got to

3  go first, a control building in that red roof, and that's

4  where the mess hall is, and then these trailers down here

5  are -- uh, are the mosque areas where they pray and

6  (unintelligible)."  You see that?  This was at that City Café

7  meeting.  This was a day before Robert Doggart was arrested.

8  A day before.  He's telling people the day before he's

9  arrested that the mosque is a group of trailers.  And the

10  reason that's important is, he's only charged with

11  solicitation of one building.  Both Counts 1 and 2 are the

12  same building, the mosque.  How can you have a plan to destroy

13  a building when you've got the wrong building?  You've got the

14  wrong building.  He says it's a trailer.  Mr. Clark and also

15  Mr. Brooks today have both been to this mosque, were very

16  clear that this is a permanent structure.  It's a block

17  building.  You've seen pictures of it.  It's clearly not a

18  group of trailers.  How can you have a plan when the object of

19  your plan and the object of these charges is not what's in

20  your mind?  And that's important because you guys have to

21  judge this case -- you guys have to look at this case through

22  the mindset of my client, okay?  And that was the mindset of

23  Mr. Doggart, is that the mosque was a trailer.

24        All right.  But what else did Mr. Doggart not have?

25  Well, he never actually used any force.  He never did any

1    recon.  There never was an attack.  Nobody was ever actually

2    injured.  We definitely haven't heard proof of religious

3    intent.  Anything you've heard about why Mr. Doggart did this

4    is because he believes these people are terrorists.  He has a

5    true belief that the residents of Islamberg are terrorists.

6    Why does he believe that?  Well, we know Fox News is the --

7    one of the reasons he believes that, right?  Fox News has put

8    evidence out, through news broadcasts.  And you're going to

9    have that in the jury room, Exhibit 109 -- Defense Exhibit 109

10   and Defense Exhibit 9, that's going to have some of these

11   articles.  These were articles that my client had in his

12   position.  These aren't things that we fabricated after the

13   fact, to say, "Why would somebody think this?"  These were the

14   things Mr. Doggart was actually reading.

15          And what was he scared about?  He was scared that

16   they were going to poison the Delaware River──right?──they

17   were going to also poison a reservoir that supplies New York

18   City, and then I think his worst fear was, they were going to

19   load up in three white windowless vans with AK-47s and go into

20   New York City and kill as many people as they could kill

21   before they were killed.  That's what Mr. Doggart believed.

22   That was what was in his mind.  Special Agent Smith has been

23   very forthcoming with you that he believes Mr. Doggart

24   believed that, he believes that was what his state of mind was

25   thinking at the time.

 1              But why would an American think that?  Why would we?

 2   Well, because it's happened before, right?  We have had

 3   terrorist attacks on our soil.  The World Trade Center bombing

 4   in 1993 is one to remember.  9/11 has come up multiple times

 5   in this trial.  You guys have your own experiences and

 6   remembrance of 9/11, but it was a terrorist attack against

 7   Americans on American soil.  And training for that terrorist

 8   attack happened in America.  They were learning to fly in

 9   Florida.  They were learning how to fight in various cities.

10   They were here training.  So it's not unreasonable for

11   somebody to believe that could happen again.  It's not

12   unreasonable to talk to some guys about doing a recon trip to

13   see if this is also a bad place.

14              And just because you do a recon trip doesn't mean

15   you come to a bad conclusion, right?  We've heard evidence

16   that Mr. Doggart looked at Dover, Tennessee.  Dover,

17   Tennessee, in -- is another hamlet, village, whatever you may

18   want to call it, of people practicing the Islam faith.  And I

19   believe they may also be members of Muslims of America there.

