# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: January 15, 2020

Ms. Anna Marks Baldwin
Mr. Thomas E. Chandler
Mr. Saeed Ahmed Mody
U.S. Department of Justice
Civil Rights Division, Appellate Section
P.O. Box 14403
Washington, DC 20044-4403

Ms. Jennifer Niles Coffin
Federal Defender Services
800 S. Gay Street, Suite 2400
Knoxville, TN 37929

Mr. Perry H. Piper
Office of the U.S. Attorney
1110 Market Street, Suite 515
Chattanooga, TN 37402

Re: Case No. 17-5813, *USA v. Robert Doggart*
Originating Case No. : 1:15-cr-00039-1

Dear Counsel,

   The court today announced its decision in the above-styled case.

   Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                            Yours very truly,

                            Deborah S. Hunt, Clerk

                            Cathryn Lovely
                            Deputy Clerk

cc: Mr. John L. Medearis

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0017p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

ROBERT R. DOGGART,

*Defendant-Appellant*.

No. 17-5813

Appeal from the United States District Court
for the Eastern District of Tennessee of Chattanooga.
No. 1:15-cr-00039-1—Curtis L. Collier, District Judge.

Reargued: December 19, 2019

Decided and Filed: January 15, 2020

Before: SUTTON, McKEAGUE, and THAPAR, Circuit Judges.

---

**COUNSEL**

**REARGUED:** Jennifer Niles Coffin, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., Knoxville, Tennessee, for Appellant. Anna M. Baldwin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON SUPPLEMENTAL BRIEF:** Jennifer Niles Coffin, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, INC., Knoxville, Tennessee, for Appellant. Anna M. Baldwin, Thomas E. Chandler, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Perry H. Piper, UNITED STATES ATTORNEY'S OFFICE, Chattanooga, Tennessee, for Appellee.

**OPINION**

SUTTON, Circuit Judge.  In today's sequel, we return to the plight of Robert Doggart, convicted at age 65 of soliciting others to terrorize the people of a small Islamic community in upstate New York.  Last time around, we concluded that the district court improperly denied Doggart the benefit of a plea bargain when it applied the wrong legal standard to conclude that he had not made a "true threat."  On remand, the district court identified an alternative basis for rejecting the plea bargain—that the five-year sentence generated by it was too lenient to account for the gravity of Doggart's conduct.  Doggart objects to this conclusion and other aspects of his convictions as well as the 235-month sentence.  In particular, he objects to one of his arson-solicitation convictions, contending that the target of the solicitation—a mosque—was not "used in" interstate commerce.  18 U.S.C. § 844(i).  We affirm in part and reverse in part, and remand for resentencing.

I.

In 2014, Doggart, a nuclear engineer and former congressional candidate, became convinced that an Islamic community in New York, self-identified as "Islamberg," was plotting a terrorist attack against New York City.  R. 285 at 38.  In a nod to O. Henry, he decided the best solution would be a terrorist attack of his own.  He began posting on his Facebook page that Islamberg, referred to as "Target 3," had to be "utterly destroyed."  R. 14 at 2.

His messages drew the attention of the FBI.  It tasked a confidential informant to strike up a conversation with him.  Over the internet and over the phone, Doggart tried to goad the informant into helping him assault Islamberg.  He explained that the residents had "to be killed" and that "[t]heir buildings need[ed] to be burnt down," especially their school, cafeteria, and mosque.  *Id.* at 2–3.  Doggart had the details all worked out, down to the weapons they would use, including Molotov cocktails and homemade explosives.  And he had a "drop dead" day for completing the operation:  April 15, 2015.  *Id.* at 3.

No. 17-5813                            *United States v. Doggart*                            Page 3

Doggart did more than talk by phone about his proposed terrorist acts. On several occasions, he traveled to meet with the "gunners" he enlisted to help him. *Id.* at 4. One of those meetings involved the FBI's confidential informant. Doggart showed up to the meeting with several firearms along with a map of Islamberg that marked the buildings he planned to destroy. Over lunch, he discussed different plans of attack. He made clear that his primary objective was to "burn down [the] mosque," and that if the residents resisted he would have no choice but to "return fire." R. 302-7 at 3. He hoped to avoid killing children unless he "ha[d] to," although he speculated that some "collateral damage" would be inevitable. R. 302-8 at 44. Having heard enough, law enforcement arrested him soon thereafter.

