**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**At Chattanooga**

UNITED STATES OF AMERICA,

      Plaintiff,

                                No 1:15-cr-39

v.                                Judge Collier/Lee

ROBERT R. DOGGART,

      Defendant.

## SENTENCING MEMORANDUM

Robert Doggart, by and through counsel, submits this memorandum in support of a guideline sentence. This matter is before the Court for resentencing after the Sixth Circuit vacated Doggart's conviction on Count Two. According to the existing PSR, the guideline calculation on Count One renders an offense level of 24, which when combined with criminal history Category I results in a guideline range of 51 to 63 months. (PSR ¶¶ 34-42, 57.) Under the statute, he faces no mandatory minimum, and a maximum possible sentence of 10 years. 18 U.S.C. §§ 247(d)(3), 373. (PSR ¶ 78.) For the following reasons, Doggart submits that a sentence within this guideline range accomplishes the goals of 18 U.S.C. § 3553(a), avoids unwarranted disparity, and accounts for the serious risks to him of remaining incarcerated during the Covid-19 pandemic.

**A.**     **A guideline sentence is sufficient to serve the purposes of sentencing under 18 U.S.C. § 3553(a)(2).**

First, a guideline sentence adequately takes into account the seriousness of the crime. In this case, Doggart was convicted of soliciting individuals to commit a civil rights violation; namely, to burn a mosque in Islamberg, New York. The jury found beyond a reasonable doubt

that Doggart did solicit individuals, thereby establishing the elements of the crime. But, while the evidence showed this conduct, the evidence also showed that no other individual, save the confidential informant, really responded with full commitment to Doggart's solicitations or did anything to participate in the solicited crime.[1] Moreover, Doggart himself repeatedly made it clear that he would not take any action to burn the mosque until and unless it was clearly established that the community of Islamberg presented a real and present danger to the United States. *See* Trial Exh. 307 at 41:28.

At the time of his arrest, Doggart had done nothing to undertake any of the all-important recognizance and was still discussing openly that he hadn't made a decision as to whether he would move forward with any attempt to burn the mosque.[2] Additionally, in his conversations immediately preceding his arrest, he was still explicit that he thought there needed to be a legal forming of a militia before any acts of defense of the country could be undertaken. *See* Trial Exh. 110 at 50:20; Trial Exh. 134 at 3:55; Trial Exh. 135 at 18:08. No persons or property were harmed. At the time of the arrest, Doggart's crime was one of speech, in that he talked to people and attempted to persuade them to join him in a further crime only if he assessed, after investigation, that the action was necessary. Certainly, as the Court has previously stated, Doggart's crime was serious, but it is appropriately captured by the guideline range.

---

[1] It is true that he had conversations with several other people – most notably William Tint in South Carolina and two other people at the City Café – however, while those people expressed interest in assisting Doggart were he to determine the existence of an <u>actual present threat</u>, none of them were active in attempting to join Doggart for his recognizance in Islamberg and there was disagreement about whether the endeavor should move forward or not. Even at the City Café, Shane Schielein indicated he wanted to think about everything for "a day or two," Trial Exh. 307 at 50:20, and also was brainstorming if there "was another tactical way to go about this." Trial Exh. 307 at 25:00.

[2] It is also noteworthy that the two in-person meetings Doggart had with would-be participants were organized by other people without Doggart's participation, other than to be present.

A guideline sentence in this case will adequately deter others from committing this crime. A guideline sentence will adequately address the needs of Doggart. Doggart arrived in court highly educated and does not need educational opportunities in prison. Moreover, no prison sentence was (or is) necessary to address his medical conditions, which he was quite capably addressing on his own within the community. And, as set out in greater detail below, a guideline sentence will avoid unwarranted disparity.

The factors that led this Court to impose a lengthy sentence previously were characteristics of Doggart and the Court's belief that he posed a danger to the community and that a lengthy sentence was necessary to protect the public. Doc. 293, PageID#5542. Since this Court first sentenced Doggart, however, there is no evidence at all that Doggart remains fixated on Islamberg. For that matter, from the time of his arrest when law enforcement told him not to go to Islamberg and all during the time he was on pretrial release, Doggart complied with all conditions imposed by the Court including having no contact with anyone from Islamberg. Further, he has continued this course of conduct during his imprisonment. He has not engaged in any discussions with any "patriot" groups and has abandoned his interest in Islamberg. Additionally, however, imperfectly, he has expressed sincere remorse for the harm his words had on the community of Islamberg. Doc 293, Page ID#5521. His communications with counsel display a much greater flexibility in his attitude than was present in 2015. While he still suffers from bipolar disorder and narcissistic personality disorder, he sincerely regrets his choices that brought him before this Court at all and the hurt that it caused. And he has confided in counsel that he considers OAF and other organizations whose members he engaged with during this regrettable, dark period in his life, to be worrisome organizations. He rues his decisions to participate in any of their "events," like the protest at the White House, and he has no desire to

further communicate with any of the members of such organizations. His reflections with counsel clearly display remorse for the harm he has caused, as well as insight on the mistakes he made.

In its order denying Doggart's motion for bond pending resentencing, this Court expressed its belief that to the extent Doggart was obsessed with "clearing his name," this did not assuage the Court that Doggart presented no danger. Moreover, the Court considered his ongoing desire to clear his name to demonstrate an ongoing lack of remorse. But it would be improper for the Court to base a determination of future dangerousness on Doggart's interest in availing himself of all procedural remedies afforded to someone accused and/or convicted of a crime. Those remedies are to ensure constitutional due process. There are many negative impacts on one's life as a result of being convicted of a crime, and Doggart's interest in placing the burden on the Government to prove him guilty in the first place, or his continued interest in availing himself of the post-conviction remedies provided by the Constitution and federal law should not be interpreted to suggest he is dangerous or lacks remorse. Indeed, he was just months ago willing to plead guilty under the terms of the plea agreement, but understandably could not risk a worse outcome for doing so. Convicted of a greater offense when he was previously willing to plead guilty, he is entitled to exercise all his due process rights; to hold that his efforts to do so create proof for this Court to find that he presents a future danger or is lacking in remorse penalizes him for exercising his rights given to him (and all defendants) when something as serious as depriving him of his freedom is undertaken by the Government.

