UNITED STATES DISTRICT COURT
EASTERN DISTRICT of TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 1:15-cr-39 |
| v. | ) | |
| | ) | Judge Collier |
| ROBERT DOGGART | ) | |

## RESPONSE TO THE DEFENDANT'S SENTENCING MEMORANDUM BY THE UNITED STATES

COMES NOW the United States of America by and through J. Douglas Overbey, United States Attorney for the Eastern District of Tennessee, Perry H. Piper, Assistant United States Attorney, and Saeed A. Mody, Trial Attorney, and hereby submits this response to the defendant's sentencing memorandum.

The defendant argues that any sentence above 63 months would create unwarranted sentencing disparities, and the Court should consider the Sentencing Commission's online Interactive Data Analyzer to find similar offenses of conviction under 18 U.S.C. § 247. See Defendant's Sentencing Memorandum, R. 344 at 8-9. Section 247 covers such a wide breadth of conduct that comparing sentences under this statute is not the same as finding similar offenses. Section 247(a)(1) alone includes defacing, damaging, or destroying religious property. Defacing a house of worship is not a useful comparison to soliciting others to join in a plan to blow up a mosque and kill women and children. It is for this very reason that U.S.S.G. § 2H1.1 – the section for determining the Base Offense Level for a civil rights offense – explicitly includes a cross-reference provision to "the offense level from the offense guideline applicable to any underlying offense." U.S.S.G. § 2H1.1(a)(1).

The defense's description of the defendant's crime as "unremarkable," "on the low end of seriousness and culpability," and "an inchoate property offense" belies the extensive record the Court has before it. (R. 344 at 6115.) Believing he was speaking to like-minded individuals, the defendant solicited, encouraged, and indeed boasted about blowing up a house of worship and killing indiscriminately. As noted before, the defendant stated, "We're gonna kill and we will be cruel, kill everything…." Exhibit 307-T, p. 36. Referencing his "action teams," the defendant stated they would "just kill, kill everybody, but there's children up there, and I don't want to do, I don't want, I don't want us to do that. Don't want to have to kill children, man. But there's always collateral damage." *Id*. at 45. There were several other examples of the defendant using violent imagery in urging others to action. He stated he had a shotgun which was "a horrible, horrible killing device, it [would] tear a human being in half," an M-4 which was "battle tested to 350 meters," numerous other handguns, over 5000 rounds of ammunition, and tracers. The defendant spoke of using machetes for hand-to-hand combat. At one point, he stated to William Tint, "If we're going to go in there, the guards have to -- whether we're going to have one or two guards, who knows. They've got to be taken out with silencers, and that will give us the distance we need." (R. 289, PageID# 5072.) The reason the defendant was not successful in recruiting individuals and executing his detailed plan was because of the FBI's investigative work to root out homegrown extremists intent on committing acts of violence – like the defendant – before they could carry out such an attack.

By imposing the sentencing enhancement under U.S.S.G. § 3A1.4 previously, this Court recognized that the defendant's crime was both a hate crime and an act of terrorism. It is the defendant's dual motive that distinguishes this case from the other cases the defendant cites. The defendant's plan was bigger than attacking a community and burning down its house of worship.

2

His goal was to terrorize Islamberg *and* to start an insurrection against the government. The Court recognized explicitly the defendant's dual goals at his original sentencing hearing. (R. 293, PageID#: 5445-52, referencing the defendant's desire to incite armed insurrection which "would appear to the Court to be more than sufficient to demonstrate an effort to influence or affect the conduct of the government.") His animus towards a Muslim house of worship is captured in § 2H1.4, but his motive to overthrow the government is not captured in § 2H1.1 or § 2K1.4 (arson). The defendants in *United States v. Grassie*, 237 F.3d 1199 (10th Cir. 2001) and *United States v. Johnson*, 152 F.3d 553 (6th Cir. 1998) had no such additional motive, so § 3A1.4 did not apply. (See R. 344 at 6116-17.) Therefore, these cases are not "comparators" as the defendant suggests.

The defense also suggests this Court look to sentences given in threats cases, but again those offenses were not "calculated to influence or affect the conduct of the government by intimidation or coercion, or to retaliate against government conduct." (R. 344 at 6120-23.) Moreover, those offenses were threats and not inducing and attempting to persuade others to carry out a deadly attack. The defense also cites *United States v. Ceasar*, 388 F. Supp. 3d 194 (E.D.N.Y. 2019), but there the defendant was charged with providing material support to a foreign terrorist organization. R. 344 at 14. This is not a useful metric for comparison.