20   But Mr. Doggart went there.  He talked to the neighbors.

21   There's a little bit of controversy in the proof, I think, of

22   whether he actually was inside the village or talking to the

23   neighbors, the mayor, that sort of thing.  But we know he went

24   there.  That's been the proof.  And he made the determination,

25   after going there, that these are peaceful, benevolent people,

 1   I think -- I believe his words were "on a -- the type of jihad

 2   that is a spiritual path back to Allah."  And what happened in

 3   Dover?  Nothing.  Nobody was attacked in Dover, nobody was

 4   assaulted.  There was no raid on Dover because the

 5   reconnaissance showed that they were peaceful people.

 6        He had a real belief these were terrorists.

 7   Mr. Muhammad Clark himself told you, "We know the rumors are

 8   out there.  We know people think we're bad people.  We know

 9   Fox News is reporting."  He also talked about his found- --

10   the founder of his land, Sheikh Gilani, had been there on site

11   and he shook hands.  Well, we also know Sheikh Gilani has ties

12   -- rumored ties to terrorism that are out there in the

13   public's perception.

14        We also know Mr. Brooks had went to Pakistan to

15   visit with Sheikh Gilani.  We also know that Mr. Brooks went

16   out of the country, down south, Ecuador, I believe, to visit

17   with somebody who he knows has rumors -- that was released as

18   a terrorist from a Canadian prison, who just happens to be the

19   father of Barry -- I'm sorry, Hussein Adams, who is the

20   trustee of The Muslims of America in Islamberg, the legal

21   owner, I think is what we established through that.

22        So their rumors are out there, and these aren't

23   rumors on Facebook.  Well, let me rephrase that.  These are

24   rumors on Facebook, but they're also rumors on Fox News.  Fox

25   News is a legitimate news source.  They are one of our three

 1    major networks, and -- they're a part of one of our three

 2    major networks, they're a subsidiary of Fox, and they air news

 3    stories.  Most people that believe -- or most people that

 4    watch Fox News believe what they see on Fox News, they believe

 5    it's -- it's news.  You guys can make that determination on

 6    your own.

 7              But who is Robert Doggart?  That's really the

 8    question.  Who is Robert Doggart?  You've heard lot of things,

 9    not from the witness stand necessarily, but from recordings of

10    Mr. Doggart.  And you heard some things that I know did not

11    sound pleasant at times.  But what you didn't hear from

12    Mr. Doggart, you didn't hear somebody who seemed just mad at

13    the world and angry and just making crazy, outlandish

14    statements for no reason.  It seems like somebody that really

15    has a fear, that really has a concern.

16              Well, what else did you not hear, though?  You

17    didn't hear any actual solicitation.  At what point did you

18    hear Mr. Doggart specifically give a definite plan and ask

19    somebody to come with him?  You didn't hear that.  You heard a

20    lot of talk about potential planning.  And my position is, we

21    never had a plan.

22              Plans need to be definite.  How many of you guys

23    have ever had plans at work?  If the plan has A, B, and C, you

24    need to do A, B, and C, right?  Well, this plan didn't have

25    that because it wasn't a plan.  There wasn't A, there wasn't

1   B, there wasn't C.  There was a whole bunch of stuff jumbled

2   around, mixed around, and it changed, not only daily, but it

3   changed in the same conversations, it changed in the same

4   conversations.  So there's not a plan here, guys.  There's

5   just not a plan.

6           And to have the mindset to solicit somebody, you

7   also need a plan, and you need to have the intent to carry

8   through with that plan.  And we know that's not possible.  The

9   reason it's not possible is because if you believe one thing

10  Mr. Doggart said, I think you probably owe it to believe the

11  other things he said.  And so if you believe he would do some

12  of these things, you should also believe he would not do

13  anything without first conducting reconnaissance and

14  determining if there is actually a threat, actually a threat.

15  He had no intention to do anything unless there was a threat.

16  And even then, just like my example of the people who were

17  going to move to Canada when Trump wins, they may say they had

18  an intent, but when time came -- when it came time -- when

19  time came to get into the car, did they go to Canada?  No.