After negotiating with federal prosecutors, Doggart reached a deal. He would plead guilty to one count of transmitting a threat to kill or injure someone in interstate commerce, carrying a statutory maximum of five years. *See* 18 U.S.C. § 875(c). In exchange, the government would not oppose a sentence reduction for his acceptance of responsibility. The district court rejected the agreement for want of a factual basis. It found insufficient evidence that Doggart had made a "true threat," which it read to require a showing that his communications were designed to "effect some change or achieve some goal through intimidation." R. 29 at 4 (quotation omitted).

The government came back with a new indictment and different charges. It charged Doggart with two counts of solicitation, 18 U.S.C. § 373, one for solicitation to damage religious property, *id.* § 247, and one for solicitation to commit federal arson, *id.* § 844(i). It also charged him with two counts of making a threat in interstate commerce over the telephone. *See id.* § 844(e). The case went to a jury, which convicted Doggart on all counts. The district court granted Doggart's motion for judgment of acquittal on his two § 844(e) convictions for the same reason it rejected his plea bargain. The judge imposed two consecutive sentences—a 120-month sentence for his § 247 solicitation conviction and a 115-month sentence for his § 844(i) solicitation conviction.

Doggart appealed. He argued that the district court wrongly denied him the benefit of his plea bargain by applying the wrong legal test for true threats. We agreed. We sent the case back to the district court with instructions that, if it found Doggart intended to make a threat, it must

"allow him to accept the plea agreement" the government offered. *United States v. Doggart*, 906 F.3d 506, 512 (6th Cir. 2018).

The district court concluded that Doggart made a threat. But it refused to accept the plea bargain for a new reason. It concluded that the agreement did not adequately reflect the severity of his conduct. Unwilling to accept a different deal, Doggart reinstated his original challenges to his conviction and sentence and objected anew to the court's rejection of the plea agreement. The government never appealed the trial court's dismissal of the two threat convictions under § 844(e), whether during the first appeal or the second one.

## II.

Up first is whether the district court abused its discretion in not accepting the plea deal we required the government to extend to him. *See United States v. Cota-Luna*, 891 F.3d 639, 648 (6th Cir. 2018). It did not. Because both parties agreed that the plea deal would not have allowed the government to bring other charges, Criminal Rule 11(c)(1)(A) governs. And a district court is under no obligation to accept a Rule 11(c)(1)(A) plea deal even if the defendant and the government both agree to it. *See* Fed R. Crim. P. 11(c)(3); *United States v. Skidmore*, 998 F.2d 372, 376 (6th Cir. 1999). When deciding whether to accept an agreement of this sort, courts often consider whether it "reflect[s] the seriousness of the actual offense behavior." U.S.S.G. § 6B1.2(a); *see, e.g.*, *United States v. Baird*, 109 F.3d 856, 868 (3d Cir. 1997); *United States v. Jeter*, 315 F.3d 445, 447–48 (5th Cir. 2002); *United States v. Greener*, 979 F.2d 517, 520–21 (7th Cir. 1992).

Doggart responds that our order cabined the district court's discretion. "If the court finds that Doggart intended to make a threat," the order said, "it must allow him to accept the plea agreement." 906 F.3d at 512. But the district court followed our instructions as far as they went. We ordered the court to permit Doggart to accept the government's offer; we did not order the court to accept that agreement without further scrutiny. Doing so would have divested the district court of an essential responsibility under Criminal Rule 11(c)(1)(A), one it did not handle the first time around. This was not the resolution, it is true, that we expected. And it is not the resolution, it is fair to say, that the government and Doggart expected, both of whom were

surprised by the court's decision. But the Criminal Rules vest the initial (and usually final) authority over the approval of such plea agreements with the district court. The court did not abuse its broad discretion in exercising that authority, and accordingly we must allow it.

That said, we must acknowledge some mystery from our vantage point about the consensus that this was a Rule 11(c)(1)(A) plea deal. The written plea agreement does not mention that rule or any other. It does not say, as that rule requires, that the government agrees "not" to "bring" other charges or to "move to dismiss" other charges already brought. Paragraph 1 of the agreement, it is true, says that, "[i]f the defendant violates the terms of this plea agreement . . . the United States may prosecute the defendant for any and all federal crimes that the defendant committed related to this case . . . [and] the defendant expressly waives any statute of limitations defense." R. 14 at 7–8. But similar boilerplate abounds in other plea deals, whether they contain a charge bargain or not. Adding to the confusion, this was not a case in which the government impliedly engaged in charge bargaining by simultaneously moving to dismiss other counts. The information filed against Doggart contained just the count Doggart pleaded guilty to.