Finally, as this Court knows, Doggart has no prior criminal behavior at all. This offense occurred during a particularly dark time in his life – after prolonged issues with depression following a divorce and the loss of his job, coupled with a more immediate rejection of him by

4

the voters when he ran for Congress and lost. Doggart has had over five years since the origin of this case, 46 months of which have been in prison, to reflect upon his actions, grapple with his situation, and prioritize how he wants to spend the rest of his life. He has a supportive family who look forward to his return. He is looking for ways to involve himself in doing good for the community and spending time with his family. While the Court was rightly concerned at the original sentencing, in large part due to Doggart's allocution, the fact is that 46 months in prison has changed Doggart and as stated above, he has no interest in returning to his prior involvement with the patriot movement. And this is not just an empty promise. His personal disinclination today to involve himself with that movement or in any criminal activity at all is fully consistent with available recidivism data.

Given his age and his complete lack of criminal history, Doggart is at a very low risk to recidivate, the lowest of all federal offenders. *See* U.S. Sent'g Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* 10 (Dec. 2017).[3] Recidivism is defined as "a person's relapse into criminal behavior, often after the person receives sanctions or undergoes intervention for a previous crime." *Id.* at 6.[4] The Commission reports that eight years after release, just 11.3% of federal offenders in Criminal History Category I released at age 60 or older were rearrested. *Id.* at 25 fig. 22. ***These findings are not dependent upon the age of the person at the time of his criminal activity, but upon their age at release***. Thus, the fact that

---

[3] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf.

[4] Quoting Nat'l Institute of Justice, U.S. Dept. of Justice, *Recidivism*, https://web.archive.org/web/20160120175242/http://www.nij.gov/topics/corrections/recidivism/pages/welcome.aspx (Jan. 20, 2016).

5

Doggart committed his offense in his sixties,[5] does not counter his risk of recidivism based upon both his complete lack of prior criminal history and his advanced age upon release, *after* he has experienced the severe sanction of prison. The important factor here is that he violated the law and received correction, and evidence shows the overwhelming likelihood that he will not recidivate upon his release. In other words, the goals of sentencing will have been met.

Even those convicted of actual terrorism offenses are highly unlikely to reoffend, contrary to assumptions. A 2019 recidivism study of terrorist offenders found that "[o]nly 1.6% of terrorist offenders released between 2001 and 2018 recidivated, and none of the crimes which they committed postrelease were clearly politically motivated." Omi Hodwitz, *The Terrorism Recidivism Study (TRS): Examining Recidivism Rates for Post-9/11 Offenders*, 13 Perspectives on Terrorism 54, 59-60 (Apr. 2019), available at https://www.jstor.org/stable/26626865. A 1.6% rate of reoffending is exceedingly, "unexpectedly low." *Id.* at 60. For those few who reoffended after release, their recidivating events were fraudulent use of food stamps, using the internet, forgery, and possession of drugs. *Id.* at 60 tbl.2. All but one had been sentenced to five years or less. *Id.*

**B.      A guideline sentence will avoid unwarranted disparities under § 3553(a)(6).**

1.  Section 3553(a)(6) directs district courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." "Under this instruction, district courts must take account of sentencing practices in other courts." *Kimbrough v. United States*, 552 U.S. 85, 108 (2007). Following this

---

[5] The circumstances surrounding his crime – that is untreated mental health issues, significant alcoholism, and his vulnerability to attention for his online discussions due both to his recent electoral rejection and his mental health issues – adequately explain his lapse in judgment that brought him to the attention of law enforcement. There is no other indication in the rest of his life that he suddenly decided to take up a life of crime in his sixties.

instruction, this Court has long recognized the value of sentencing practices in other courts. Over a decade ago, it adopted the approach that when national sentencing data show that courts impose below-range sentences in more than fifty percent of cases under a given guideline, a below-range sentence may well be appropriate. *United States v. McElheney*, 630 F. Supp. 2d 886, 894-95 (E.D. Tenn. 2009).

In *McElheney*, for example, it relied on such data in a child pornography case to conclude that "the Guidelines are no longer descriptive of national sentencing practices." *Id.*; *see also United States v. Rothwell*, 847 F. Supp. 2d 1048, 1050 (E.D. Tenn. 2012) (noting that the rate of below range sentences had by then increased to sixty percent). In *United States v. Kamper*, 860 F. Supp. 2d 596, 608 (E.D. Tenn. 2012), the Court said that "[i]f, as with child pornography, courts were imposing non-Guideline sentences on MDMA defendants in more than fifty percent of cases, this statistic would support Kamper's argument [for a downward variance]," and in fact later imposed a below-range sentence in that same case (Kamper's co-defendant) based in part on statistics that had since become available showing "most judges are not imposing sentences within the guideline range." *See* Sent'g Tr. at 63-64, *United States v. Joe Head*, No. 1:11-cr-3 (E.D. Tenn. May 21, 2015) (Doc. 283).

The Sixth Circuit has confirmed the propriety of this Court's approach. In *United States v. Stock*, 685 F.3d 621 (6th Cir. 2012), it made clear that national sentencing data released by the U.S. Sentencing Commission should serve as "a starting point for district judges in their efforts to avoid unwarranted sentence disparities" under 18 U.S.C. § 3553(a)(6). *Id.* at 629 & n.6 (internal quotation marks omitted). Since then, it has further made clear that it intends for this starting point to function as a substantive measure of reasonableness.

Case 1:15-cr-00039-CLC-SKL   Document 344   Filed 09/16/20   Page 7 of 29   PageID #: 6111

In a recent decision, for example, the Sixth Circuit reviewed, on the government's appeal, the reasonableness of a below-range sentence in an "unremarkable" assault case. *United States v. Boucher,* 937 F.3d 702, 714 (6th Cir. 2019). In considering the need to avoid sentencing disparities, the Sixth Circuit examined Sentencing Commission data showing the average sentences for defendants in Criminal History Category I and sentenced for assault and used this data along with sentencing outcomes in individual cases as "comparators." *Id.* at 713. The court vacated the sentence because the district court imposed a sentence far below these comparators, and failed to address the "acute" "risk of disparity" the below-range seemed to create. *Id.* at 714.

The Sixth Circuit again looked to the Commission's national sentencing data as a comparator when it reviewed (and reversed) the above-range sentence of a person convicted for illegal reentry in *United States v. Perez-Rodriguez*, No. 18-4203, 2020 U.S. App. LEXIS 16781 (6th Cir. May 27, 2020). That data indicated that the defendant's case—an ordinary illegal reentry case—"is less serious than the average illegal reentry case,*"* and facts the district court treated as aggravating were already taken into account by the guideline range itself. *Id.* at *13, 16. The court reversed the sentence as substantively unreasonable in large part because the district court selected the sentence without properly considering sentencing disparities." *Id.* at *16-17.