A similar offense of conviction to the defendant's is *United States v. Allen, Wright, and Stein*, 364 F. Supp. 3d 1234 (D. Kan. 2019). In that case, three members of a militia conspired to blow up an apartment complex in Garden City, Kansas, because the complex was home to a Somali-Muslim community and mosque. *Id* at 1238. Stein was convinced that law enforcement would do nothing to limit Muslims coming into the country, and he planned a preemptive strike to kill Muslims. *Id* at 1239. The members of the militia continued to plan their attack, and Allen hoped a planned manifesto would "trigger [ ] like-minded people across the nation to f*cking stand

3

up and start doing the same thing we're doing – [against] Muslims and the Government." *Id*. Unlike Doggart, who inquired (from Tint) about obtaining explosives but had not yet attempted to procure any, Allen, Wright, and Stein took steps to obtain materials for explosives. The defendants attempted to make homemade explosives and to buy 300 pounds of fertilizer from an undercover federal agent. *Id*. at 1240-41. The defendants were arrested, charged, and convicted of conspiracy to use a weapon of mass destruction, in violation of 18 U.S.C. § 2332a, and conspiracy to interfere with their intended victims' civil rights, in violation of 18 U.S.C. § 241.

In finding that both the hate crime enhancement and domestic terrorism enhancement applied, the district court noted that the objective of the conspiracy could not be "distilled into a single purpose." *Id*. at 1246. The defendants' motive included bringing harm to the Muslim residents of the apartment complex but also to inspire like-minded citizens to engage in similar violent conduct. *Id*. All three defendants were sentenced to at least 300 months imprisonment.

Similarly, the defendant's stated goal in his planned attack on Islamberg was to be a "flashpoint" for an uprising against the United States and to inspire like-minded individuals to overthrow the government. This Court previously found that the defendant intended to solicit others to destroy the Islamberg mosque not just because of its religious character, but also to incite a civil insurrection against the government. (R. 293, PageID# 5452.) The Court noted, for example, the defendant's statement "that the government we have was no longer willing or able to protect its citizens, and that patriots and militias need to rise up and take over the government's responsibilities." (*Id*. at 5451.) The Court also found court that the defendant "was talking about setting in motion an armed insurrection against the government of the United States that would force the government of the United States either to respond to the attacks or to give in and capitulate." (*Id*. at 5452.)

4

Lastly, the defendant argues that "researchers are unanimous that lengthy prison sentences do not deter others." (R. 345, PageID# 6138.) Academicians aside, common sense would dictate that lengthy prison terms would have a deterrent effect, especially in focused and pre-mediated crimes such as the defendant's. The defendant's was not a thoughtless crime: in fact, there was much conversation, recruitment and planning by the defendant. The defendant's theory regarding general deterrence, if it applies at all, probably applies more to crimes of passion, or perhaps, more frequently committed criminal activity such as drug distribution or property theft. Focused crimes, such as the terroristic threats repeated over and over, and solicitation of others to commit those acts, require contemplation. While others who are in the contemplation stages of such crimes learn of the possibility of a lengthy sentence, perhaps they will have time to reflect upon their choices.

The Court did not sentence the defendant based solely on a general deterrence theory. In fact, the Court found that "the most important consideration in this case is *retribution*." (R. 293, PageID# 5534.) (Emphasis added.) There are three general areas to consider in imposing a sentence for the defendant—deterrence, incapacitation, and retribution. The defendant, and others like him, must be deterred. The defendant should be incapacitated. He was a risk before and he remains a risk today. He expressed his desire to kill innocent people. The defendant stated on numerous occasions that he was willing to die for his cause. Worse, he was willing to sacrifice other like-minded individuals for his cause. During the defendant's allocution he did nothing to allay the Court's concerns. In fact, he heightened them. However, in considering retribution as the most important factor, the Court considered the entirety of the evidence presented at trial and sentencing, some good for the defendant but much that was damning, and the Court determined that a sentence of over 19 years was "sufficient but not greater than necessary" to achieve the aims of sentencing.

*Conclusion*

The Court's previous sentence of 235 months captured the harm perpetrated by the defendant. The Court is now limited to 120 months. The fact that a house of worship is small and has insufficient connections to interstate commerce does not preclude the Court from finding that the defendant's conduct is still an act of terrorism. The defendant's motivations and actions remain the same; the government did not meet a jurisdictional element of the vacated count of conviction. Retribution, deterrence and incapacitation are still paramount; an upward departure is warranted under § 3A1.4.

Respectfully submitted,

J. DOUGLAS OVERBEY
United States Attorney

By: s/ Perry H. Piper
Perry H. Piper, BPR #013384
Assistant U.S. Attorney
1110 Market Street, Suite 515
Chattanooga, Tennessee 37402
Perry.Piper@usdoj.gov

By: Saeed A. Mody
Saeed A. Mody, NY # 4368080
Trial Attorney
Civil Rights Division

.