20  Did Mr. Doggart go to New York?  No.

21          We kept hearing a drop-dead date of April 15th,

22  April 15th, 2015.  Well, Mr. Doggart was arrested on

23  April 10th, 2015.  And what do we know?  Let's go backwards a

24  little bit.  So when the FBI arrested him on April the 10th,

25  2015, they conducted an interview with him.  We didn't get to

1    hear that interview in court.  But while they were conducting

2    the interview, they had many, many agents at his house.  You

3    guys know this from Retired Special Agent Fuller.  And let's

4    go back through the things they didn't find at Mr. Doggart's

5    house.  They found some weapons.  I think they found seven

6    weapons, total.  Some people say that's a cache or a lot of

7    weapons.  I think you guys can use your own judgment.  The

8    common house in the Southeast, I don't think seven weapons is

9    anything out of the ordinary.

10       They want to tell you these are bad weapons because

11   they're painted black and they're assault weapons.  Well,

12   they're perfectly legal weapons; we know that.  The weapon

13   that somewhat looks like a military M16 we know is not; it's a

14   semiautomatic AR-15 that any 18-year-old American without a

15   criminal record or a crime of domestic violence can legally

16   own.  Don't even have to be 21.  You can buy that gun when

17   you're 18.  Fires one round at a time.  Does not fire bursts.

18   Is not fully automatic.

19       So what does Mr. Doggart not have?  Well, we know he

20   doesn't have fully automatic weapons, right?  He doesn't have

21   silencers in his house.  He doesn't any illegal weapons, any

22   weapons that are a crime just to possess.  He doesn't have any

23   explosives.  He doesn't have any grenades.  He doesn't have a

24   single BDU.  How many times did you hear, "We'll wear BDUs

25   when we do this, we'll wear BDUs."  He doesn't have a single

February 13, 2017    Closing Argument by Mr. Turner

 1  one.  We also heard cold-weather gear.  At one point I think

 2  it was also called a "cold-weather BDU" or a "polar BDU," and

 3  I -- we -- Agent Smith, I believe, responded that that would

 4  be a thicker BDU for -- for the wintertime, to keep you warm

 5  and that sort of thing, and more than likely would be colored

 6  white to blend in with the snow.  Doesn't have that, either.

 7  Night vision goggles, we talked about, he absolutely does not

 8  have.  We've asked that question a few times, from Agent

 9  Fuller and Agent Smith.  Ten guys, what about that?  The one

10  number that comes back most commonly is ten, right?  At one

11  point we hear five.  We hear four.  We hear 20, I think, at

12  one point.  But the one number that comes up the most, I would

13  say, is ten guys.

14          THE COURTROOM DEPUTY:  Mr. Turner, you have five

15  minutes.

16          MR. TURNER:  Thank you.

17          We never heard about ten guys, because there weren't

18  ten guys.  We don't -- we haven't heard any proof of newly

19  purchased weapons, anything that Mr. Doggart would have

20  purchased specifically for this type of activity or plan.  We

21  only know of weapons he previously owned.

22          The FBI was surveilling this guy pretty well.  They

23  had an airplane in the air most days.  They had his neighbor's

24  house they were using as a surveillance point.  They had a

25  tracker on his car.  They had a surveillance team following

1  him nonstop.  And you don't hear about any bad activities

2  there, right?  You heard he went to South Carolina and saw his

3  grandkids.  They want to tell you he was supposed to meet with

4  William Tint, that meeting that did not happen.  That's all I

5  can say about that.  He did not meet with William Tint.  But

6  he did meet with his daughter and grandkids.  And of course he

7  went to Nashville——we know that——to meet with the CS.