The stakes of imprecision are not inconsequential. If the government made no such offer, Rule 11(c)(1)(B) would cover the plea. In that case, the district court would have no authority to reject the deal. Because the character of this plea deal does not implicate our jurisdiction, we adopt the interpretation that both parties (ultimately) assented to during the plea colloquy and stipulated to on appeal. Even so, the criminal justice system would benefit from more precision at the trial-court level on this score.

### III.

Doggart objects to his conviction for solicitation to commit federal arson on the ground that the target of the crime—a mosque—is not "used in" interstate commerce or in any activity affecting interstate commerce. 18 U.S.C. §§ 373, 844(i). We agree.

The text of this criminal statute does not create a natural home for the attempted destruction of a mosque. The underlying arson statute says in relevant part: "Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an

explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned." 18 U.S.C. § 844(i). This encompassing grant of authority (to prosecute the arson of "any" building) comes with a broad limit on that authority (to do so only when the building is "used in interstate [commerce]" or "used . . . in an activity affecting interstate [commerce]").

By any conventional measure, these terms do not cover the attempted destruction of a local mosque or for that matter any house of worship. In everyday English, one does not think of a mosque that serves a 200-person local community as a building used in commerce, much less interstate commerce. There may be plenty of good reasons to prosecute Robert Doggart for his deranged plan. But the words of this statute are not one of them.

Precedent backs this up. Arson, the United States Supreme Court has made clear, is "a paradigmatic" state law crime, one usually best left to the States to prosecute. *Jones v. United States*, 529 U.S. 848, 858 (2000). In an opinion by Justice Ginsburg, *Jones* determined that Congress did not exercise the full scope of its Commerce Clause powers in enacting § 844(i). *Id.* at 854–55. The National Legislature's decision to cabin the arson statute's reach to buildings "used in" interstate commerce, the Court reasoned, reflected a decision to regulate less than Congress otherwise might have power to require. *Id.* It then construed the statute to apply only to the destruction of buildings with an "active employment for commercial purposes, and not merely a passive, passing, or past connection to commerce." *Id.* at 855. Under that approach, *Jones* unanimously read § 844(i) not to cover the arson of a residence. Otherwise, the Court feared, the statute would transform "virtually every arson in the country [into] a federal offense." *Id.* at 859; *United States v. Laton*, 352 F.3d 286, 303 (6th Cir. 2003) (Sutton, J., dissenting).

In holding that the federal arson statute does not cover private residences, the Court rejected several alleged connections between homes and interstate commerce. It did not suffice, the Court ruled, that an interstate bank lent the owners money to buy the home, that the building was insured by interstate companies, or that interstate energy companies kept the house warm. *Jones*, 529 U.S. at 852–57. In each instance, the interstate activity was perceived as too fleeting and incidental to the conventional use of a home—as a shelter, a place to live, a place to raise a family. *Id.* at 855–56. The same presumably would be true for other equally attenuated

connections between private homes and interstate commerce: that each home is part of a large interstate commercial market in home buying and selling; that people often cross state lines to buy houses; that the materials to build residences often come from other States; or even that an unsentimental economist might characterize a family as a group of profit-maximizing individuals who live together as a way to keep expenses down.

Three canons of construction reinforced the Court's conclusion. One was the rule of lenity. *Id.* at 858. This is a criminal statute after all. Another was the principle that, unless Congress speaks "clearly," the federal courts will not assume that it means to change the "federal-state balance in the prosecution of crimes." *Id.* (quotation omitted). Arson is a quintessential state law crime, and the power to regulate arson under interstate commerce includes the power to marginalize any local regulation of the topic (by creating higher federal sentences for the same crime) or to preempt it (by barring any local regulation of the topic). The third canon was that, "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *Id.* at 857–58 (quotation omitted). The Court relied on the "used in" qualifier to limit the reach of the statute to conventional uses of interstate commerce and to prevent the law from exceeding Congress's Commerce Clause authority by regulating any and all local arsons. All indicators of meaning considered, the Court ruled that one category of American buildings—private residences—is generally out of bounds when it comes to the federal arson statute.