2. Here, the relevant national sentencing data—the "starting point" for considering the need to avoid unwarranted disparity—support Doggart's argument for a sentence within the applicable range of 41 to 51 months. The Sentencing Commission's online Interactive Data Analyzer shows that in fiscal year 2019, the average sentence length for offenders convicted of an "individual rights" offense (which includes 18 U.S.C. § 247), sentenced under U.S.S.G. § 2H1.1, and in Criminal History Category I, like Doggart, was 42 months. *See* Attachment A –

8

U.S. Sent'g Comm'n, *Average and Median Sentence Length* (2019). Half of the offenders were sentenced to 22 months or less. *Id.*

These data also show that in 2019, 60% of all such offenders were sentenced below the range. *See* Attachment B – U.S. Sent'g Comm'n, *Sentence Imposed Relative to Guideline Range*. Over the past five fiscal years, just 26.9% of all offenders similarly situated to Doggart, *i.e.*, convicted of a civil rights offense and sentenced under § 2H1.1, were sentenced within the applicable guideline range (53 out of 197 total). Three people total were sentenced above the range (1.5%), and overall, **71.5%** were sentenced below the range (141 out of 197 total). If those who received government sponsored downward departures are removed from the equation, on the theory that a defendant who cooperated is not similar to Doggart, then **66%** (109 out of 165) were sentenced below the range based on § 3355(a) factors.

These data, in combination with the numerous other factors indicating that Doggart presents little to no risk of reoffending, strongly support a sentence within the range of 51 to 63 months, or even below it. It certainly provides no support for an above-range sentence.

Even if the terrorism adjustment applied (it does not, *see* Part C, *infra*), resulting in a guideline sentence of 120 months as capped by the statutory maximum, the data support a sentence within Doggart's otherwise applicable range. Attachment C sets forth national sentencing data for offenders who actually received the terrorism adjustment at § 3A1.4.[6] They

---

[6] The data used for these analyses were extracted from the U.S. Sentencing Commission's Individual Offender Datafiles by Dr. Paul J. Hofer, Policy Analyst, Sentencing Resource Counsel Project, Federal and Community Defenders, and former Special Projects Director, U.S. Sentencing Commission. The Individual Offender Datafiles, FY 2015-2019, are available for download at https://www.ussc.gov/research/datafiles/commission-datafiles. Although the particular data analyses in Attachment C have not been published by the U.S. Sentencing Commission, the underlying data are the same data used in the Commission's annual Sourcebook of Federal Sentencing Statistics. Using standard statistical software, such as SAS or SPSS, the Individual Offender Monitoring Datafiles can be used to perform a wide variety of analyses and

Case 1:15-cr-00039-CLC-SKL   Document 344   Filed 09/16/20   Page 9 of 29   PageID #: 6113

show that over the past five fiscal years, a total of 197 individuals received the terrorism adjustment. Just 19.3% were sentenced within the applicable guideline range (under a variety of guidelines) (38 out of 197), while **79.6%** were sentenced below the range (157 out of 197). And the rate of below-range sentences is *even higher* for the most frequently used guidelines to which the terrorism adjustment was applied, which includes solicitation to commit murder and actual terrorism offenses, while the extent of the downward reduction from the bottom of the applicable guideline range for reasons other than cooperation is quite large:

- For the 25 offenders sentenced under § 2A1.5 (Conspiracy or Solicitation to Commit Murder), **92%** were sentenced below the applicable range, with the average extent of non-Government-sponsored below-range sentences being **57.2%** below the range;

- For the 99 offenders sentenced under § 2M5.3 (Providing Material Support or Resources to Designated Foreign Terrorist Organizations or Specially Designated Global Terrorists, or For a Terrorist Purpose), **76.1%** were sentenced below the applicable range, with the average extent of non-Government-sponsored below-range sentences being **42%** below range;

- For the 15 offenders sentenced under § 2M6.1 (Unlawful Activity Involving Nuclear Material, Weapons, or Facilities, Biological Agents, Toxins, or Delivery Systems, Chemical Weapons, or Other Weapons of Mass Destruction; Attempt or Conspiracy,

---

generate tables and graphs beyond those published by the Commission. For a description of the Commission's datafiles, see U.S. Sent'g Comm'n, *Fifteen Years of Guideline Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform*, App. D at 1 (2004).

**73.3%** were sentenced below the applicable range, with the average extent of Government-sponsored below-range sentence being **48.9%**.[7]

Even for the nine offenders sentenced under § 2A2.1 for assault with intent to commit murder or attempted murder, **66.0%** were sentenced below the applicable range. The only offenders whose rate of within-range sentences is above 50% is for those sentenced under § 2A1.1 for first degree murder (5 of 8, or 62.5%). These data show, in stark form, that the terrorism adjustment recommends sentences that are greater than necessary in the great majority of cases to which it applies, and most especially so in cases involving conspiracy or solicitation to commit murder. In other words, courts recognize that the adjustment's blunt severity fails to serve sentencing purposes in the *ordinary terrorism* case, in the *ordinary solicitation to commit murder by terrorism* case, and in the ordinary *terrorism* case involving *weapons of mass destruction*.[8]

Doggart's crime, as civil rights crime go, is unremarkable—even on the low end of seriousness and culpability. It involves no murder, no assault, no weapons of mass destruction, and no physical damage to person or place. It is, at bottom, an inchoate property offense. True, Doggart's words could have encouraged the wrong people to take harmful action which in turn

---

[7] The total numbers of sentences averaged as reflected in the second table in Attachment C, showing the average extent of reductions, do not perfectly match the total number of offenders in the first table because SPSS apparently does not calculate average sentences for groups with just one person, *e.g.*, § 2A1.2. Should the Court wish to see the extent of the reduction for all 197 individual offenders, counsel can provide that to the Court. Should the Court wish to verify these data, the Commission will provide these data directly to the Court on its request. *See* U.S. Sent'g Comm'n, Organization – Office of Research and Data, https://www.ussc.gov/about/who-we-are/organization ("[T]he [Office of Research and Data] provides analyses about specific criminal justice and guideline application issues at the request of Congress and the courts."); *United States v. Stock*, 685 F.3d 621, 629 n.6 (6th Cir. 2012).

[8] The adjustment's failure to serve sentencing purposes in most cases corresponds with the fact that the Commission did not promulgate it based it on empirical evidence or national sentencing data. *See* Part C.1, *infra*.