8         But where is all the surveillance where he's

9  training, where he's showing the master gunner not missing,

10 where he's preparing for combat, preparing for action, he's

11 buying BDUs, he's stockpiling all these machetes and

12 additional guns and grenades?  Doesn't exist.  They were

13 watching him every day up until they arrested him, and none of

14 that stuff happened.  Where's the photos where he tried to

15 drive to New York?  Doesn't exist.  He never tried to drive to

16 New York.  Where's the photographs where he met with William

17 Tint?  They don't have them.  He did not meet with William

18 Tint.

19        Ladies and gentlemen, there was not a plan.

20 Mr. Doggart had some thoughts that he discussed on the

21 Internet with people he had met on the Internet.  Some of

22 those thoughts were pressed forward by the government because

23 they implanted a confidential source, who they paid, to get

24 him to take steps in furtherance of a crime.  Mr. Doggart

25 would not have committed this crime, he did not commit this

 1  crime, and the only reason he's in trial today is because the

 2  government put a CS into his life to try to put this crime at

 3  a much advanced level.  It would not have happened without the

 4  government's involvement; it only happened because of that.

 5  And let's give you a good example of that.  Why is that true?

 6  Well, what about everyone else we've heard about in this case?

 7  What about William Tint?  The FBI tried to tell you, "I think

 8  he's guilty."  Why didn't they charge him?  Can they only

 9  charge one person?  Is there a law that you can only charge

10  one person?

11        Shane Shielein, "He's a bad dude," right?  "He'll do

12  it.  We've got an investigation on him.  He came to

13  Chattanooga to meet."  You heard him on the tape, what he

14  said.  Has he been charged?  Absolutely not.

15        Sally McNulty, another person you heard on the tape.

16  Wouldn't put her at the same level as the other people, but

17  she still is on the tape discussing these actions.  Is she

18  charged?  No.

19        Chris Powell, another person you heard about, he

20  wasn't charged.  Nobody else you heard about was charged,

21  except William Tint with lying to the FBI.  He was not charged

22  with any crime involving Mr. Doggart.  Mr. Doggart had nothing

23  to do with his statement to the FBI.

24        You know, guys, you know, they say sticks and stones

25  may break your bones, but words will never hurt you.  Well,

1  maybe that's why Shane Shielein's not in jail.  Maybe that's

2  why William Tint's not in jail.  Maybe that's why Madonna is

3  not in jail, because she just recently said she was going to

4  blow up the White House.  But Robert Doggart is on trial for

5  his words.  He's on trial for being concerned about terrorist

6  activity in America that was broadcast by Fox News.  He's on

7  trial for being an American patriot who is concerned with his

8  country.  The government got involved and made -- tried to

9  make a criminal out of Robert Doggart.  You're the conscience

10 of the community.  I ask you to do your duty.  And the only

11 just verdict is finding my client not guilty on all four

12 counts.  Thank you.

13             THE COURT:  Mr. Piper.

14             MR. PIPER:  Thank you, Your Honor.

15             Ladies and gentlemen, Mr. Turner does an

16 admirable -- an admirable effort trying to tell you that the

17 only reason Robert Doggart sits here today is because of the

18 CS, Sangre de Lobo, Blood of the Wolf.  I'll be candid with

19 you, you know, had we picked a nickname for a CS, it would not

20 have been Blood of the Wolf, but that's what we had, and

21 here's why we had that, is because Robert Doggart, on

22 February 6th, reached out to a whole bunch of people on the

23 Internet.  Sangre de Lobo, the CS, was not one of them.  He

24 talked about his attack plan.  We've got this in the Facebook

25 postings that we reviewed with Agent Smith I think as early --

1    as late as this morning.

2            The defendant wants to argue this mish-mosh of,

3    "Well, it was entrapment, but, really, he didn't do anything

4    wrong, anyway, but if he did do something wrong, it was

5    entrapment because the government introduced the CS."

6            And I submit to you, if it was the CS driving this

7    train, please, acquit him, send him home, send him home,

8    acquit him.  If the CS is driving the train here, valid

9    defense, perfectly good.  But that's not what happened.  And

10   your common sense tells you that's not what happened.