The same is true, even more true, of houses of worship. Whether it's a church, a synagogue, or a mosque, they are no more "active[ly]" used for "commercial purposes" than residential homes are. *Id.* at 855. A place of worship simply is not the kind of building traditionally used for commercial activities. The structures instead are associated with spiritual and local activities—a place of worship and a source of community and education for people of a shared faith. One could tie aspects of these buildings, we realize, to some commercial activities, just as one could do the same with respect to a family dwelling. Yes, the buildings are often insured. (Faith goes so far.) A house of worship must comply with governmental building and safety codes that apply to commercial buildings. (Give to Caesar what is Caesar's.) The faith

community usually employs and pays the individuals who work in the buildings. (Even servants of God have bills to pay.) And these expenses and the expenses to construct the buildings themselves are paid for through tithes and other contributions—usually money earned through commercial, often interstate commercial, activities. But just as these and comparable activities did not suffice to treat residences as buildings used in interstate commerce, they do not suffice to transform houses of worship into buildings used in interstate commerce. That a "building is a church" or house of worship of any kind, "without more," does not cut it. *United States v. Rea*, 300 F.3d 952, 960 (8th Cir. 2002); *see also United States v. Davies*, 394 F.3d 182, 193 (3d Cir. 2005); *United States v. Carr*, 271 F.3d 172, 179 (4th Cir. 2001); *United States v. Mahon*, 804 F.3d 946, 951 (9th Cir. 2015); *United States v. Gillespie*, 452 F.3d 1183, 1187 (10th Cir. 2006).

Even so, general rules often come with exceptions. *See Jones*, 529 U.S. at 855–56. One could imagine a private residence that is also used to run a daycare center—or a private residence that is also used as the primary office of a lawyer, a dentist, or a therapist. What starts as residential could become commercial. Something similar could happen to a place of worship. A building might be used as a house of worship on Fridays, Saturdays, or Sundays but used as a space for rent the rest of the week. It's also possible that commercial activities in a house of worship—a daycare center again—could suffice to transform it into a building used in interstate commerce.

Our decision in *United States v. Rayborn* illustrates the other side of the line. 312 F.3d 229, 234 (6th Cir. 2002). A church ran three radio broadcast stations that broadcast in three different States, which sufficed to transform it into a building "used in" interstate commerce under the arson statute. *Id.* The Fourth Circuit's decision in *United States v. Terry* runs with the same grain. 257 F.3d 366 (4th Cir. 2001). The court upheld an arson prosecution that targeted an independent daycare center in a church. The criminals started the fire to cover up a theft of money from the daycare center, which operated in a church but was managed separately from it. *Id.* at 367–71; *accord Gillespie*, 452 F.3d at 1188–89. As these cases show, the government may overcome the presumption that § 844(i) does not cover the arson of a house of worship or a private residence, so long as its proposed active connections to interstate commerce rise above the kinds of attenuated and passing connections rejected in *Jones*.

In foraging for commerce in this mosque, the government identifies two activities. One is that the mosque planned to have a bookstore. Scheduled to open in the mosque, Zavia Books would manufacture books and resell others from international wholesalers. Some customers would have to cross state lines to shop at the store. And some customers would be able to buy books online or by phone using a toll-free number, and Zavia Books would ship them to the customers no matter where they live. We need not decide whether this suffices to transform the mosque into a building used in interstate commerce, for our use of the conditional tense suggests a timing problem. Doggart's arrest came on April 10, and the bookstore did not produce its first book until that May and did not make its first sale until that June at the earliest. That means the mosque was merely preparing to affect interstate commerce at the time of the arrest—and modestly so at that. The trial evidence shows only a few expenditures, never quantified, for paper, ink, and staples by April 10.

No case to our knowledge, and none cited by the government, has identified the requisite "active" use where the owner of the building engaged in activity as pedestrian and minimal as this. The statute refers only to buildings "used in" commerce—not to potential future uses in commerce. 18 U.S.C. § 844(i). And *Jones* itself referred only to "current[]" uses of the building, 529 U.S. at 859, and refused to rely on "past" uses of the building, *id.* at 855, suggesting skepticism of future uses. While some of our sister circuits have made allowances for temporarily closed businesses located in unambiguously commercial buildings, *see, e.g.*, *United States v. Troy*, 618 F.3d 27, 29–31 (1st Cir. 2010); *United States v. Iodice*, 525 F.3d 179, 182–85 (2d Cir 2008), they have not invoked future or past uses to transform a building presumptively not used in interstate commerce, like a residence or a house of worship, into one used in interstate commerce. All in all, the bookstore's modest purchasing activity by April 10 did not make the mosque a building "used in" interstate commerce under the arson statute.