11

could have damaged property or hurt or killed people, even if Doggart himself did not and never would have done so himself. Whatever risk of harm his conduct may have occasioned is accounted for by the very fact that § 247(a)(1) is deemed a "crime of violence" under § 373, making his conduct a federal crime. And the guideline range accounts for the special danger of his words by using the guideline for the offense solicited. The guideline range also reflects the particular civil rights offense for which he was convicted, accounting for his motivation and the harm to the victims by adding three levels based on the finding that he intentionally selected the property at Islamberg because of the religion of the inhabitants. U.S.S.G. § 3A1.1(a); PSR ¶ 36. There is nothing about the nature and circumstances of this civil rights offense that is not already accounted for in the guideline range itself.

3. The Sixth Circuit has also indicated that courts may consider other individual cases as comparators. The best comparator is *United States v. Grassie*, 237 F.3d 1199, 1201 (10th Cir. 2001). There, the defendant was convicted of several counts related to completely destroying a church by fire. *Id.* at 1203. This was part of a spree of offenses in which he damaged and destroyed religious property at several churches and caused $3 million in damages. One of the counts, Count One, was a violation of 18 U.S.C. § 247(a)(1) and (d)(3), the very same offense underlying the solicitation count for which Mr. Doggart was convicted. *Id.* at 1201. For total destruction of the church, because of its religious character, Grassie was sentenced to a guideline sentence of 57 months. *Id.* at 1205. (He was also changed with and convicted of arson under §844(h)(1), which carried an additional 10-year mandatory consecutive sentence.)

Another comparator is *United States v. Johnson*, 152 F.3d 553 (6th Cir. 1998), where the defendant intentionally set fire to a church in Dyersburg, Tennessee." *Id.* at 554. He was charged with two counts of arson, in violation of 18 U.S.C. § 844(i), one count of intentionally damaging

religious property, 18 U.S.C. § 247(a)(1), and one count of intentionally damaging religious property "because of the race and color of individuals associated with that religious property." *See* 18 U.S.C. § 247(c). He ultimately pled guilty to the last offense and was sentenced to 60 months, which reflected an upward departure based in part on his "reprehensible" motive. The Sixth Circuit reversed the departure, noting that his motive was already accounted for by the three-level victim enhancement under § 3A1.1, the same one Doggart received. *Id.* at 555. On remand, he was sentenced to 41 months. *See* Amended Judgment, *United States v. Johnson*, No. 2:96-cr-20143 (W.D. Tenn. Oct. 20, 19980 (Doc. 93).

A third comparator is *United States v. Wuertenberg*, No. 6:01-cr-60042 (W.D. La. Aug. 30, 2001), in which the defendant pled guilty to damaging a church under § 247(a)(1), and caused over $70,000 in damages. He was sentenced to 63 months

Doggart, in contrast, damaged no property. He had a vague plan for committing a § 247(a)(1) offense, but only if he determined after yet-to-be-conducted investigation that the inhabitants of Islamberg presented a threat. Moreover, while he certainly solicited people, he hadn't persuaded any of the people he talked to, but for the CI, to participate had he actually *established* a present danger to the country <u>and</u> law enforcement refused to take action upon being provided the information.

4. In the more general category of civil rights violations, another comparator is the recent case of *United States v. Douglas*, 957 F.3d 602 (5th Cir. 2020). There, the defendant, a Louisiana corrections officer, was convicted for what can only be described as a sadistic act of terror against helpless individuals under his care and control. He and his co-defendants took five inmates to an area in the prison where there were no security cameras, made them kneel while their hands were handcuffed behind their backs, and then along with his co-defendants took turns

spraying the handcuffed, inmates directly in the eyes with pepper spray when they denied membership in a gang. *Id.* at 605. The defendants engaged in this conduct seemingly for sport, as the inmates posed no threat, were compliant, and were not struggling. They then lied about the inmates, blaming the inmates as deserving of their treatment, and lied on an incident report. *Id.* at 605-06. The defendant's guideline range under § 2H1.1 was 97 to 121 months, but because he was convicted of conspiracy to commit a civil rights violation, his guideline sentence became 60 months. He asked for a lower sentence, citing the same statistics Doggart cites here, but the court still imposed a guideline sentence of 60 months in light of the § 3553(a) factors. *Id.* at 606.

Again, in stark contrast, Doggart's offense is an inchoate property offense, borne of a misguided plan to be of service to the country. His unrealized plan, egged on by the confidential informant who orchestrated their meetings, was consistently conditioned on first finding an actual threat in Islamberg—a condition that never occurred and that he had in fact made no concrete plans to try to discover by the self-imposed deadline of April 15, 2015.

5. An as the data show, even individuals convicted of actual terrorism offenses have received sentences far below the applicable guideline range, and more like Doggart's range, because the terrorism range is far greater than necessary to serve sentencing purposes. For example, in *United States v. Ceasar*, 388 F. Supp. 3d 194 (E.D.N.Y. 2019), a defendant with no prior criminal record had serious health conditions. *Id.* at 197-98. She sought acceptance in ISIS (also called ISIL), which advocates "violence and destruction in the United States and other parts of the world." *Id.* She "actively sought to support and assist ISIL" by connecting people with ISIL and encouraging them to join, and posting propaganda for ISIL online. *Id.* at 194, 200-02. She planned to travel to ISIL territory to join ISIL. *Id.* at 194, 202. After she was arrested and pled guilty to providing material support to a foreign terrorist organization, she was granted

Case 1:15-cr-00039-CLC-SKL   Document 344   Filed 09/16/20   Page 14 of 29   PageID #: 6118

presence release on bond. *Id.* at 203. Shortly thereafter, she engaged in "widespread" violations of her bond conditions, including by contacting people she had identified as ISIL supporters and indicating through online messages that "she believed that her conduct leading to conviction for conspiring to provide material support to ISIL was not wrong." *Id.* at 204. Then she lied about it, resulting in the conviction for obstruction. Id. at 204-05. As a result of the terrorism adjustment, her guideline range was 360 to 480 months. *Id.* at 218.