11           Everything that Mr. Turner says -- gets up here and

12   maligns Mr. Clark, Mr. Brooks, the two fellows from Islamberg

13   who came down here and testified.  Let me tell you, Mr.--  And

14   he wants to argue about, "Well, their memory is bad," or -- or

15   says, "Ironically it was the *Moral Code*," "Ironically."  I

16   don't know what's ironic about that.  I don't know why he sees

17   fit to demean these two guys who were victims of Doggart's

18   horrible expressions over the telephone and over the Internet.

19   Why is that ironic?

20           Let me tell you what is ironic, is that Mr. Turner

21   says, "Camp wasn't canceled in 2015, because the first books

22   he sent were to campers."

23           If you remember what Brooks said, he said, "I sent

24   them to South Carolina."  That's where he sent the books to.

25   Mr. Turner chooses to ignore that.

 1            MR. TURNER:  (Moving head from side to side.)

 2            MR. PIPER:  Go ahead and shake your head, Mr. Turner,

 3    but that's exactly what the testimony was.

 4            That's exactly what he said.  And to think that

 5    these two guys are going to get up here and lie--  Look at

 6    these people.  These two guys are going to get up here and lie

 7    to put this gentleman in?  (Indicating.)  Who does that--  Who

 8    is telling the truth on this?  Who is telling the truth on

 9    this case?  It's not Mr. Turner.

10            Let me remind you, when poor old Cathy Fuller,

11    retired FBI agent, gets up here, and all her role is is to

12    bring these -- the Mossberg and the M400 and the ammunition

13    in, the last thing Mr. Turner said to her was, "There's not

14    5000 rounds of ammunition."  It wasn't even a question.  He

15    just screamed at her and said it.

16            As luck would have it, what was the next thing out

17    of the tape?  You-all remember this.  Doggart said he had

18    15,000 rounds of ammunition.

19            And I asked Smith, I said, "How much did he have?"

20            And he said, "Approximately 5200 rounds of

21    ammunition."

22            It wasn't even a huge deal.  He just wanted to call

23    her a liar.  And he gets caught on that.  He gets caught on

24    the fact that he's got tracer ammunition.  We haven't charged

25    Mr. Doggart with having illegal weapons.  There's not one

1   aspect of this indictment that charges him with having an

2   illegal weapon.  What we've charged him with is two counts of

3   solicitation and two counts of threats.

4           And Mr. Turner says, "Well, you've got to have a

5   plan.  You've got to have a plan."

6           What he has a plan to do is to solicit people to

7   burn this mosque, and issues threats to do it.  That's what

8   his plan is.  And while he and I may disagree about the

9   specifics of the plan, he has specifics.  He wants to gather

10  people, he wants to recruit, to encourage people to help him

11  do this.  He claims it's all conditional upon this recon.

12  But, remember, every time he talks about recon, what's the

13  next thing out of his mouth?  The next thing is talking about

14  burning buildings.

15          I don't want to bore you-all with a whole bunch of--

16  I'm going to rip these out.  (Indicating.)  He talks about--

17  This was the last passage that I had Smith on this morning,

18  and this was from the City Café, and you'll see here this is

19  the portion that we were talking about.  "Down here -- the

20  trailers are down there, uh, are the mosque areas."  That's on

21  Page 7.  On Page 5, probably about a minute before that, let's

22  see what Mr. Doggart says:  "Those are the three buildings we

23  looked at.  Those are the three buildings we looked at.  Take

24  those three out, they're out of business."  The context of

25  that conversation was, they were calling this up on the

1    Internet, they were looking at somebody's cell phone or iPad

2    and they were calling it up.  "Take those three buildings out,

3    they're out of business."

4            Mr. Turner claims, "Oh, got nothing to do with it

5    being a mosque.  It's got nothing to do with Islam."  And I

6    submit to you he appeals to your prejudice, by bringing

7    9/11 in it, by bringing the World Trade Center bombing in it.