One other point on this score. It's not clear whether the creation and distribution of religious literature suffices to show that a mosque is used in interstate commerce. While the record is nearly non-existent on the planned amount and type of literature production, one could imagine a religious entity that produces tracts solely for religious purposes and charges at most the costs for production. Think of the Jehovah's Witnesses or other faith groups that distribute

religious literature.  Some faiths require such proselytization as part of their faith—as a spiritual enterprise, not a commercial one.  In like manner, one could not fairly characterize the Church of Jesus Christ of Latter-day Saints as having a commercial travel-abroad program.  Any commerce affected by these religious activities is incidental to the mission of the church, even if it might affect interstate commerce.  "[T]he distribution of publications regarding religion," like a mission trip, is "simply an important part of the functioning of a church"—often "an essential aspect of promoting religious beliefs."  *Lamont*, 330 F.3d at 1256.  All of which underscores the wisdom of Judge Reinhardt's remark about the "peculiarity of hunting for commerce in a house of worship," *id.* at 1253—a task caselaw requires us to undertake but one we should handle with skepticism.  *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188–96 (2012).

The government's second attempt to find commerce in this mosque does not work either.  The community of Islamberg runs a camp each summer.  Between 300 and 400 children attend the camp each year from "all over the U.S." with average tuition between $100 and $150 per student.  R. 289 at 61–62.  The camp provides religious education, some of which occurred in the mosque.  One problem is that the use is de minimis.  *Jones* requires "active employment for commercial purposes."  529 U.S. at 855.  But this religious programming made up only a portion of the summer camp's curriculum, and the mosque itself featured in only a portion of that religious programming.  Just as housing campers from time to time in private homes does not make those homes commercial, sending campers to attend religious services in a house of worship does not transform that place of worship into a place of commerce.

Remember also that the mosque did not run the camp, did not profit from the camp, and so far as the record shows did not charge the camp for use of the mosque.  Summer camps, it is true, have "long been recognized" as involving commerce, and that is true even when the camp operates as a nonprofit.  *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 573–74 (1997).  But in this instance the mosque did not run the camp.  The town did.  That does not suffice to make the mosque a building used in interstate commerce.

In the final analysis, the government did not satisfy its burden of establishing that the mosque was "used . . . in any activity affecting interstate [commerce]" based on the proposed opening of a bookstore or its occasional use by a local summer camp. 18 U.S.C. § 844(i).

(The alert reader may wonder whether a similar interstate-commerce problem undoes Doggart's conviction for solicitation to destroy religious property. *See* 18 U.S.C. § 247. Doggart never challenged that conviction on this ground for one. And he had a reason not to do so for another. Section 247 does not require the targeted property—the mosque—to be used in activity affecting interstate commerce. It requires only that the "offense" occurs "in or affects interstate or foreign commerce." *Id.* § 247(b). Because Doggart planned an attack in New York from his home in Tennessee and planned to use instrumentalities of interstate commerce to make the attack, one could see why he did not challenge this conviction on that ground. *See United States v. Ballinger*, 395 F.3d 1218, 1222 (11th Cir. 2005) (en banc).)

IV.

Doggart claims that destroying religious property, his § 247 conviction, does not qualify as a crime of violence under the solicitation statute. To qualify, an offense must have "as an element the use, attempted use, or threatened use of physical force against property or against the person of another." 18 U.S.C. § 373. Physical force refers to a force capable of causing physical pain or injury to a person or physical damage to property. *See Johnson v. United States*, 559 U.S. 133, 138–40 (2010).

The predicate crime prohibits "intentionally defac[ing], damag[ing], or destroy[ing] any religious real property, because of the religious character of that property." 18 U.S.C. § 247(a)(1). Not all convictions under it are of a kind. This divisible statute permits five different penalties depending on the offense elements the government proves, ranging from one year's imprisonment (for garden-variety cases involving minimal harm) to life (in cases where death results). Doggart's conviction came under § 247(d)(3), which allows a sentence of up to 20 years for two different sorts of offenses—one that results in "bodily injury" and one that "include[s] the use, attempted use, or threatened use of a dangerous weapon, explosive, or fire."