At sentencing, an expert testified that Ceasar's relationship with ISIL was "more of an emotional affiliation" to an idealized, online community with a "strong bond of loyalty" and "caring." *Id.* at 214. Another expert testified about the recent recidivism study done of terrorist offenders that found that "[o]nly 1.6% of terrorist offenders released between 2001 and 2018 recidivated, and none of the crimes which they committed postrelease were clearly politically motivated." *Id.* at 214. The court in *Caesar* imposed a sentence of 48 months—46 months for the material support conviction and 2 months for the obstruction. *Id.* at 223. The court acknowledged that her offenses were serious, but explained the sentence at great length, referring to (among other things) her "clinical issues affecting her judgment," available deradicalization treatment, and her medical needs. *Id.* at 220-22. The court recommended that she serve the sentence at a BOP medical facility. *Id.*

Like the defendant in *Ceasar*, Doggart suffers from numerous medical conditions, including a serious heart condition. He suffers from major depression, is bipolar, and has a narcissistic personality disorder, with a long history of engaging in fixated, grandiose thinking that his own family does not take seriously. He had no criminal history to speak of. His activities in this case reflect poor judgment and a lot of talk—fantastical, attention-seeking talk for shock value and to show off his intelligence to people he met online. Again, for all his talk of doing

recognizance in Islamberg by a date specific, he had not in fact prepared to go at all. And unlike Ceasar, Mr. Doggart was out on bond for nearly two years without incident.

6. Given the history of this case,[9] it is also fair to compare Mr. Doggart's case to cases in which defendants were convicted of threat offenses and who engaged in hate crimes directed at religious or other targets, in some cases more serious conduct.

For example, the Department of Justice describes on its website the case of William Syring, No. 1:18-cr-00036 (E.D. Va.), who was sentenced in 2019 to 60 months on fourteen counts including seven hate crime charges and seven interstate threat charges "for threatening employees of the Arab American Institute (AAI) because of their race and national origin. Syring also targeted AAI employees because of their efforts to encourage Arab Americans to participate in political and civic life in the United States." Dep't of Justice, *Virginia Man Sentenced To 60 Months In Prison For Threatening Employees Of The Arab American Institute* (Aug. 15, 2019), www https://www.justice.gov/hatecrimes/hate-crimes-case-examples. "Syring sent over 700 emails to AAI employees from 2012 to 2017, including five death threats. Similarly, in 2008, Syring admitted to sending threatening emails to AAI employees and used language nearly identical to that in his 2017 emails. For over a decade, AAI employees lived in fear that he would follow through with his threats. The threatening messages took a toll on them, their families, and their loved ones." *Id.*

Eric Lin, No. 19-cr-20551 (S.D. Fla.), was also sentenced to 60 months "for making repeated on-line threatening communications that targeted Hispanics." The DOJ website states

---

[9] As the court is well aware, the parties initially entered into a plea agreement under the terms of which Doggart would plead guilty to a single count of making an interstate threat, in violation of 18 U.S.C. § 875(c). The court ultimately rejected the agreement, but the parties agreed that his conduct satisfied the elements of § 875(c).

16

that "between May 30, 2019, and August 14, 2019, Lin made multiple threatening communications via Facebook to injure and kill a South Florida resident and to kill all Hispanics in Miami and other places. These included messages like 'I'm coming to Rape and kill you' and 'I will stop at Nothing until you, your family, your friends, your entire WORTHLESS LATIN RACE IS RACIALLY EXTERMINATED!' In Lin's messages, he also discussed mass shootings of Hispanics and the idolization of Adolf Hitler." DOJ Press Release, *Maximum Prison Term Given to Man for Making On-Line Threats to Injure and Kill Hispanics* (June, 23, 2020), https://www.justice.gov/usao-sdfl/pr/maximum-prison-term-given-man-making-line-threats-injure-and-kill-hispanics. The 60-month sentence imposed in this case was a rare upward variance from the § 2H1.1 guideline range of 41 to 51 months, which the government sought due to his "heinous" conduct. Gov't Sent'g Mem. at 1, *United States v. Lin*, No. 19-cr-20551 (S.D. Fla. June 18, 2020) (Doc. 31).

And Daniel McMahon, No. 3:19-cr-14 (W.D. Va.), a self-described and self-appointed "Antifa-hunter," was sentenced to 41 months, the top of his guideline range of 33 to 41 months "for threatening an African-American Charlottesville City Council candidate because of his race and because he was running for office, and for cyberstalking a separate victim through Facebook messenger." DOJ Press Release, *Florida Man Sentenced for Racially-Motivated Interference with Election in Charlottesville, Virginia and for Cyberstalking in Florida* (Aug. 31, 2020), https://www.justice.gov/opa/pr/florida-man-sentenced-racially-motivated-interference-election-charlottesville-virginia-and. In his sentencing memorandum, in which he asked for a sentence of eighteen months in prison, McMahon explained that

> through his online personas [he] found the social acceptance that he had long-desired. He garnered accolades from others in the white nationalist community by conducting obsessive background research on individuals who he and others believed were associated with Antifa. Through this role as an 'Antifa hunter', and

17

encouraged by others, he saw himself as an 'investigative journalist.' He would 'routinely attempt to notify authorities when he observed violence and was able to identify the individuals who he believed were perpetrators.' He believed himself to be famous, describing himself as an 'internet celebrity' with '12,000 fans online.' . . . Mr. McMahon entered the lives of the victims in this case because he perceived that they were associated with a group, Antifa, that had targeted himself and his family. He truly believed, however wrong at the time, that his role was to engage with them for his greater cause, a cause that had become an obsession. His obsessive focus, driven by his mental health disorder, resulted in his extremely bad behavior regarding the daughter of one of the victims.

Sent'g Mem at 6, *United States v. McMahon*, No. 3:19-cr-14 (W.D. Va. Aug. 27, 2020) (Doc. 61). From the government's perspective, "[t]his defendant weaponized social media to threaten and intimidate his perceived political enemies and propagate a violent white-supremacist ideology." DOJ McMahon Press Release, *supra*. Even so, the government requested the within-range 41-month sentence ultimately imposed. Gov't Sent'g Mem. at 2, *United States v. McMahon*, No. 3:19-cr-14 (W.D. Va. Aug. 23, 2020) (Doc. 58).

Finally, consider the defendant in *United States v. Rayyan*, 885 F.3d 436 (6th Cir. 2018). He "had an affinity for the Islamic State . . . and showed it by watching online content that glorified its exploits. He watched one video entitled 'Kill them wherever you find them' five times, and he called it 'the best one yet.' He featured a photo depicting a jihad-inspired execution on his Twitter account. And he requested links to videos depicting Islamic State fighters throwing prisoners from the tops of buildings. Watching them 'made [his] day.'" *Id.* at 439. He illegally purchased firearms, used drugs, and told an undercover FBI agent that he "had 'planned out' an attack on a large church near where he worked and described making preparations" and that he regretted not carrying it out. *Id.* He said "[i]f he could not 'do jihad [in] the midd[le] east,' he wanted to 'do . . . jihad over here,' and "claimed he 'would[']ve killed every last one of them[.] Especially the wom[e]n and children.'" *Id.* And "he told the undercover agent that he wanted to murder one of the officers who arrested him." *Id.*

18

He was convicted of making a false statement when purchasing a firearm and for being an illegal user of drugs in possession of a firearm, and his guideline range was 15 to 21 months. The government sought an upward variance to 96 months, but the district court varied upward to 60 months—described by the Sixth Circuit as a "stiff" sentence. *Id.* at 440. In affirming the upward variance, the Sixth Circuit described Rayyan as "a man who repeatedly broke federal law to obtain firearms, reveled online about the exploits of a terrorist group, and confided in others that he had planned to carry out violent attacks of his own."