8    Didn't mention the coal, mention a number of things he could

9    have mentioned.  But as the Court instructed you when you came

10   in in this case, you're going to see a lot of folks who don't

11   look like us.  They have different attitudes.  They have a

12   different religion.  But you know what they are?  They're

13   Americans.

14           And Mr. Doggart wants to claim this constitutional

15   adherence.  He's a strong constitutional guy.  Well, guess

16   what?  He's situational in his adherence to the Constitution,

17   he has a situational adherence to it.  He loves the Second

18   Amendment, he loves the Tenth Amendment, he says it all the

19   time.  Guess what he doesn't love.  He doesn't love the First

20   Amendment.  He doesn't want to let people practice their

21   faith.  He doesn't like the Fifth Amendment, no deprivation of

22   life, liberty, or property without due process of law.  That's

23   what he wants to do; he wants to take their property, and

24   possibly even their lives, without due process of law.  And

25   guess what else he doesn't like?  He doesn't like the

1    Eighth Amendment, no cruel and unusual punishment.  It's

2    pretty cruel and unusual to kill people, to kill children, to

3    kill anybody who comes to put out a fire, and that's what he

4    says he's going to do.  He doesn't say it once.  He says it

5    all the time.

6         So, ladies and gentlemen, that thing about the

7    trailers -- and I was trying to ask Agent Smith, because

8    Mr. Doggart is appending two different issues together.  He

9    says nobody else is charged except Tint.  I think Agent Smith

10   explained to you when they interviewed Tint in South Carolina,

11   Tint denied any knowledge of the plan to go burn, he denied

12   any knowledge of having a meeting with Robert Doggart or talks

13   with Robert Doggart.  That's what he lied about.  That's in

14   South Carolina.

15        He also talks about Shane Shielein.  And let's talk

16   a little bit about the danger of solicitation.  It's more

17   about the seed you plant than that what you harvest.  The

18   danger of solicitation.  He's talking to Shielein and poor old

19   Sally McNulty, a realtor from Ooltewah, and she's talking

20   about taking out terrorist training camps.  And what's Shane

21   Shielein say?  "Well, is there another way to do this?  Is

22   there another way to be effective on it?  Why don't we poison

23   their water supply?  Why don't we put something in Islamberg's

24   water supply and send them a message?"  That's what the danger

25   of solicitation is, you get people-- Hey, we've embraced that

1   Shane Shielein's not a good guy, that he may have some flights

2   of fancy, that he believes he's an archangel, whatever.

3   Mr. Doggart may, too.  But he's not arguing insanity here,

4   folks.  He's not saying, "I wasn't sane."  If anything, he's

5   saying just the opposite, "I knew what I was doing."

6          Let's talk a little bit about this -- let's look at

7   what the best-case scenario is.  And this is, again, from a

8   conversation between the CS and Mr. Doggart, and he talks

9   about, "The best-case scenario is, well, we go in there and

10  we -- we go in there with ten guys and we blow up the three

11  buildings, we kill a few of them, or all of them, and all of

12  us die.  Now, everybody dies eventually."  Now, that's the

13  best-case scenario, "We go in there with ten guys."

14         Here was the worst-case scenario:  "We go in there

15  and they're innocent but we kill them anyway."

16         He's got a bias.  You've heard it.  He said, "I'm

17  going to go up there as a ruse.  I'm going to go up there and

18  figure out where these buildings are located, how much

19  manpower they've got, how -- what kind of artillery, what kind

20  of toys they have."  He's got a-- He says it a number of

21  times.  He says it all the time.  "I am going to go up there

22  to do that."  He's got this bias in his mind, and Mr. Turner

23  has admitted this; he's either been brainwashed -- as Shane

24  Shielein would say, he's got "cognitive diss-o-nance" about

25  this brainwashing that either Fox News or the Internet or

1  whomever puts on him.  But that's where his mind is.  But the

2  danger is, when he goes out and recruits others, it's that

3  seed that he plants.  It's not the harvest.  It's not the

4  going to Minneapolis for the Super Bowl.  It's that seed that

5  he plants.  And that's what the Court's going to instruct you.