Because § 247 defines divisible offenses, each with distinct elements, we apply the modified categorical approach to them. *Descamps v. United States*, 570 U.S. 254, 257 (2013). That's a shorthand way, if awkward way, of saying that we may look to trial materials, including "jury instructions," to determine "which statutory phrase" formed the basis of the defendant's conviction. *Johnson*, 559 U.S. at 144.

All of these rules considered, we are left with this question: Does "intentionally defac[ing], damag[ing], or destroy[ing]" religious "real property" using "a dangerous weapon, explosives, or fire," 18 U.S.C. § 247 (a)(1), necessarily involve the use of "physical force," *id.* § 373?

It does. Dangerous weapons are dangerous because, when used, they generate force capable of causing injury to people and damage to property. *See United States v. Harris*, 853 F.3d 318, 322 (6th Cir. 2017). Explosives have the same characteristic. *See United States v. Hull*, 456 F.3d 133, 139–40 (3d Cir. 2006); *United States v. Jennings*, 195 F.3d 795, 798 (5th Cir. 1999); *United States v. Serafin*, 562 F.3d 1105, 1111–12 (10th Cir. 2009). And because "[f]ire *is* itself a physical force" that causes physical damage too, the intentional "setting of fire to . . . churches" necessarily has "as an element the use, attempted use, or threatened use of physical force." *Mbea v. Gonzales*, 482 F.3d 276, 280 (4th Cir. 2007); *see also Santana v. Holder*, 714 F.3d 140, 144 (2d Cir. 2013).

Doggart resists this conclusion on several fronts, none helpful. He protests that § 247(d)(3) is not internally divisible, and as a result a requirement of "bodily injury" does not necessarily require the use of physical force. But it strains conventional English to read an end ("bodily injury") and a means ("dangerous weapon, explosive, or fire") as alternative ways of committing the same offense, especially since the presence of both elements yields a *different* criminal offense. *See* 18 U.S.C. § 247(d)(2). Should any doubt linger, our "peek" at Doggart's charging papers and jury instructions finds no reference to "bodily injury." *See United States v. Mathis*, 136 S. Ct. 2243, 2256–57 (2016). Doggart's main rejoinder—that we may look to trial documents only to resolve questions about state law offenses—runs up against contrary precedent. *See United States v. Burris*, 912 F.3d 386, 392–93 (6th Cir. 2019) (en banc). Nor does the rule of lenity change our view. That applies only when a statute remains "ambiguous"

even after "consulting traditional canons of statutory construction." *United States v. Hayes*, 555 U.S. 415, 429 (2009). No such lack of clarity here.

Doggart objects that this reading punishes even de minimis damage. What if, he points out, a defendant set only a small fire or fired only a single gunshot through a window? Only? We have our doubts about the minor nature of either act. More to the point, these hypotheticals still involve the use of physical force, as they employ inherently dangerous (and often unpredictable) instruments to cause physical damage to real property.

But hold up, says Doggart. A conviction under § 247(d)(3) could be sustained through indirect conduct, such as lighting a parked car on fire with the intention of that fire spreading to a nearby church. Yes, that's so. And aptly so. The defendant in that scenario has intentionally damaged a church using fire and using a car as an intermediary. That the harm "occurs indirectly, rather than directly," does not matter. *United States v. Castleman*, 572 U.S. 157, 171 (2014).

V.

Last comes the issue of Doggart's sentence. His presentence report, which set a guidelines range of 235 to 240 months, assumed convictions on both solicitation counts. By reversing one of those two convictions, we have also called into doubt whether the initial "sentencing package" the district court settled on still makes sense. *See United States v. Clements*, 86 F.3d 599, 600 (6th Cir. 1996). We remand for resentencing to allow the district court to answer that question in the first instance.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 17-5813

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ROBERT R. DOGGART,

    Defendant - Appellant.

> **FILED**
> Jan 15, 2020
> DEBORAH S. HUNT, Clerk

Before: SUTTON, McKEAGUE, and THAPAR, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Tennessee of Chattanooga.

    UPON CONSIDERATION of the district court's Memorandum & Order of June 4, 2019 and the supplemental briefs and arguments of counsel,

    IT IS ORDERED that the district court's rejection of Robert R. Doggart's plea agreement and his conviction for solicitation to destroy religious property are AFFIRMED, his conviction for solicitation to commit federal arson is REVERSED, and the case is REMANDED for further proceedings consistent with the opinion of this court.

                                               **ENTERED BY ORDER OF THE COURT**

                                               Deborah S. Hunt, Clerk