Doggart's conduct is in many ways similar to—and not worse than—the conduct in these other cases, except that he was fastidious about not breaking any firearms laws.

**C.      The terrorism adjustment does not apply to Count One**.

In the revised PSR adopted by the Court, the terrorism adjustment was applied only to Count Two, on the ground that the offense solicited, a violation of 18 U.S.C. § 844(i), is a listed "federal crime of terrorism" under 18 U.S.C. § 2332b(g)(5). (PSR ¶ 26.) A violation of § 247(a), in contrast, is not a listed "federal crime of terrorism," and the PSR did not apply the adjustment to Count One. This omission did not depend on, and was not required by, any other guideline calculation; it was a freestanding reflection of the plain language of § 3A1.4. And its presence or absence was not immaterial to the overall guideline calculation. Had the PSR included the terrorism adjustment in Count One, that count would have become the offense with the higher offense level under the Chapter 3 grouping rules, increasing Doggart's total offense level to 36 and his guideline range to 324 to 405 months. The government did not object, however, and the Court adopted the guideline calculations as they were. The government also did not appeal the calculation, though Doggart appealed, raising the possibility that he might succeed in being resentenced on Count One alone.

19

At this point, just days before the resentencing and after many months of opportunity, the Government still has not raised an objection to the guideline calculation for Count One. It should be barred now from making such an objection. However, to the extent the Government may now argue that the terrorism adjustment should apply to Count One, and this Court finds that the Government has not waived this argument, *see United States v. Bourquin*, 966 F.3d 428, 435 (6th Cir. 2020) (declining to permit the government to present additional evidence on remand to meet its burden in support of guideline enhancement because it had previously failed to do so despite notice and two opportunities), Doggart explains why the terrorism adjustment does not apply by its plain terms, and why the Court should not depart upward under § 3A1.4 cmt. (n.4).

1.  The terrorism adjustment cannot apply in Doggart's case because the § 247 offense solicited in Count One is not a "federal crime of terrorism." The adjustment applies only "[i]f the offense is a felony that involved, or was intended to promote, a Federal crime of terrorism." U.S.S.G. § 3A1.4. The term "Federal crime of terrorism" "means" "an offense that" (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and (B) "is a violation of" one of a list of specified federal offenses. 18 U.S.C. § 2332b(g)(5)(A), (B); U.S.S.G. § 3A1.4 cmt. (n.1). Even assuming the Sentencing Commission acted within its authority by promulgating this adjustment so that it applies not only to the specific offenses listed in § 2332b(g)(5), but also to unlisted offenses "involv[ing]" or "intended to promote" one of the statutorily listed crimes, *see United States v. Graham*, 275 F.3d 490, 516-18 (6th Cir. 2001),[10] Doggart's offense neither involved nor was intended to promote a statutorily listed crime.

---

[10] In *Graham*, the Sixth Circuit relied on the expansive intend-to-promote language in the guideline to hold that conspiracy to commit a listed § 2332b(g)(5) offense can form the basis of the adjustment, despite that conspiracy is excluded from the list of Federal crimes of terrorism in

Damaging or destroying religious property under § 247(a) is not listed in § 2332b(g)(5). The only statutorily listed offense identified in this case as the "Federal crime of terrorism" that Doggart purportedly intended to promote was federal arson under § 844(i), a crime it turns out he did not in fact solicit because the mosque was not used in interstate commerce. *United States v. Doggart*, 947 F.3d 879 (6th Cir. 2020). Because federal arson did not occur as a matter of fact and law, Doggart could not have intended to promote it. By the plain terms of § 3A1.4 and § 2332b(g)(5), therefore, his solicitation of the § 247 offense could not have been intended to promote a Federal crime of terrorism.

The history of § 3A1.4 supports the conclusion that Doggart's inchoate § 247 offense is excluded from § 3A1.4's application. The terrorism adjustment made its first appearance in 1994, when Congress directed the Commission to "amend [the] sentencing guidelines to provide an appropriate enhancement for any felony, whether committed within or outside the United States, that involves or is intended to promote international terrorism, unless such involvement or intent is itself an element of the crime." Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 120004 (1994). The term "international terrorism" was defined to encompass certain defined "activities" that "are a violation of" either state or federal law, or that "would be" a violation of either state or federal law if committed in a state or federal jurisdiction. 18 U.S.C. § 2331(1) (1995). The Commission responded to the directive by promulgating

---

§ 2332b(g)(5). *See Graham*, 275 F.3d at 516-18. But the *Graham* court did not consider whether, under *United States v. LaBonte*, 520 U.S. 751 (1997), the Commission's "intend-to-promote" language fails to "bow to" Congress's 1996 specific directive that the adjustment is to apply "only to" the statutorily specified offenses in § 2332b(g)(5). *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 730 (1996). Doggart challenged the validity of the "intend-to-promote" language in his appeal, as it was the basis for applying the terrorism adjustment for Count Two. Now that Count Two and its underlying federal arson crime has been vacated, there is no listed offense upon which to base even this expansive "intend-to-promote" language.

§ 3A1.4, which applied "[i]f the offense is a felony that involved, or was intended to promote, international terrorism." *See* U.S.S.G. App. C, amend. 526 (Nov. 1, 1995). The new adjustment provided for a twelve-level increase to the offense level, with a minimum offense level of 32, and an automatic Criminal History Category VI. The Commission gave no reason for these choices. *Id.* (Reason for Amendment).

The next year, as part of the Antiterrorism and Effective Death Penalty Act of 1996, Congress passed a new statute, 18 U.S.C. § 2332b, entitled "Acts of terrorism transcending national boundaries," and in it defined a new term, "Federal crime of terrorism." See Pub. L. No. 104-132, § 702 (1996). It defined "Federal crime of terrorism" to "mean[] an offense that (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and (B) "is a violation of" one of a list of specified federal offenses. 18 U.S.C. § 2332b(g)(5)(A), (B).