6  The act need not be completed.  That's certainly true.  Had

7  the act been completed, we'd have different charges here.

8  Thank goodness they weren't.

9          Talks about interstate commerce and the mosque.

10  You've heard testimony.  The Court's going to instruct you on

11  a place of worship, how interstate commerce can be satisfied

12  by out-of-state people coming in.  Certainly the campers came

13  in.  He wants to argue about the campers and whether they paid

14  any money.  The two gentlemen we called both went to the camp.

15  Both were counselors.  They both said yes--  And Mr. Brooks

16  this morning said he paid a hundred and fifty bucks when he

17  went and -- he was 20 years old, I think, 19 years old,

18  perhaps, when he went from California, and he went, and the

19  mosque was part of the experience for the campers, they had

20  religious instruction there.  The Court's going to tell you

21  that minimal contact in interstate commerce is all that's

22  required.  And certainly there's more than that.  This is a

23  famous mosque for the residents of Islamberg, for these

24  Muslims, and people come from all over the country.  That

25  affects interstate commerce, ladies and gentlemen.  There's no

1    question that it doesn't.

2            He says it's convenient that the bookstore is in the

3    mosque.  That's Mr. Turner, "Well, it's just convenient that

4    the bookstore--"  Well, do you think they were lying about

5    that?  Do you think that they just got up here and made that

6    up to satisfy the interstate commerce requirement?  Brooks

7    told you.  If Brooks was going to lie to you, he'd tell you

8    something different.  He said they had four to five thousand

9    dollars in sales, he started in February, started gathering

10   the equipment, the first sale was in May, the first shipment

11   was in May, and that was to South Carolina, the same year that

12   the camp canceled.

13           He says the CS made $250,000.  Actually I think it

14   was more like 200,000, the other 50,000 was for expenses, over

15   the course of 16 years, which I think is about $12,000 a year.

16   Not a great way to make a living, but there are a lot of

17   people out there who do it.  And what did Smith tell you?  He

18   said, "Well, given the FBI's expenditure in this case," he

19   says, "it was easily a couple hundred thousand dollars with

20   soft money."  I wrote that down.  I don't really know what

21   soft money is, but I'm assuming Agent Smith meant that that

22   was money they were paying in salaries anyway.  My money is

23   hard money, but I'm not an FBI agent.  I don't mean to be

24   flippant, but that's what he said, "at least a couple hundred

25   thousand dollars in soft money," with all the people they had

 1   camping out, all the -- all the surveillance and everything

 2   they'd done.

 3          Then Mr. Turner says, "The CS got a 10K bonus, a

 4   10,000-dollar bonus, and we don't know why."  And this was

 5   after he died.  Attempting to impugn the CS.  Smith told you

 6   why, and the reason was is because the CS had his life

 7   threatened by these militia members; and the FBI, generous as

 8   they are, decided to give his widow $10,000 for the threats

 9   that he had gone through and the heartache he'd gone through

10   over this case alone.

11          Again, he says the CS pushed it forward, pushed it

12   forward.  And Smith told you this:  "When you've got

13   grenades--  When you start talking about using grenades, we

14   want to know that.  When you start talking about using

15   silencers, we want to know that."  Turner wants to criticize

16   this, and I submit to you it's good law enforcement.  Ask

17   yourself, is it common sense?  Is it reasonable?  When you

18   have somebody talking about grenades, wouldn't it be a good

19   idea to have them call somebody and say, "Hey, tell me about

20   those grenades," or "Tell me about those silencers"?  That's

21   just common sense, ladies and gentlemen.  That's just good law

22   enforcement.