As part of that Act, Congress issued a new specific directive to the Commission, this time to "amend the sentencing guidelines so that the chapter 3 adjustment relating to international terrorism only applies to Federal crimes of terrorism, as defined in section 2332b(g) of title 18, United States Code." Pub. L. No. 104-132, § 730 (1996). In response, the Commission amended § 3A1.4 simply by removing the term "international terrorism" and replacing it with "federal crime of terrorism," and by adding in commentary that "federal crime of terrorism" is defined at 18 U.S.C. § 2332b(g). *See* U.S.S.G. App. C, amend. 539 (Nov. 1, 1996). The result is that the adjustment now applies "[i]f the offense is a felony that involved, or was intended to promote, a Federal crime of terrorism." U.S.S.G. § 3A1.4. As its reason for the amendment, the Commission said only that it "implements" Congress's specific directive. *Id.*

22

As noted, the list of specified offenses of conviction at 2332b(g)(5)(B) excludes § 247(a). When Congress declares what a term "means," as it does in § 2332b(g), it intends to exclude that which is not stated. *Burgess v. United States*, 553 U.S. 124, 130 (2008). Because Congress intentionally chose not to list § 247 in its exclusive definition of "federal crime of terrorism"— and at the same time mandated that the Commission amend the adjustment so that it "only applies" to the listed crimes—reading § 3A1.4 as inapplicable in this case is entirely consistent with the 1996 directive and the plain terms of § 3A1.4.

Legislative history confirms this straightforward reading. The final Conference Report for AEDPA describes the directive as follows:

> This section gives the U.S. Sentencing Commission amendment authority to expand the scope of its Chapter 3 enhancement for "international terrorism offenses" under the U.S. Sentencing Guidelines, to apply only to federal crimes of terrorism as defined in section 2332b(g). In amendments to the Sentencing Guidelines that became effective November 1, 1996, a new provision that substantially increases jail time for offenses committed in connection with a crime of international terrorism. This section of the bill will make that new provision *applicable only to those specifically listed federal crimes of terrorism, upon conviction of those crimes* with the necessary motivational element to be established at the sentencing phase of the prosecution, without having to wait until November 1996 for the change to become law.

142 Cong. Rec. H. 3337 (1996), 1996 WL 174947 (emphasis added). Thus Congress believed it was broadening § 3A1.4 in one way and limiting it in another: broadening it because "federal crime of terrorism" covers more offenses than "international terrorism," and limiting it because the enhancement would not apply absent a *conviction* for an enumerated crime. Rather than applying to any "offense[] committed in connection with" a predicate crime, as it had previously directed, § 3A1.4 would "apply only to" those predicate crimes themselves, "upon conviction of those crimes." *Id.*

In short, because he was convicted of a single count involving § 247(a) and when there is insufficient evidence that he solicited federal arson, Doggart neither committed nor promoted a Federal crime of terrorism. By reversing Count Two, the Sixth Circuit effectively vacated the terrorism adjustment, which in turn vacated the sole driver of the stacking of the two counts and the 235-month guideline sentence. The Sixth Circuit alluded to this radical change in its opinion, noting that it had "called into doubt whether the initial 'sentencing package' the district court settled on still makes sense." *United States v. Doggart*, 947 F.3d 879, 888 (6th Cir. 2020) (quoting *United States v. Clements*, 86 F.3d 599, 600 (6th Cir. 1996)). It is Doggart's position that when there is no underlying or promoted Federal crime of terrorism of any sort, the guideline range of 51 to 63 months is the only one that makes sense.

2. The PSR suggests that if the terrorism adjustment does not apply by its terms, an upward departure may be warranted. (PSR ¶ 96.) Doggart urges the court to decline to depart upward. To do so based on the same factfinding required by the guideline text would replicate serious problems with applying the terrorism adjustment in the first place. The adjustment is greater than necessary to serve sentencing purposes in this and the majority of cases and, if applied based on the specific factfinding required for departure, would result in an as-applied Sixth Amendment violation.

a. The terrorism adjustment is a draconian one-size-fits all increase lacking any empirical basis or ties to § 3553(a). *See* James P. McLoughlin Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Inequality 51, 57-58, 108, 112-15 (2010). As recounted above, it is not the product of the Commission's characteristic institutional role, but the brute implementation of a specific congressional directive—two characteristics that together support

24

downward variances based on courts' evaluation of the § 3553(a) factors. *See Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) (explaining that the Commission's role is to promulgate sentencing guidelines based on empirical evidence and national experience, reflecting advances in human knowledge about criminal justice and no greater than necessary to serve sentencing purposes); 28 U.S.C. § 991(b). As in *Ceasar*, and as the data confirm, courts vary below the steep guideline ranges the adjustment produces for individualized reasons, and also due to its categorical failings, in the large majority of cases to which it most frequently applies. *E.g.*, *United States v. Alhaggagi*, 372 F. Supp. 3d 1005 (N.D. Cal. 2019); *United States v. Muhtorov*, 329 F. Supp. 3d 1289 (D. Colo. 2018); *see* Part B.2, *supra*.

*Alhaggagi*, for example, was decided by Judge Breyer, a current member of the Sentencing Commission who recognizes that guidelines "should be based, above all, on empirical data." *Id.* at 1012. He sets out in detail how the terrorism adjustment's automatic CHC VI is "inappropriate" because it is not tied to the seriousness of the offense and does not reflect empirical risk of recidivism. *Alhaggagi*, 327 F. Supp. 3d at 1013-14. He notes that courts cite no authority when they recite that terrorists are "unique" in their likelihood of reoffending. *Id.* at 1014-15 ("Repetition of that assertion might give it the ring of truth, but does not make it true."). In fact, he noted, the available recidivism data suggests that those with little or no criminal history are not likely to reoffend. *Id.* at 1015. (The terrorism study cited above was released the next month.) "[M]ost importantly," Judge Breyer concluded, "the terrorism enhancement's treatment of criminal history flies in the face of fair, individualized sentencing." *Id.* at 1015-16 (citing and quoting Transcript of Disposition at 69, *United States v. Mehanna*, No. 09-cr-100017 (D. Mass. 2012) (O'Toole, D.J.) (observing that the adjustment is "a fiction," "subversive to the mission of the Guidelines")).