23          And it wasn't the defendant that says, "Oh, I don't

24   want to talk about grenades."  He says, "If we get grenades,

25   you know, and we get caught with them, we're in trouble."

 1              Let's talk a little bit more about solicitation and

 2     the danger of it.  When he talks to Anita Gaunt, Gant——I'm not

 3     sure how her name's pronounced——he talks to her about doing

 4     all these things, and, you know, you can tell she's

 5     disinterested, "Yeah, well, you'll get caught," you can just

 6     tell by her tonal inflection.

 7              When he talks to his daughter Hillary Doggart Greer

 8     in South Carolina and he talks about, "We are going to do a

 9     preemptive strike--"  I think I've got this somewhere.  "We

10     are going--"  Here it is.  This is Exhibit 119.  Right there,

11     "And in Texas coming up on the 15th of April, we're going to

12     preempt it."

13              And you've heard this before.  Her response is, "Oh,

14     Dad."  She doesn't believe it.  She doesn't want to believe

15     it.  She thinks, "Well, come on."  Much like his daughter that

16     testified today, Mrs. Atkins, that's not the man she knew,

17     that's not the man she wants to hear about.  And God bless

18     them.  To have this kind of thing going on in your family, how

19     horrible must it be.

20              But what happens when Doggart says it to William

21     Tint?  "We need to go in there and burn those three

22     buildings," on March 22nd, the date of Count 3, "We need to go

23     in there and burn those three buildings and put them out of

24     commission."

25              (Brief pause.)

1          MR. PIPER:  "I don't want to kill anybody, but if we

2    burn down their--  There's our three targets, there's the

3    kitchen, the mosque, and of course their school.  If we take

4    out those three buildings, those three components, we can just

5    walk away."

6          What's William Tint's response to that?  It's not,

7    "Oh, Dad," or, "Oh, Bob," or "Oh, Senator," it's, "I have an

8    EOD guy.  I have an EOD guy.  Explosives ordinance disposal,

9    that's the guy that I've got."

10          And then Mr. Best wanted to make a deal -- "Well, he

11    didn't know what an EOD guy --"

12          Well, apparently he does, because he says, "Well,

13    then, that is important, because we were going to discuss

14    before going up there what kind of incendiary devices we're

15    going to use, what kind of accelerants we're going to use."

16          Does that sound like a plan to you, ladies and

17    gentlemen?  Does that sound like a threat to burn this --

18    these buildings down, a threat communicated in interstate

19    commerce over a cellular telephone?  The Judge is going to

20    instruct you that's an instrumentality of interstate commerce.

21          THE COURTROOM DEPUTY:  Mr. Piper, you have two

22    minutes.

23          MR. PIPER:  Thank you.

24          He says he's not unreasonable in his belief that

25    there were terrorists at Islamberg.  The problem with that is,

1  he has a preconceived notion about what he's going to do.

2  He's not soliciting people to go up and do a recon, ladies and

3  gentlemen.  He is soliciting people to go up and destroy these

4  buildings and kill other people.  He's the guy that says,

5  "Children -- I don't want to kill children, but there's always

6  collateral damage."

7          His son-in-law said, "I would be surprised if he

8  said that."  But he shouldn't have been, because he says it

9  all the time.

10          The Court's going to instruct you on reasonable

11  doubt——this is the last thing I'm going to say——and the

12  Court's going to tell you that a reasonable doubt is based

13  upon reason and common sense.  When you use your common sense

14  in this case, like Mr. Mody said, I submit to you there's only

15  one verdict that's appropriate, and that's guilty.  Thank you.

16                          END OF EXCERPT

17

18

19          I, Elizabeth B. Coffey, do hereby certify that I

20  reported in machine shorthand the proceedings in the

21  above-styled cause, and that this transcript is an accurate

22  record of said proceedings.

23

24                              s/Elizabeth B. Coffey
                                Elizabeth B. Coffey,
25                              Official Court Reporter