25

Alhaggagi was convicted of attempting to provide material support to a foreign terrorist organization, an actual "federal crime of terrorism" listed in § 2332b(g)(5). Though he had zero criminal history, the terrorism adjustment resulted in a guideline range of 324 to 405 months, achieved only by stacking counts. *Id.* at 1007 n.1, 1008. Judge Breyer departed downward to Alhaggagi's true CHC I due to overrepresentation of criminal history, and imposed a sentence nearly half the bottom of the applicable guideline range. *Id.*

*Muhtorov* reflects a similar rationale and result. Muhtorov was also convicted of providing material support to a foreign terrorist organization, along with other related counts. 329 F. Supp. 3d at 1292. The court acknowledged that his offenses "are serious and his rhetoric is frightening." *Id.* at 1303. It described Muhtorov as an underemployed man with a degree in construction engineering, a "braggart who craved attention and admiration of others," acting on "delusions of grandeur" by channeling his ambition "working as a propagandist and recruiter" for a terrorist organization. *Id.* at 1292, 1303. Notably, the court recognized that these characteristics "ma[de] the resoluteness of his actions and intentions questionable." *Id.* at 1292. While his counsel argued that Muhtorov "did not intend to follow through with his claims or actually support terrorism," Muhtorov himself was not so clear. *Id.* at 1296. Because of the terrorism adjustment, the guideline range was 324 to 405 months, but the court "reject[ed]" the range on the ground that it was "inadequate and illogical as applied to terrorism-related cases and the facts of this case in particular." *Id.* at 1301-02 (referring to *United States v. Jumaev*, 2018 WL 3490886, at *8-13 (D. Colo. 2018)). "In the terrorism context, the basic problem with the Guidelines is the utter vacuity of empirical evidence or facts employed by the Sentencing Commission in forming them." *Id.* at 1302. The court imposed a sentence less than half the bottom of the advisory guideline range.

When courts vary so frequently and so far downward from the guideline range produced by the terrorism adjustment, and in cases involving actual Federal terrorism crimes, an upward departure in the case of Doggart's inchoate, non-terrorism offense strikes as especially inappropriate.

b. Another reason not to depart upward is that the departure would have to be based on the particular factfinding that "the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. § 3A1.4 cmt. (n.4). Any sentence based on this factfinding, to the extent that the factfinding is what makes the sentence substantively reasonable, would violate the Sixth Amendment. Even after *Booker*, "there will inevitably be some constitutional violations under a system of substantive reasonableness review, because there will be some sentences that will be upheld as reasonable only because of the existence of judge-found facts." *Rita v. United States*, 551 U.S. 338, 374 (2007) (Scalia, J., joined by Thomas, J., concurring). The Supreme Court has "not rule[d] out as-applied Sixth Amendment challenges to sentences that would not have been upheld as reasonable on the facts encompassed by the jury verdict or guilty plea," *id.* at 375, so "[t]he door therefore remains open for a defendant to demonstrate that his sentence, whether inside or outside the advisory Guidelines range, would not have been upheld but for the existence of a fact found by the sentencing judge and not by the jury," *Gall v. United States*, 552 U.S. 38, 60 (2007) (Scalia, J., concurring); *United States v. Conatser*, 514 F.3d 508, 530-31 (6th Cir. 2008) (Moore, J., concurring); *see also Jones v. United States*, 135 S. Ct. 8, 8-9 (2014) (Scalia, Ginsburg & Thomas, JJ., dissenting from denial of certiorari) ("It unavoidably follows that any fact necessary to prevent a sentence from being substantively unreasonable—thereby exposing the defendant to the longer sentence—is an element that must be either admitted by the

defendant or found by the jury. It may not be found by a judge."); *United States v. Sabillon-Umana*, 772 F.3d 1328, 1331 (10th Cir. 2014) (Gorsuch, J.) ("It is far from certain whether the Constitution allows" a district judge to "increase a defendant's sentence (within the statutorily authorized range) based on facts the judge finds without the aid of a jury or the defendant's consent.") (citing *Jones*, 135 S. Ct. at 8). Given recent cases like *Boucher* and *Perez-Rodriguez*, discussed in Part B.1, *supra,* and the data presented here, the Sixth Circuit could easily conclude that it would not affirm as substantively reasonable a departure sentence under § 3A1.4 but for the necessary judicial factfinding upon which it was based, and therefore reverse the sentence as an as-applied Sixth Amendment violation.

**D.     The circumstances of the COVID-19 pandemic weigh in favor of a guideline sentence.**

Finally, Doggart continues to have serious medical problems. Since his incarceration, he suffered from a heart attack. He continues to suffer from high cholesterol and heart disease. These illnesses, particularly his heart disease,[11] along with his age,[12] place him at great risk of serious complications or death should he contract Covid-19. According to the Bureau of Prison's website, there have been 213 cases of Covid-19 and eight (8) deaths among inmates at Lexington FMC where Doggart is housed. Despite efforts, the Bureau of Prisons has been unable to prevent the spread of the virus. In fact, a recent study published by Tufts University concluded that one of the reasons that the BOP has had a significant number of deaths is that their general standard of medical treatment is low, resulting in seriously ill people not receiving early enough medical

---

[11] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#serious-heart-conditions.

[12] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

28

intervention, resulting in what otherwise may have been avoidable deaths. *See* Bridget Conley & Matthew Siegel, World Peace Foundation, Tufts Univ. Fletcher School, *96 Deaths in Detention: A View of COVID-19 in the Federal Bureau of Prisons as Captured in Death Notices* (Aug. 26, 2020).[13] This Court previously imposed a term of years less than the statutory maximum, which suggests that it is not this Court's intent that Doggart should die in prison. Accordingly, as circumstances have changed through no fault of Doggart, resulting is a more dangerous situation within the prison, even if this Court were inclined to impose an above-guideline sentence in pre-Covid-19 times, it should now impose a guideline sentence.

**Conclusion**

For all these reasons, this Court should impose a sentence within the guideline range of 51 to 63 months.

Respectfully submitted,

FEDERAL DEFENDER SERVICES OF
  EASTERN TENNESSEE, INC.

By: */s/ Myrlene R. Marsa*
Myrlene R. Marsa, BPR # 016798
Assistant Federal Defender
835 Georgia Avenue, Suite 600
Chattanooga, Tennessee  37402
Myrlene_Marsa@fd.org
(423) 756-4349

By: */s/ Jennifer Niles Coffin*
Jennifer Niles Coffin, BPR # 020703
Assistant Federal Defender
800 South Gay St., Suite 2400
Knoxville, Tennessee 37929
Jennifer_coffin@fd.org
(615) 736-5047

---

[13] Available at https://sites.tufts.edu/wpf/files/2020/08/96-deaths-in-detention-20200827-final.pdf

29